## INTRODUCTION

Kailin Wang comes before this Court for sentencing following her September 30, 2025 guilty plea to two counts of cyberstalking under 18 U.S.C. § 2261A, pursuant to a Rule 11(c)(1)(C) agreement with a stipulated sentencing range of five years' probation to twelve months' imprisonment. (Dkt. 89.) She is 43 years old. She is a first-time felony offender — before this prosecution, she did not have so much as a misdemeanor conviction on her record. And in the seven years leading to this moment, she has, quite literally, lost everything. Her career lies in ruins. Her financial security is gone. Her freedom has been sharply curtailed. And her only child — the son she carried alone for nine months, delivered alone, and fought for across three states and an ocean — has been taken from her. The last time she held him, he called her "my DNA Mommy." That was May 17, 2024. She has not been permitted to see or speak to him since. (Volume 2_October 2022 through Present; pp. 330-335 ) On February 23, 2026, a Danish court stripped her of all contact: no visits, no video calls, no letters, no phone calls. It went further still, extinguishing even her statutory right to receive information about her son's welfare To understand how this came to be, the Court must understand how it began.

On March 6, 2019, Judge Darwin of the San Francisco Superior Court entered an ex parte interim custody order granting CT (V1) sole legal and physical custody of the parties' three-and-a-half-month-old infant — a child whom CT (V1) had never visited, never financially supported, and never once inquired about since the day of his birth. (Volume 1_February 2018 through October 2022 ;  pp. 28, 114-168)

FDV-19-814465

███████████████████ VS. KAILIN WANG

**MINI MINUTES FOR MAR-06-2019 08:30 AM FO**

(404) 3/6/2019
Judge: Richard Darwin                    Clerk: Sadie Li
Reporter: Vicki Gross #5525              Bailiff: Deputy Anasse

Petitioner present with Darrick Chase and Erica Jahnstone. Respondent not served and not present. Petitioner's oral motion to substitute service via email or via Respondent's parents' home address - DENIED. Personal service is required for restraining order requests.
Petitioner's request to continue hearing and modify temporary restraining order - granted. Petitioner granted temporary sole legal and physical custody of minor child, ████████████████ (DOB ███/18). The mother shall receive no visitations till further orders of the Court.
Court signed Amended DV-110 Temporary Restraining Order and DV-116 Order on Request to Continue Hearing. File endorsed copies provided to counsel.
Matter continued to 4/10/19 at 8:30am in Dept. 404 for Domestic Violence Restraining Order Hearing. Court finds good cause to continue matter beyond 21 days.

1

Ms. Wang was listed on the court record as "Not Present, and Not Served." No evidentiary hearing was held. The order authorized the infant's immediate separation from his mother and removal from the only home he had ever known. Judge Darwin himself later acknowledged that the order had been entered on wholly one-sided information. That same day — hours after the ink dried on a custody order issued without Ms. Wang's knowledge or presence — CT (V1), accompanied by his legal team and family associates, flew to Utah and physically removed the child from the Wang home. The father who had contributed nothing to his son's first months of life — not a visit, not a dollar, not a phone call — departed Utah that evening with the infant in his arms. . (Volume 1_February 2018 through October 2022 ; pp. 28, 114-168)

For the seven years that followed, Ms. Wang did what mothers do: she showed up. She made hundreds of trips from Utah to California — by car, by plane, across 2,000 miles each way — for court-ordered supervised visits that lasted one to two hours, twice a month. She bore one hundred percent of the travel costs herself. In seven years of supervised visitation, she did not miss a single visit. The professional record assembled by Rally Supervised Visitation, Terra Firma, and ACAFS — covering more than 200 documented visits — is replete with reports attesting to the bond between mother and son: consistent, age-appropriate, joyful interactions, with zero safety violations across the entire period. 2019-06-25 to 05-17-24 Over 265 SUPERVISED VISITS

Every time CT (V1) moved to terminate all contact, the courts rejected him. He lost on the abduction-risk claim. He lost on the suspension of in-person visits. He lost on his first motion to terminate California's jurisdiction. He lost every time — until the third criminal prosecution made it impossible for Ms. Wang to fight back before the child was gone. 2025-07-15 Number of times CT (V1) filed for Termination of all forms of visitation

The pattern had run twice before without achieving its ultimate objective. In October 2019, the day before a critical Utah UCCJEA hearing that was poised to send the custody case to a forum more protective of Ms. Wang's parental rights, she was arrested outside a supervised visitation center in San Francisco on a $750,000 bond. Utah declined

jurisdiction the next morning — with her booking report entered as Exhibit A — and the window closed. (Volume 1_February 2018 through October 2022 ;  pp. 268-279)

In 2024, the San Francisco Superior Court had scheduled a June 11, 2024 hearing to finalize an international visitation framework requiring CT (V1) to fund and facilitate Ms. Wang's contact with their son in Denmark. Volume 2_October 2022 through Present; pp. 319-348) Six days before the 6/11/24 hearing, on 5/8/24 a federal grand jury returned an indictment — signed by AUSA Jennifer Kerkhoff Muyskens, who has since been formally disciplined for professional misconduct and resigned — recharging conduct that had already been prosecuted twice before. Ms. Wang was detained on May 23, 2024. On June 3, 2024, CT (V1) left the United States with the child.

This Court shall retain its jurisdiction under the UCCJEA.

2.  **Ongoing Visitation Pending Evidentiary Hearing Regarding Request for Termination of Visitation and the Newly Filed Request for Child Custody and Rebuttal of the 3044 Presumption.**

Mother shall continue to have therapeutic sessions with Rally as ordered by this Court. Father shall be responsible for having the child travel every other month to the Bay Area for visitation. Alternatively, at Father's discretion, Father shall arrange for supervised therapeutic sessions with an authorized provider in Denmark so Mother can have supervised therapeutic visitation every other month. Additionally, Father shall provide this Court with authorized professional providers for approval by this court. In the months where there is no in person visitation, Father shall also arrange for the retention of authorized professional supervisors in Denmark to set up twice monthly supervised video visitation.

The Court will hold a review hearing on Tuesday, June 11, 2024 at 9:00 AM in Dept. 403 to confirm and order the visitation schedule. Father shall file and serve his proposals reflecting the foregoing visitation orders ten days in advance.  Mother shall file and serve her response declaration five days in advance of the hearing. Neither brief is to be more than ten pages. Both parties shall file and serve updated

3

The June 11, 2024 confirmation of international visitation in Denmark never happened. Shortly after Wang was federally detained, CT (V1) moved to terminate California's jurisdiction entirely, urging the family court to send the case to Denmark as the more convenient forum — and simultaneously extended a written invitation for Ms. Wang to open custody proceedings there. What he did not disclose was that he would tell the San Francisco criminal court the precise opposite: that the Unified Family Court in San Francisco "required" retention of Ms. Wang's passport because of the family law litigation, and that there was "no reason to transfer the passport to a court that has no connection to the Unified Family Court in San Francisco." In family court: Denmark should decide the case. In criminal court: the case belongs in San Francisco and the passport must stay. The result was a closed loop — Ms. Wang could neither litigate in California, from which she had been expelled, nor appear in Denmark, to which she had been invited but from which she was barred. The invitation was extended; the door was locked. Volume 2_October 2022 through Present; pp. 382-388, 430, 452-460)

Ms. Wang does not come before this Court to excuse her conduct. She has acknowledged it plainly and repeatedly — in federal court, in Utah, and in California. What she asks is only what any defendant is entitled to ask: that this Court consider the full context of her conduct before deciding her fate. Three separate prosecutorial offices — federal, California State, and Utah State — have reviewed the complete record, litigated this matter for years, and arrived at the same conclusion: this plea is the appropriate resolution. 2025-11-03 Utah v. Wang 211100167-Emails w/Jared Perkins Plea Negotiations

The global plea agreement, negotiated over many months, reflects a collective prosecutorial judgment that the September 30, 2025 Rule 11(c)(1)(C) agreement — with its stipulated sentencing range of five years' probation to twelve months' imprisonment — is a reasonable and just outcome. If the Court does not accept this agreement, the parties will instead face three full trials in three jurisdictions: the California stalking case, which required five days merely for the preliminary hearing and carries an estimated two-month trial; the reinstated Utah state subpoena case; and a federal trial in this District that would almost certainly require more than the five days previously estimated by former AUSA

4

Jennifer Kerkhoff Muyskens — a prosecutor who has since been formally disciplined and found to have committed professional misconduct in a multi-day disciplinary proceeding. The California matter is, in all material respects, identical to the conduct charged here, with the exception of three "IC3" communications that Ms. Wang admitted were "harassing" solely because AUSA Joey Blanch made that admission a non-negotiable condition of the global resolution. As a compromise, the government agreed to withdraw the words "defamatory" and "false," as the underlying reports are not false. Ms. Wang has never conceded that the IC3 complaints were false and continues to maintain that every allegation in them was true. ==2025-09-15 to 09-25-25 USA v. Wang Plea emails and Drafts of 3 Plea Versions==



**Plea Draft  Revisions in Black is what Wang will admit to.**

*In order to harass and intimidate Victim 2* [redacted], *I used multiple social media accounts and phone numbers to send numerous messages, texts, and other communications **directly** to him.* ←—I did not post anything related to [redacted] Stone's family, nor am I aware of any allegation to that effect. Happy to plead if the prosecutor can show evidence to the contrary.



Ms. Wang's decision to accept the plea agreement reflected a sober assessment of the practical realities she faced. Her counsel advised her that AUSA Blanch had communicated that the plea terms would only worsen from that point forward, and that she would file her stayed motion to revoke pretrial release if negotiations failed. Ms. Wang has been simultaneously managing three pending prosecutions across three jurisdictions for the past seven years — eight years, and four prosecutions for the same conduct, when the V2 matter is included — all while under intensive pretrial supervision with limited resources. Proceeding through three complex, simultaneous federal and state trials — represented only by an overworked public defender stretched across a crushing caseload, in a system where defendants without dedicated counsel fare catastrophically worse — was not a realistic path. The global plea was, in her judgment and her counsel's,

the least harmful resolution available, not a concession that the IC3 reports were fabricated or made in bad faith.

**The question the Court must confront honestly is this:** what was Ms. Wang supposed to do?

Reject the plea, antagonize the federal government, and gamble her freedom across three simultaneous trials — in three jurisdictions, represented only by an overworked public defender stretched across a crushing caseload, and without resources — on the hope that a jury would vindicate her? She was not facing one formidable adversary. She was facing two. On one side stood the full prosecutorial power of the United States government. On the other stood CT (V1) — a multimillionaire who has deployed, by documented count, no fewer than 31 known attorneys, expert witnesses, and private investigators against Ms. Wang across these proceedings. (2025-04-22 CT (V1)'s 31 known Attorneys, Experts, Private Investigators)

His legal army includes California Super Lawyers billing at $800 per hour; a Board-Certified Family Law and Appellate Specialist who has litigated this matter continuously since June 2019; an internet attorney who previously served on then-Attorney General Kamala Harris's Task Force Against Cyber Exploitation; a former United States Secret Service agent engaged as a cybersecurity expert at $700 per hour; a retired FBI profiler charging $8,000 per day; Dr. J. Reid Meloy, Ph.D., ABPP — a forensic psychologist who has authored over 250 peer-reviewed articles and consulted for the FBI's Behavioral Analysis Unit at Quantico, commanding $10,000 per day, and who was the prosecution's expert in the Timothy Masters wrongful-conviction case, where the same methodology of profiling from adversarially assembled documents without a direct clinical interview contributed to an innocent teenager serving nearly ten years in prison before DNA exonerated him; and a Danish attorney coordinating proceedings abroad. (2025-04-22 CT (V1)'s 31 known Attorneys, Experts, Private Investigators)

This is not a legal team. It is a legal apparatus — one that has been methodically deployed across multiple courts, multiple states, and multiple countries, for multiple years, with virtually unlimited resources. Ms. Wang, by contrast, had a public defender.

That is not a fair fight. That is not even close to a fair fight. And yet the law expected her to wage it — simultaneously, across three courts, in three states — or accept the terms she was offered. That is not a choice the law should demand of anyone. (2025-04-22 CT (V1)'s 31 known Attorneys, Experts, Private Investigators)

**The alternative was not merely inconvenient;** it was catastrophic in its potential consequences. The same U.S. Attorney's Office that prosecuted Ms. Wang recently secured a 579-month sentence against Brent Richard Johnson for producing and possessing child sexual abuse material. Ms. Wang is not Brent Johnson. She is not remotely comparable to Brent Johnson. Yet the machinery of federal prosecution is the same, the stakes of losing at trial are the same, and the sentencing exposure of a convicted defendant who forces the government to trial is always greater than that of one who accepts responsibility. Ms. Wang accepted the plea not because she was guilty of fabricating anything, but because she was a rational person who understood that defying the government's terms risked trading a negotiated resolution for the full weight of federal prosecutorial power — a weight that has crushed far more culpable defendants than her.

This context does not undermine the voluntariness of her plea. It explains why a defendant who maintains the underlying truth of her IC3 allegations nonetheless chose, rationally and deliberately, to accept responsibility for the harassing manner of her communications rather than risk the consequences of three trials. The Court should recognize that distinction when evaluating the weight to assign any argument that the IC3 reports were knowingly false.

> **As AUSA Blanch acknowledged on the record***: "We're talking about a defendant who has already pled guilty and is facing significant prison time. I know, under some of the cases that the Court is familiar with and that I have prosecuted, 12 months is not a significant amount of time. But it is a significant amount of time for Ms. Wang. She has never spent significant time in custody before. She spent approximately 41 days in custody. This is a plea agreement that has been heavily negotiated and that she seems to regret. She doesn't think that she deserves any time in custody."* 1/12/26 Tr. 38:16–24.

8

That assessment is accurate in light of AUSA Blanch's typical prosecutions, which include, for example, the recent case of Brent Richard Johnson, 52, of Cedar Hills, Utah, who was sentenced to 579 months' imprisonment and a lifetime of supervised release after producing and possessing a sexually explicit video of a 10-year-old girl. AUSA Joey L. Blanch of the U.S. Attorney's Office for the District of Utah prosecuted that case. https://www.justice.gov/usao-ut/pr/serial-sex-offender-sentenced-48-years-prison The contrast is instructive not to minimize Ms. Wang's conduct, but to illuminate its true place on the spectrum of federal criminal culpability. Ms. Wang filed complaint reports. Mr. Johnson sexually abused a child. That these two matters were handled by the same office, under the same federal criminal statutes, underscores how critical it is that this Court exercise its independent judgment at sentencing and impose a punishment proportionate to what Ms. Wang actually did — not to the worst-case outcome she wisely chose to avoid.

Should the Court determine that probation alone is insufficient, Ms. Wang respectfully requests a brief custodial sentence of three to six months, designation to FPC Bryan (Bryan, Texas), and voluntary self-surrender within 60 to 90 days. Ms. Wang notes that FCI Dublin — previously among the federal female facilities — was permanently closed by the Bureau of Prisons in December 2024 following a systemic sexual abuse scandal that resulted in ten criminal charges against correctional staff and a $116 million government settlement. FPC Bryan remains the appropriate minimum-security female facility designation for a short-term sentence. The requested 60-to-90-day self-surrender period is consistent with—and in fact more conservative than—this Court's own prior practice. In United States v. Rust, No. 2:19-cr-00164-TS (D. Utah), this Court granted a convicted money-laundering defendant a self-surrender period of nearly two months, later extended to nearly four months, following sentencing. And in United States v. Alvarez, No. 2:21-cr-00111-HCN (D. Utah), the same U.S. Attorney's Office that is prosecuting Ms. Wang accepted a seven-week self-surrender period in a cyberstalking case under the identical statute, 18 U.S.C. § 2261A, after the court conducted the individualized analysis required by 18 U.S.C. § 3143(a). Ms. Wang has been fully compliant with all conditions of home confinement and GPS monitoring since July 2024. This Court and Magistrate Judge Oberg have both already found on the record that she does not present a serious risk

of flight. A self-surrender period of 60 to 90 days is warranted by this Court's own precedent, the same Office's prior practice in an analogous case, and Ms. Wang's unbroken compliance record. One further consideration bears emphasis regarding sentence structure. The Rule 11(c)(1)(C) agreement caps the maximum custodial term at twelve months. A flat twelve-month sentence carries no good-time credit, because the federal good-time statute, 18 U.S.C. § 3624(b), applies only to a "term of imprisonment" of more than one year. If the Court nonetheless elects to impose the maximum custodial term, Ms. Wang respectfully requests a sentence functionally equivalent to twelve months and one day, rather than a flat twelve months. A sentence of twelve months and one day is eligible for good-time credit and, when combined with the 41-day credit for pretrial detention, would yield an effective term of approximately nine months, assuming full good-time credit. By contrast, a flat twelve-month sentence must be served day-for-day, resulting in a meaningfully longer period of actual incarceration than the marginally longer nominal term. A sentence of twelve months and one day is therefore both more proportionate and more consistent with the treatment of similarly situated defendants in other federal cases where a court imposes a nominal twelve-month custodial term.

For the reasons set forth above, this Court should honor that collective prosecutorial judgment and impose a sentence of five years' probation or a term of home confinement — or, if imprisonment is deemed necessary, a custodial term of three to six months, with 41 days' credit for time served, at the lower end of the stipulated range.

## BACKGROUND

*I. Ms. Wang's Personal History and Character*

### A. Life Before This Case

Kailin Wang, now 43, was born in 1983 to Chinese immigrant parents who arrived in the United States with almost nothing and worked long hours in blue-collar jobs to provide for their family. Ms. Wang earned her Bachelor's degree in Accounting from Utah Valley University in 2016 and built a steady professional career — working in tax at Extra Space Storage, then Forever 21 Corporate in Los Angeles, with KPMG in Salt Lake City,

and ultimately on assignment for Goldman Sachs in Jersey City. She was simultaneously pursuing her CPA licensure, having already passed the Taxation section. Before the events of this case, she had no adult criminal convictions — neither misdemeanor nor felony.

In early 2018, at age 35, she traveled to San Francisco to explore potential employment opportunities and to vacation. It was there, on Valentine's Day — February 14, 2018 — that she connected with C.T. on Tinder.

TIMELINE AND CONTEXT

The following timeline is offered not to relitigate the custody dispute, but to situate Ms. Wang's conduct within the events that precipitated it — evidence directly relevant to the nature and circumstances of the offense under 18 U.S.C. § 3553(a)(1).

### February 2018

Ms. Wang matched with C.T. on Tinder while visiting San Francisco. C.T. initiated all communications. They met in person twice: on February 28 and March 4.

### June 2018

Ms. Wang discovered she was pregnant and informed C.T. the same day. While she initially contemplated an abortion, when she asked for more time to consider the decision, C.T. immediately pressured her to terminate — threatening a "bad ending" if she did not comply.

On June 20, 2018, by his own later sworn admission, C.T. became unable to eat, sleep, or work due to pregnancy-related stress.

On June 24, 2018, after Ms. Wang decided to continue the pregnancy, C.T. texted:

> **C.T.:** *"The longer you wait the harder it's going to be to pull the trigger… this will not play out favorably for anyone. Guaranteed."*

C.T.'s father, A.T., was then CEO of a Fortune 500 company earning $85M+ in annual compensation per SEC filings. C.T. knew precisely what resources stood behind that guarantee.

### November 26, 2018

Ms. Wang delivered K.W. in Utah. C.T. knew the due date. He did not appear, call, text, or inquire about the birth. Instead, he blocked Ms. Wang on social media.

### December 5, 2018

11

Ms. Wang emailed C.T.'s parents — A.T. (former President of Google Americas, then CEO of DocuSign) and T.T. (Menlo Park school board member) — sharing photos of their grandchild and requesting help facilitating communication with C.T. Both immediately blocked her.

### December 24, 2018

Only after C.T. and his entire family had blocked all communication did Ms. Wang publish her first post on Medium describing her experience. This date is undisputed by V1 as the origin of the alleged harassing posts. Every post that followed was a direct response to being blocked; no post, harassing conduct, text, or communication of any kind predates December 24, 2018.

### January 3, 2019

In California child support proceedings, C.T. filed a response denying paternity and requesting a court-ordered genetic test.

### February 11, 2019

DNA results from the Los Angeles DCSS confirmed C.T. was the father. Ms. Wang emailed the results to his attorney, Darrick Chase. No response was received.

### February 13, 2019

A.T. (C.T. 's Tech CEO father) filed a police report with SFPD. The report itself noted that Ms. Wang had made no threats and had requested nothing from anyone.

### February 15, 2019

Two days later, C.T. filed for a domestic violence restraining order, sole custody, and zero visitation in San Francisco Superior Court — despite having never met the child — based solely on Ms. Wang's blog posts. The court granted a temporary restraining order but denied sole custody and zero visitation pending a hearing set for March 6, 2019.

### February 20, 2019

Upon learning that Ms. Wang was in New York filing for child support and a protective order, A.T. directed agents to escalate harassment of her family in Utah. This included falsely accusing her father of possessing a firearm at work and pursuing her elderly parents — who had the three-month-old baby in the car — for 40 minutes across multiple Utah cities in a black Dodge Charger. The chase was captured on video. Randall Wang's Fathers HR-Melissa Todd-Car Chase.pdf

Letters and affidavits from her father's employer and a family friend documented the terror that C.T.'s agents — who had camped outside the Wang home in Spanish Fork, Utah — inflicted on the family.

### March 6, 2019 — Three Critical Events

Three coordinated events unfolded on this single day:

- **8:00 a.m. PST** — An anonymous post appeared on Holysmoke.org under the alias "Kailin Wang," threatening a murder-suicide over unpaid child support.
- **8:30 a.m. PST** — An ex parte hearing was held in San Francisco Superior Court. Ms. Wang was not present and had not been served. Based solely on C.T.'s declarations, the court issued an emergency order granting C.T. temporary sole legal and physical custody with zero visitation for Ms. Wang. Judge Darwin explicitly noted: "There's been no evidence, there has not been an evidentiary proceeding… I am not making any findings."

**2:12 p.m. MST** — **Mark Brenzinger,** a clinical forensic psychologist employed by Hillard Heintze[1] retained by C.T.'s family — called Utah Valley 911 to request a welfare check based on the "Kill Baby K" post.

That same day, C.T. flew to Utah and enlisted **Salem, Utah DCFS** to forcibly remove the infant from the Wang home, relying entirely on the anonymous March 6, 2019 "Kill Baby K" post.

**March 9, 2019** In the Utah CPS report dated March 9, 2019, at 12:00 p.m., paternal grandmother TT emailed Utah County DCFS social worker Robbie Adams, stating: "Baby and Daddy are both doing very well, and they are totally in love with each other. We are staying at the home of some friends in Park City through the hearing on Tuesday, and will then fly home with baby Tuesday evening." TT reported that CT's lawyer had spoken with someone high in the **State Attorney's office — Gary Lee Bell,** former Assistant Utah Attorney General, who was later convicted as a child pedophile — to understand the shelter hearing process. She expressed confidence it would go smoothly, dismissing threats from Wang's attorney: "The Wangs have apparently hired an attorney who is making lots of threats, but we've got the facts on our side, so that will go nowhere."

**TT continued: "I don't fear the longer-term custody process either, given the facts in the case and also given that San Francisco PD expects the DA will be pressing felony charges against Ms. Wang very soon. I expect that CT will retain sole physical and legal custody of his son forever."** She concluded by noting her husband (AT) was flying in for the Tuesday 2:40 p.m. hearing.

## March 8, 2019

San Francisco police executed a search warrant on the March 6 post. The results demolished the IP-based attribution theory: Cloudflare Trust & Safety confirmed in writing (May 2019) that HolySmoke.org "was logging the wrong IP addresses" and that no user-identifying data could be produced. T-Mobile CSLI placed Wang's phone at 65 West 70th Street, New York, NY continuously throughout all of March 6, 2019. Law enforcement expressly concluded it was "not possible" that Wang made the post. SFPD's own investigator told Wang's attorney in May 2019 that "IP addresses are spoofed" and the post could not be proven to be Wang's — and when the arrest warrant was filed seven months later, the Kill Baby K post was excluded from all eleven counts. (PSR Obj. App. ¶¶ 36–38, Exhs. I, K, N, P, R.)

### May 8, 2019

At a hearing before Judge Darwin in Case No. FDV-19-814465, C.T. objected to supervised visitation and requested no visitation whatsoever. Judge Darwin, still crediting C.T.'s account, set an evidentiary hearing for June 25, 2019 to determine whether Utah or California had jurisdiction over custody and visitation.

### June 10, 2019

Fourteen days before the evidentiary hearing, C.T. secretly applied for a new passport for the child and attempted to travel to Denmark without court approval — in direct violation of California Family Code §§ 2040 and 3063, which prohibit both applying for a new passport and traveling outside California without authorization when a party holds temporary custody.

This constituted an actual act of attempted abduction. Fortunately, because C.T. had failed to appear at the birth in Utah and Ms. Wang had delivered alone, he was never listed on the birth certificate and was denied by the court permission to be added until five years later, in May 2024.

### June 25, 2019

At the evidentiary hearing, Judge Darwin acknowledged that his March 6 order had been issued on one-sided evidence and that California lacked jurisdiction over custody and visitation. He transferred those matters to Utah, modified custody to include supervised visitation, and ordered C.T. to pay 100% of supervision costs. A Utah hearing was subsequently scheduled for October 18, 2019.

### October 17, 2019

The day before the critical Utah UCCJEA jurisdiction hearing, C.T. had Ms. Wang arrested at Saint Francis Memorial Hospital, moments before a court-ordered supervised visitation session. C.T. sought a bond of $750,000. The Rally caseworker documented C.T.'s reaction when told the visit was cancelled due to the arrest:

> **C.T.:** *"Fantastic; I'll turn around right now."*

### October 18, 2019

Utah declined UCCJEA jurisdiction — a direct result of Ms. Wang's arrest the prior day. C.T.'s Utah attorneys submitted the San Francisco Sheriff's inmate report as an attachment and asked the Utah court to decline jurisdiction and return the case to California.

### October 23, 2019

In People v. Wang, Case No. 19016407, C.T.'s civil attorney, Douglas Rappaport, argued in open court (10/23/19 People v. Wang Case no. 19016407 Reporter's Transcript, p. 3):

**MR. RAPPAPORT:** *"Your Honor, there is an issue as it relates to conditions of her release. We're asking that she surrender her passport in this particular case. The reason being there is an open visa to China, and it's good for ten years… the family court has determined that there is a child abduction risk here… we simply ask the court to confiscate her passport."*

### November 6, 2019

Eight months after the Holysmoke post, Utah DCFS reversed its finding from "Supported" to "Unsupported," formally determining that Ms. Wang had not posted the murder-suicide threat. The reversal followed Cloudflare's written confirmation that HolySmoke.org had been logging incorrect IP addresses and that the Kill Baby K IP (108.162.219.228) could not be attributed to any individual user. By that point, K.W. had been absent from his mother's life for eight months, and Ms. Wang had already been arrested on a $750,000 bond on other charges — while the post that triggered his removal was forensically unattributable to her. (PSR Obj. App., Exh. I, K.)

### June 22, 2020

C.T.'s civil attorney, Douglas Rappaport, wrote to San Francisco ADA Donald du Bain advising that a perjury conviction would serve as:

**Rappaport:** *"the scarlet letter that is needed to ensure that future victims, prosecutors, and judges understand who they are dealing with."*

A family law attorney was directly instructing a criminal prosecutor on charging strategy — strategy expressly designed to benefit his client in an active custody dispute.

### 2019 – 2024

Ms. Wang fought for visitation in San Francisco Family Court — largely self-represented — against a multi-attorney team funded by A.T. Supervision reports from Rally, Terra Firma, and ACAFS, covering more than 200 visits, documented zero abduction attempts, zero safety violations, and consistently positive, age-appropriate interactions between Ms. Wang and her son.

**The period between 2021 and 2024 reveals a recurring pattern:** at each critical custody juncture, a criminal proceeding was activated or escalated and then used in family court to erode or eliminate Ms. Wang's contact with her son. **In each of the first two instances, courts ultimately corrected the result. In the third, the intervention was final.**

### July 16–19, 2021

On July 16, 2021 C.T.'s attorney Darrick Chase emailed Ms. Wang notifying her that an ex parte hearing had been scheduled for July 19, 2021 at 1:30 PM in Department 405. C.T. sought temporary emergency orders to suspend all in-person supervised visitation at Rally and replace it with video-only contact through ACAFS

in Utah, citing a purported heightened child abduction risk. CT's Unlawful Surveillance (1).pdf

At the July 19, 2021 hearing, attorney Douglas Rappaport told the court that "within a week of filing the Ex Parte request," they had received a sworn statement from a law enforcement officer — obtained in connection with a search warrant on Ms. Wang's home and electronic devices in Utah — stating there appeared to be an abduction risk. The search warrant was issued based on the Utah subpoena-related investigation. Rappaport used that law enforcement affidavit — obtained three days before the Utah charges were even formally filed — as the evidentiary foundation to suspend all in-person visitation with Ms. Wang's son.

What Rappaport omitted was that he himself had supplied the very information he was now laundering through law enforcement: Sergeant Hales's incident report and search-warrant affidavit expressly identify Rappaport as the source of the "new fraudulent subpoena" and the two private-security statements, all transmitted to Utah authorities by Rappaport, which were then repackaged as a sworn "possible threat of abduction of Child" in paragraph 10 of the affidavit. ([pp. 7 of 12] of the 2021-03-01 Sgt. Hales-Police Report-Rappaports False Abduction Info.pdf)

Rappaport then presented that law-enforcement affidavit — obtained three days before the Utah charges were even formally filed — as if it were independent proof of danger, and used it as the evidentiary foundation to suspend all in-person visitation with Ms. Wang's son. Utah Sheriff's Sergeant Richard Hales later completed a full forensic search of the seized devices, found no evidence of any abduction plot, and returned all property to Ms. Wang's counsel on October 19, 2021, confirming that the "abduction risk" Rappaport had funneled through the warrant process was unsupported by the underlying evidence.

## July 23, 2021

Three days after the ex parte family court hearing, the Utah County DA charged Ms. Wang with fourteen felonies in State v. Wang, Case No. 211100167: twelve counts of felony forgery, one count of second-degree felony perjury (filed February 10, 2021[Dkt. 100; Exhibit-J]), and one count of felony communications fraud. The charges arose from Ms. Wang's reuse of prior court-stamped subpoena forms in discovery proceedings in which Judge Low had already granted her explicit discovery authority — conduct that the same Utah County Attorney's Office would eventually resolve, after years of litigation, to two misdemeanors with all felony forgery counts dismissed. (Dkt. 100; Exhibit K)

## July 29–30, 2021

Ten days after the ex parte hearing, Rappaport returned to the San Francisco Family Court and made the premise of the strategy explicit. He argued: "When is it appropriate — you know, assuming she's going to go to prison here. You know, assuming she is, you know, is prosecuted and the feds don't pick this case up

16

because of the interstate jurisdiction. When is — when is the exit strategy here for her? We don't know, but she's certainly planning it. She's plotting it. It's for those reasons that we're asking the Court to modify the visitation." (7/29/21 RT 39:23–40:4.)

On July 30, 2021, Judge Wiley issued an order terminating all in-person visitation and substituting video-only contact through ACAFS pending further order.

### August 18 – September 13, 2021

Ms. Wang filed a pro se interlocutory writ petition with the California Court of Appeal (Case No. A163278) on August 18, 2021. On September 13, 2021, the Court of Appeal issued an alternative writ finding that the San Francisco Superior Court had failed to make the statutorily required findings under Family Code §§ 3048(b)(2) and 3031(c) before terminating in-person visitation. The court ordered the superior court to either hold a new hearing considering protective measures and the child's best interests, or show cause why a peremptory writ should not issue. This appellate rebuke of the July 30, 2021 termination order required a five-day evidentiary hearing spanning October 22, 2021 through January 5, 2022.

### October 19, 2021

Utah County Sheriff's Office Sergeant Richard Hales completed his examination of all electronic devices seized pursuant to the June 1, 2021 search warrant — the same search warrant whose supporting affidavit Rappaport had presented to the San Francisco Family Court as proof of abduction risk. After a full forensic review, Sergeant Hales found no evidence of any plan to abduct the child and returned all seized property to Ms. Wang's public defender. The predicate for terminating in-person visitation had produced zero corroborating evidence.

### November 15, 2021

The California Court of Appeal issued a published opinion in *C.T. v. K.W.*, 71 Cal. App. 5th 679 (2021) (Justice Stuart Pollak), reversing Judge Wiley's denial of attorney fees and remanding under Family Code § 7605(a). The court found that the domestic violence action had "become the proceeding in which custody of the parties' son is being determined" and that Ms. Wang — "proceeding in propria persona" and "unable to afford counsel" — was facing "a well-financed effort to deprive her of custody and visitation of her son." The opinion constitutes a published appellate recognition of the power imbalance that defined this entire proceeding.

### February 2, 2022

Following five days of evidentiary hearings on remand from the Court of Appeal writ, Judge Wiley reinstated supervised in-person visitation, finding that continued suspension was not in the child's best interests. The court found that the child was bonded to his mother and that visitation reports from Rally, Terra Firma, and ACAFS had consistently documented appropriate, age-appropriate interactions with zero safety violations. C.T.'s abduction risk claim — the claim used to obtain

suspension of in-person visits the prior July — was rejected after full evidentiary scrutiny. (Dkt. 96-4)The order increased Ms. Wang's visitation by 250% over the pre-suspension baseline, with supervised in-person visits twice monthly at Rally and weekly video visits through ACAFS.

### February 29, 2024

C.T. filed another ex parte motion to terminate all visitation — months after an identical request had been denied by Judge Darwin, the same judge who had originally granted C.T. ex parte sole custody of a child he had never met and had sought to abort, before partially reversing himself on June 25, 2019.

### March 2 & 9, 2024

Without prior notice, C.T. failed to appear for two consecutive court-ordered interstate visitation sessions, after having required the Wang family to travel from Utah to California on multiple occasions. 2024_03:03:24_Emails Re CT No Notice No Show Menlo Park PD.pdf

### April 9, 2024

C.T. filed for an international move-away to Denmark and sought termination of California's jurisdiction and of all forms of visitation.

**May 2, 2024**: Judge Roeca granted C.T.'s move to Denmark, with ongoing international visitation pending an evidentiary hearing. C.T. was ordered to facilitate in-person visitation in the Bay Area every other month, or supervised visitation in Denmark as an alternative, with twice-monthly supervised video visitation during periods when in-person visits did not occur. Fees were to be allocated based on the parties' respective incomes.

**May 8, 2024**: Six days after C.T. failed to obtain a full termination of visitation, Ms. Wang was indicted by a federal grand jury. The case was prosecuted by AUSA Jennifer Kerkhoff Muyskens, who has since been charged by the DC Office of Disciplinary Counsel with professional misconduct — including allegations of altering and concealing evidence and presenting fraudulent evidence. Muyskens subsequently resigned from her position as a federal prosecutor in Utah.

**May 10, 2024**: San Francisco prosecutor Donald du Bain moved to amend the 2019 criminal complaint to add new misdemeanor charges and seek Ms. Wang's detention based on: (1) a March 2, 2024 welfare check call; (2) an April 9, 2024 post about C.T.'s move to Denmark that mentioned the minor's name; and (3) C.T.'s false claim that Ms. Wang's April 12, 2024 filing improperly disclosed his $5.2 million anonymously held property. Contrary to C.T.'s assertion, the LLC address cited by Ms. Wang was neither private nor confidential; it appeared in publicly available records with the identifying parties' names and was used solely to establish C.T.'s continuing California contacts —

not to obtain his personal address, which Ms. Wang has known for six years without ever visiting.[2]

**May 17, 2024**: The last supervised visit took place. The child arrived wearing a face mask, said "Boo Boo," and together they made sushi, completed puzzles, played foosball, and read Green Eggs and Ham. When Ms. Wang asked, "Am I your Mommy?" her son answered: "You are my DNA Mommy." When the visit ended, he hugged her.

**May 23, 2024**: Ms. Wang was federally detained in Utah. The federal indictment charged the same conduct already pending in California — using the same evidence from December 2018 through March 2019 involving V1 — and added conduct from September through November 2017 involving WS, plus May 2019 IC3 complaints involving V2. Ms. Wang continues to assert that those IC3 complaints were truthful, while V1 and V2 maintain they were harassing.

**June 3, 2024**: C.T. moved to Denmark with the child.

**July 3, 2024**: Following an appeal to U.S. District Judge Ted Stewart, a federal judge ordered Ms. Wang's release from the Utah jail, effective July 10, 2024, subject to strict conditions including GPS home detention and internet restrictions.

**August 1, 2024**: Judge Roeca ordered C.T. to comply with the Denmark visitation orders and denied his request to terminate California's jurisdiction.

**August 19, 2024**: C.T. invited Ms. Wang to open a child custody case in Denmark, noting that Denmark had acquired jurisdiction. Under Danish law, Familieretshuset (FRH) is the sole authorized supervised visitation provider; FRH resources are activated upon Ms. Wang filing there. FRH had provided her with a form in May 2024; she had not yet filed as of this writing.

**August 22, 2024**: C.T. appealed Judge Roeca's August 1, 2024 order denying his request for California to terminate jurisdiction over the parties' child custody and visitation matters. Case No. A17116          0.

**August 23, 2024**: The Court of Appeal stayed all trial court proceedings pending C.T.'s appeal, effectively blocking enforcement of the visitation framework Judge Roeca had established as a condition of permitting C.T. to relocate to Denmark. Under the May 2, 2024 order, C.T. had been required to facilitate in-person Bay Area visits every other month, or supervised therapeutic sessions in Denmark, with twice-monthly video visits during any period in-person contact did not occur. The stay rendered those obligations entirely unenforceable — once again leaving Ms. Wang without any court-enforced mechanism to see her child.

**March 6–11, 2025**: A five-day preliminary hearing was held in San Francisco Criminal Case No. 19016407. Ten of fourteen counts were dismissed, including all charges arising from 2019 and the March 2, 2024 wellness-check calls. The court specifically dismissed the counts predicated on Ms. Wang's public social-media commentary about the case, expressly invoking First Amendment overbreadth principles and holding that extending a criminal protective order to general social-media posts would be unconstitutional, citing *Molinaro v. Molinaro* (2019). (Vol. 4, Prelim. Hr'g Tr. 472–473.) Among the dismissed counts were those premised on Ms. Wang's posting of photographs of aborted fetuses — images the preliminary hearing court itself characterized as political speech about reproductive coercion rather than criminal threats: when the prosecution argued that People's Exhibit 4 (a photograph of a dismembered fetus) was a credible threat, the Court intervened sua sponte, stating "the caption for this is 'coerced her into an untimely abortion.' So that's a different issue from the credible threats as to stalking potentially" (Vol. 3, Prelim. Hr'g Tr. 409:17–20), and pressed the prosecution to identify threatening conduct entirely outside the abortion context (Vol. 3, Prelim. Hr'g Tr. 410:8–11). V-1's own testimony confirmed that People's Exhibit 2 bore the caption "This is an 18-week fetus, CT pressured me into killing his fully developed son" — a statement of political accusation, not violence. (Vol. 1, Prelim. Hr'g Tr. 51.) The defense argued, and the Court accepted, that such speech is constitutionally protected under the framework established in Eugene Volokh, *Gruesome Speech*, 100 Cornell L. Rev. 901 (2015), an article Ms. Wang had herself transmitted to law enforcement and defense counsel in October 2022 documenting the First Amendment protection applicable to such images.

**March 20, 2025**: The California Court of Appeal affirmed California's continuing exclusive jurisdiction over custody and visitation in *C.T. v. Superior Court*, Case No. A171160, holding that jurisdiction is determined at the time proceedings are filed and is not divested by the subsequent relocation of the parties.

**March 25, 2025**: At a hearing in San Francisco Superior Court on Ms. Wang's request to release her passport to the federal district court in Utah, Douglas Rappaport appeared as C.T.'s victim's advocate in opposition. Rappaport argued there was a "huge problem" with releasing the passport to the federal court because the Unified Family Court in San Francisco required it due to abduction risk. He emphasized that the federal district court in Utah "has no idea what is happening in the family law litigation" and has "no connection to the Unified Family Court in San Francisco" or to the victim's advocate. Rappaport stated that "the litigation related to the passport related to the child is all here" in San Francisco — not Utah — and therefore there was no reason to transfer the passport to a court with no connection to the family proceedings. See 3/25/25 Reporter's Transcript (3/25/25 RT 18:4–19:24).

**April 8, 2025**: Having lost on appeal in *C.T. v. Superior Court*, Case No. A171160 — where he argued that California lacked jurisdiction because neither party currently resides there — C.T. filed a new motion asking California to decline jurisdiction in favor of Denmark under the inconvenient forum doctrine.

**May 14, 2025**: Douglas Rappaport, appearing as C.T.'s victim's advocate, filed a Crime Victims' Rights Act motion in federal court alleging that while on pretrial release Ms. Wang had published 1,286 pages of partially unredacted federal discovery online, exposing the minor child's identifying information and other protected parties' personal data. Ms. Wang denies all allegations. (Dkt. 71)

**June 4, 2025**: The U.S. Attorney for the District of Utah moved to revoke Ms. Wang's pretrial release, alleging she violated release conditions and the federal protective order by posting unredacted discovery documents and embedding a link to them in her August 23, 2024 Court of Appeal brief. Ms. Wang denies all allegations. (Dkt. 76)

**September 30, 2025**

Ms. Wang entered a guilty plea in federal court pursuant to a stipulated sentence: no less than five years' probation and no more than 12 months' imprisonment, followed by three years of supervised release if imprisonment is imposed. The government agreed to withdraw the June 4, 2025 revocation motion and not seek detention prior to sentencing.

**November 4, 2025**

Ms. Wang entered a plea agreement in State of Utah v. K.W., Case No. 211100167, accepted by Judge Denise Porter on November 10, 2025. Count 1 involved omitting information from a 2019 protective order application; Count 8 involved repurposing a previously court-stamped subpoena form in 2020. Any sentence was to run concurrently with the federal sentence. C.T., through his Utah criminal attorney Gregory Ferbrache, opposed acceptance of the agreement; Judge Porter accepted it nonetheless.

**January 12, 2026**

Magistrate Judge Pead denied Ms. Wang's request to travel to Denmark, citing trustworthiness concerns based primarily on seven emails sent between January 9 and 12, 2026 — after the court had advised her not to contact it while represented by counsel — as well as her state court conviction.

**January 21, 2026**

Judge Ted Stewart affirmed the denial of travel to Denmark after de novo review, acknowledging Ms. Wang's strong supervision performance but concluding that no conditions could reasonably ensure her appearance or protect the victims if she were issued a passport and permitted to travel abroad. The court deferred to the Danish court's finding that remote participation was sufficient.

**January 26, 2026**

Main hearing in BS 29022/2025 KBH, Copenhagen City Court. Ms. Wang appeared virtually from Utah. The court refused a continuance despite her attorney having sought to withdraw due to insufficient time to prepare, concerns about inadequate funding to competently represent Ms. Wang, and his own admission that he was

inadequately prepared. Funding for a defense timeline was denied. The court accepted C.T.'s 80-page timeline largely without modification. A formal challenge to the presiding judge's impartiality was entered into the record.

### February 23, 2026

The Family Court at Copenhagen City Court issued its judgment: (1) dissolving joint parental responsibility and granting sole custody to C.T.; (2) declining to refer the matter to Familieretshuset for supervised visitation; (3) refusing to order any form of contact — visits, video calls, letters, or telephone — between Ms. Wang and her son; and (4) removing Ms. Wang's statutory right to receive information about her son's circumstances under the Parental Responsibility Act § 23(3).

Ms. Wang filed a timely appeal.

### March 4, 2026

Ms. Wang's court-appointed attorney, Bjørn Dilou Jacobsen, notified her that the judge who presided over the January 26 hearing had withdrawn from the case and that a new judge would be assigned. Attorney Jacobsen filed an appeal of the February 23 judgment.

This timeline does not excuse the charged conduct. But it is essential context: Ms. Wang's online communications were not predatory. They were the escalating, misguided response of a mother who perceived — rightly or wrongly — that institutional processes were being weaponized against her at each critical juncture of a custody dispute involving vastly unequal resources. She has accepted responsibility for how she responded. The question before this Court is whether, given everything that preceded and followed her conduct, imprisonment adds anything that probation does not.

---

### THE THREE-PROSECUTION PATTERN: Criminal Cases as Custody Weapons

Across seven years, three separate criminal prosecutions—brought in Spanish Fork, Utah County, and this Court—have been activated at precisely the moments when Ms. Wang achieved or approached favorable visitation rulings, then cited back into family court to restrict or eliminate her contact with her only child. This pattern does not excuse Ms. Wang's conduct. But it is essential context under 18 U.S.C. § 3553(a)(1) for understanding the "nature and circumstances of the offense" and why a first-time felony offender, with no history of violence and a record of flawless post-indictment compliance, nevertheless continued posting over time.

### 1. First Prosecution: V2 (W.S.) / Spanish Fork → San Francisco (2019)

October 4, 2017: WS filed a police report with the San Francisco Police Department, Incident Report No. 170810414, alleging that since July 2017 Ms. Wang had been sending him harassing text messages and making harassing phone calls, and that she was also contacting and harassing his friends and family. On November 20, 2017, WS's ex-girlfriend filed a separate SFPD report, Incident Report No. 170945607, stating that Ms. Wang had obtained her information through WS and was harassing her via social

media; she specifically cross-referenced WS's October 4 incident report. Despite these two San Francisco police reports, SF law enforcement never contacted Ms. Wang regarding WS's allegations, no arrest warrant was issued, no charging document was filed, and there is no indication that any meaningful follow-up was conducted. Because San Francisco took no action, WS also reported the alleged harassment to the Spanish Fork Police Department in Utah, where Ms. Wang resided.

November 20, 2017: In Spanish Fork City v. Wang (Case No. 171301350), Spanish Fork City issued Ms. Wang a citation for Electronic Communication Harassment under Utah Code § 76-9-201 — the same day WS's ex-girlfriend filed her SFPD report. Ms. Wang was not booked into custody. A Class B misdemeanor criminal complaint was filed on December 11, 2017, initially charging 20 counts for alleged conduct between October 30 and November 20, 2017; the complaint was later amended to 50 counts after Ms. Wang declined an early plea offer. A Class B misdemeanor in Utah is punishable by up to six months in jail and a $1,000 fine. Ms. Wang appeared as ordered, retained private counsel (attorney Ed Brass), and litigated the misdemeanor case from November 2017 through October 2019, incurring substantial legal fees and participating in multiple hearings and settlement negotiations.

· October 31, 2019: Spanish Fork City prosecutor Jason Sant filed a motion to dismiss, stating: "The San Francisco District Attorney's Office has filed a felony case relating to the facts of this case. Thus, the Plaintiff respectfully requests this case be dismissed without prejudice."

· February 24, 2020: Judge Jared Eldridge of the Fourth Judicial District, Utah County, Spanish Fork Department, entered a formal Order to Dismiss Case No. 171301350 with prejudice — not, as sometimes referenced, in 2019.

· February 2019: C.T.'s father filed an SFPD report regarding W.S., and Sgt. Michelle Martinez reopened the investigation based on the same 2017 conduct that W.S. had reported in San Francisco but that San Francisco police had not pursued.

On March 6, 2019, C.T. obtained ex parte orders granting him sole legal and physical custody in San Francisco. On June 25, 2019, Judge Darwin partially reversed himself, recognized he had received only one-sided information, ordered supervised visitation over C.T.'s objection, and transferred the case back to Utah—a forum more favorable to non-custodial parents. Utah then set a jurisdictional hearing to accept the case and enter custody and visitation orders.

· October 17, 2019: The day before that critical Utah UCCJEA hearing, Ms. Wang was arrested at Rally Supervised Visitation at Saint Francis Memorial Hospital on $750,000 bond, moments before a court-ordered supervised visit was to begin. The arrest was for alleged cyberstalking based on posts from December 24, 2018 to March 18, 2019.

**The Rally caseworker recorded C.T.'s reaction to the cancelled visit and arrest:** *"Fantastic; I'll turn around right now."*

23

·      October 18, 2019: Utah declined UCCJEA jurisdiction. C.T.'s Utah attorney submitted Ms. Wang's San Francisco booking report as Exhibit A—showing four felonies and six misdemeanors on $750,000 bond—and urged Utah to defer to California.

The jurisdictional outcome was a direct product of the arrest's timing: the criminal case eliminated Utah as a forum that could protect Ms. Wang's relationship with her son.

San Francisco later filed a felony case on the same 2017 W.S. conduct, and Spanish Fork dismissed *"because the San Francisco District Attorney's Office has filed a felony case relating to the facts of this case."* The San Francisco Domestic Violence Felony Complaint, Case No. 19016407, filed October 18, 2019, charged WS-related conduct as Count X: felony stalking under California Penal Code § 646.9(a) for the period September 1, 2017 through November 20, 2017 — the identical factual nucleus previously charged in Spanish Fork as Class B misdemeanors and reported to SFPD in October and November 2017. CT simultaneously sought and obtained a $750,000 bail amount in connection with this filing. After a five-day preliminary hearing in March 2025, Judge Patrick S. Thompson dismissed 10 of 14 counts, expressly questioning whether Ms. Wang's posts constituted "true threats" and comparing her conduct to a parent using GoFundMe to raise custody funds. Under the global resolution, California will dismiss that case entirely after this federal sentencing.

## Ms. Wang's Statement: The WS (V2) Count (Count 2)

### Acceptance of Responsibility for V2

Ms. Wang has pleaded guilty to Count 1 of the Indictment, charging her with Cyberstalking WS in violation of 18 U.S.C. § 2261A. She admits that beginning in September 2017 and continuing through November 2017, she engaged in a course of conduct intended to harass and intimidate WS. Specifically, she used multiple social media accounts and phone numbers to send numerous messages, texts, and other communications directly to him. She also sent numerous messages and other communications about WS to his friends and family, and posted harassing and defamatory statements about him on public Internet sites. Ms. Wang accepts full responsibility for her actions. What she did was wrong, and she caused substantial emotional distress to WS.

### Multiple Prosecutions for the Same Conduct

Ms. Wang has been prosecuted three separate times for the same conduct involving WS spanning nearly eight years across three different jurisdictions. The initial San Francisco police reports (October–November 2017) resulted in no action by law enforcement at that time. On November 20, 2017, she was criminally cited in Spanish

Fork City, Utah with electronic communication harassment under Utah Code § 76-9-201 (Case No. 171301350)—a Class B misdemeanor punishable by up to six months in county jail and a $1,000 fine. She retained private counsel, incurred substantial legal fees, and litigated that matter for nearly two years.

Then, on October 18, 2019—nearly two years after the Spanish Fork charges were filed—San Francisco authorities filed a felony complaint charging the same conduct involving WS, consolidating it with charges related to V1 (C.T.). The timing was not coincidental: as documented in motion practice by Ms. Wang's California counsel, the decision to charge the WS matter was triggered by V1's father (A.T.)—CEO of a Fortune 500 company and former President of Google Americas—urging law enforcement to reopen the old police reports. The San Francisco prosecution team even contacted the Spanish Fork City Prosecutor and urged him to dismiss the Utah case so that both matters could proceed in San Francisco. The Spanish Fork City Court declined to dismiss, resulting in Ms. Wang defending herself simultaneously in two jurisdictions for identical conduct.

Now, approximately five years after the San Francisco charges and seven years after the Spanish Fork citation, Ms. Wang faces a third prosecution for the same October–November 2017 conduct—this time in federal court. She does not raise this history to evade responsibility, but respectfully asks this Court to weigh the cumulative toll of nearly eight years of criminal proceedings, the payment of multiple defense attorneys across jurisdictions, and the prolonged uncertainty about whether she would face misdemeanor or felony, state or federal charges.

**The Mutual Nature of the Conflict: Utah Civil Proceedings and Judicial Findings**

While defending the Spanish Fork criminal case, the parallel Utah civil proceedings revealed the deeply mutual nature of this conflict. On January 22, 2018, Ms. Wang and her parents filed three Requests for Civil Stalking Injunctions against WS in Utah, citing persistent harassment including: repeated contact after being told to stop; threats and insults directed at her parents; public distribution of false and defamatory information; orchestrated humiliation campaigns affecting her employment prospects; and

dissemination of details about her sealed New York case to mutual acquaintances and former colleagues.

WS's documented conduct toward Ms. Wang and her family included: calling her father's cell phone on September 7, 2017, while her father was traveling in Iceland; calling her mother on September 11, 2017, and screaming at her, calling Ms. Wang derogatory names and threatening to ruin the family's reputations; calling her father again on October 2, 2017, demonstrating he knew her father's employer, home address, and recent travel; contacting former colleagues and men Ms. Wang had previously dated, including reaching out to Rory Will in Boston (the individual connected to her sealed 2013 New York matter); asking Ms. Wang to meet a "friend" at a restaurant directly below her New York apartment, demonstrating research into her exact location; and posting her personal information—including details about her Spanish Fork arrest record—to "League Chat," a public forum on The League dating application with an audience of over 100,000 viewers.

On May 4, 2018, the Honorable Thomas Low held an evidentiary hearing in the 4th District Court in Provo, Utah. After hearing testimony from both WS and Ms. Wang, Judge Low found WS guilty of harassment and stalking and issued three permanent stalking injunctions in Ms. Wang's favor—prohibiting WS from contacting Ms. Wang and her parents through May 4, 2021—based on WS's own admissions of repeated, unwanted contact after being instructed to cease all communication. This judicial finding is material: the conflict was not one-sided. WS was never criminally prosecuted for conduct that a court found, after an evidentiary hearing, constituted harassment and stalking.

**Context of the Offense: How the Conflict Developed**

In July 2017, WS and Ms. Wang matched on a dating application called "The League." Shortly after connecting, WS researched her background extensively and discovered information about a past legal matter in New York in October 2013—a conviction for disorderly conduct under New York Penal Code § 240.20, a violation (not a misdemeanor or felony) under New York law. He began referencing this sealed history in communications with her, using it as a source of leverage. On August 7, 2017, WS sent

26

Ms. Wang articles about dating-related legal disputes—references she reasonably interpreted as veiled warnings about what he could do to her given her past.

By October 2, 2017, communications had become intensely hostile. WS threatened to contact Ms. Wang's employer at Goldman Sachs and demanded she appear with him on the Dr. Phil television program to discuss their conflict publicly. The prospect of her sealed case and personal history being exposed on national television caused Ms. Wang severe distress. Ms. Wang acknowledges that rather than disengaging, blocking all communications, or relying solely on the legal process, she retaliated in ways that were harmful and illegal. The fact that a Utah judge later found that WS had harassed and stalked her does not excuse her own harassment of him.

**Ms. Wang's Wrongful Conduct Toward WS (September–November 2017)**

Between September and November 2017, Ms. Wang engaged in retaliatory harassment rather than disengaging or relying solely on legal remedies. Specifically, she: sent numerous text messages and communications containing derogatory and defamatory content and vulgar language; used robo-calling applications to make hundreds of phone calls to WS per day over a three-month period, and when he blocked her number, continued calling from dozens of other numbers causing him to receive several hundred calls per day; posted defamatory allegations about WS on various websites; and sent messages about WS to his friends and family, drawing them into the conflict. This conduct was wrong. It caused WS severe emotional distress. He testified that this was "probably the worst thing" he had ever gone through in his life; he became increasingly anxious, scared, and paranoid about his safety. Ms. Wang accepts full and unqualified responsibility for this harm.

**The 2019 IC3 Reports: Ms. Wang's Position**

In February 2019, multiple posts targeting Ms. Wang appeared on Holysmoke.org on the exact day that SFPD Sgt. Michele Martinez contacted WS about C.T.'s custody case. WS lived less than five minutes from C.T. in San Francisco. WS had a documented history of posting publicly about Ms. Wang on The League application. The posts contained details that only WS and C.T. would have known—including references to her Spanish Fork arrest, her parents, and threats that she would be "locked up soon." Given

these circumstances, and the three permanent stalking injunctions she had obtained against WS, Ms. Wang filed IC3 reports in May and June 2019 based on her sincere belief that WS was involved.

Ms. Wang has admitted that she filed those IC3 reports in order to have WS investigated by law enforcement as a way to continue harassing and intimidating him. She deeply regrets using law enforcement as a tool in this manner—an abuse of the system and a betrayal of public trust—regardless of whether her underlying suspicions were reasonable. She should have reported her concerns to her attorney or sought other legal remedies. The draft plea agreement originally required her to admit that "in truth, I had made these posts about myself so that I could blame them," language she could not and would not accept. After significant negotiations, the government agreed to remove any language about the falsity of the IC3 reports. The admitted language describes the purpose of the reports—a characterization Ms. Wang disputes but which was the minimum the government would accept to resolve all pending cases.

**What Ms. Wang Has Learned and the Changes She Has Made**

Through this prolonged process, Ms. Wang has learned that when someone is harassing you, the answer is complete disengagement—not counter-harassment. She should have blocked all communication with WS, relied on her attorneys and the protective orders that Judge Low granted, and moved on. She accepts that she is responsible for her own actions regardless of what others do. Even when she felt victimized—feelings later validated by Judge Low's findings—she had a choice in how to respond and made the wrong choices. She recognizes that she should have sought mental health support during this period to process her feelings of anger, violation, and fear rather than acting out in harmful and criminal ways.

Since the federal charges were filed, Ms. Wang has: ceased all contact with WS and everyone associated with him (her harassing conduct largely ended after the May 2018 Utah hearing, with the only subsequent conduct being the 2019 IC3 reports, and there have been no allegations of further harassment since June 2019—over six years ago); engaged in regular mental health treatment, including weekly individual therapy since August 2024, and compliance with medications for ADHD, anxiety, and depression;

28

implemented strict personal boundaries about handling disagreements; and cooperated fully with authorities. Ms. Wang is deeply sorry for the harm she caused WS and sincerely hopes he can find peace knowing that this conflict is long concluded.

With respect to the disparity in treatment, this Court should note that WS was never prosecuted for his conduct, despite Judge Low's findings that he harassed and stalked Ms. Wang and her family. The permanent injunctions issued against him were based on his own courtroom admissions of repeated, unwanted contact after being told to stop. Yet he faced no criminal consequences, while Ms. Wang has now been prosecuted three times across eight years for conduct from the same three-week period in fall 2017.

## 2. Second Prosecution: Utah Subpoena Case (2021)

While supervised in-person visits at Rally in San Francisco were ongoing, Ms. Wang—proceeding pro se after exhausting roughly $30,000 on prior internet counsel—attempted to mirror the broad discovery order C.T. had obtained:

· April 10, 2019: Judge Darwin granted C.T. a sweeping discovery order authorizing at least 25 subpoenas under a single authorization.

· March 5 and June 2, 2020: Utah Judge Thomas Low granted Ms. Wang explicit discovery authority, including subpoenas for the child's records, treating providers, ISPs, and investigation of anonymous posts attributed to her.

· June–December 2020: Believing her conduct consistent with Judge Low's orders, Ms. Wang reused court-stamped subpoena forms rather than obtaining new blanks.

· May 2021: Judge Low clarified that she may not reuse stamped forms. Ms. Wang stopped immediately and never repeated the conduct.

After San Mateo County District Attorney Steve Wagstaffe declined to prosecute the subpoena allegations, C.T.'s team shifted the same accusations to Utah County:

· March 1, 2021: Utah County initiated an investigation after California's declination.

· June 1, 2021: Utah Sgt. Richard Hales executed a search warrant at Ms. Wang's home based on an "abduction plot" narrative supplied by C.T.'s attorney.

The linkage to family court was explicit:

· July 19, 2021: Before any charges were filed, C.T.'s attorney Douglas Rappaport appeared ex parte in San Francisco family court, presented Sgt. Hales's

search-warrant affidavit, and told Judge Wiley they had "a sworn statement from an officer of the law stating that there appears to be an abduction risk."

·        July 22, 2021: Utah County filed 14 felonies in State v. Wang (Case No. 211100167): 12 counts of felony forgery, one count of second-degree felony perjury, and one count of felony communications fraud, all based on Ms. Wang's reuse of court-stamped subpoena forms in discovery that had been expressly authorized.

·        July 29, 2021: Rappaport returned to family court and made the leverage strategy explicit: "When is it appropriate — you know, assuming she's going to go to prison here… assuming she is, you know, is prosecuted and the feds don't pick this case up because of the interstate jurisdiction. When is — when is the exit strategy here for her? We don't know, but she's certainly planning it. She's plotting it." (7/29/21 RT 39:23–40:4.)

·        July 30, 2021: Judge Wiley terminated all in-person Rally visitation; Ms. Wang was reduced to video-only contact through ACAFS.

Ultimately, the allegations collapsed:

·        September 13, 2021: The California Court of Appeal issued an alternative writ of mandate, holding that the trial court had failed to make required findings before terminating in-person visitation and ordering a new hearing or a showing of cause.

·        October 19, 2021: After full forensic review, Sgt. Hales returned Ms. Wang's seized devices, having found no evidence of any abduction plan.

·        October 2021–January 2022: Five days of evidentiary hearings followed.

·        February 2, 2022: Judge Wiley reinstated supervised in-person visitation, finding that the child was bonded to his mother, that all professional providers had documented appropriate interactions, and that the abduction-risk claim was unsustained.

All 12 forgery counts were ultimately dismissed; the case resolved as two misdemeanors.. In January 2026, Utah County prosecutor Jared Perkins emailed that he was "not involved in any way in the federal hearings about her desire to travel to Denmark," but acknowledged that "the federal prosecutor may be using information from my case to inform the federal court about the risks" of international travel.

### 3. Third Prosecution: Federal Case — AUSA Jennifer Kerkhoff Muyskens (2024)

By 2024, C.T. was seeking permission to relocate the child to Denmark. Courts had consistently maintained supervised visitation, even when restricting it.

·       May 2, 2024: Judge Roeca granted C.T.'s move-away request but ordered an international visitation plan to preserve ongoing contact between Ms. Wang and her son, expressly denying C.T.'s request to terminate all visitation. A follow-up hearing to finalize the plan was set for June 11, 2024.

·       May 8, 2024: Six days after Judge Roeca preserved visitation, a federal grand jury returned the present indictment, signed by AUSA Jennifer Kerkhoff Muyskens. Count 2 recycled the same 2017 V2 (W.S.) conduct that had been dismissed with prejudice in Spanish Fork and then prosecuted in San Francisco; Count 1 charged cyberstalking of C.T. based on posts from December 2018 through 2020.

·       May 17, 2024: Ms. Wang had her last supervised visit with her son—the "DNA Mommy" visit described in the Introduction.

·       May 23, 2024: She was detained federally.

·       June 3, 2024: C.T. left the United States with the child for Denmark.

Unlike in the first two instances, there was no realistic opportunity for correction. By the time any court could reassess detention or the indictment, the relocation had been accomplished. On February 23, 2026, a Danish court extinguished all contact—including video—after the child had been abroad for more than a year and Ms. Wang had been under federal supervision without travel authorization.

## 4. The Common Architecture, Forum-Shopping, and IC3 Complaints

Each escalation follows the same five-step architecture:

1.      A critical custody moment approaches or an unfavorable ruling for C.T. has just issued.

2.      A criminal proceeding is activated or escalated.

3.      The criminal matter is immediately invoked in family court as proof that Ms. Wang is dangerous.

4.      Visitation is restricted or eliminated.

5.      In the first two instances, appellate or evidentiary review ultimately corrects the restriction; in the third, correction is impossible because the child has been moved internationally during Ms. Wang's detention.

This is not coincidence; it is a documented sequence reflected in court transcripts, signed prosecution filings, and the dockets of three separate courts. The forum-shopping dimension reinforces the point: after San Mateo declined the subpoena case, C.T.'s team moved it to Utah County, which filed fourteen felonies; when state prosecutions could not

achieve permanent separation, the same underlying V2 (W.S.) conduct—dismissed with prejudice in Spanish Fork and already prosecuted in San Francisco—was charged federally. The severity of the charges escalated in direct proportion to the custody stakes: local misdemeanors when visitation was still supervised and local; state felonies when in-person visits at Rally were ongoing; and federal felonies when C.T. sought to relocate the child overseas.

**C.T.'s Shifting Litigation Positions.** The forum-shopping architecture operated through a series of directly contradictory representations made simultaneously to different courts. In San Francisco Family Court, C.T. urged the judge to decline California's long-standing UCCJEA jurisdiction in favor of Denmark under the inconvenient forum doctrine — successfully obtaining an order on July 30, 2025 that sent custody and visitation issues overseas. Yet in the parallel San Francisco criminal proceedings, his victims' advocate, Douglas Rappaport, opposed even transferring Ms. Wang's seized passport to the Utah federal court, arguing there was "no reason to transfer the passport to a court that has no connection to the Unified Family Court in San Francisco," and that the family court "required the passport" due to alleged abduction risk. In other words, C.T. told the family court that Denmark should decide the case while simultaneously telling the criminal court that the case was still in San Francisco and that Ms. Wang's passport had to remain there. The result was a jurisdictional trap of his own construction: she could neither litigate in California, from which his family-court motion had expelled her, nor appear in Denmark, from which his criminal-court opposition had barred her.

C.T.'s account of why he relocated to Denmark shifted in the same way. In family court, he framed the move as employment-driven and financially supported, presenting evidence of a job in Denmark, over $500,000 in parental funding for litigation and relocation, and his full-time work abroad as markers of a stable, permanent relocation in the child's interests. In criminal proceedings and CPS-driven narratives, he recast the identical move as a protective measure taken out of fear of Ms. Wang — leveraging the "victim" posture in criminal forums to portray himself as fleeing danger, while simultaneously invoking his Danish location and resources in family court as the basis for California to cede jurisdiction. The relocation was either a calm professional decision

32

backed by family wealth, or a fearful flight from a dangerous defendant — depending on which court was listening. It cannot be both. This Court should weigh that inconsistency when evaluating the government's characterization of Ms. Wang as the aggressor and C.T. as a victim requiring the full protective machinery of the federal criminal justice system.

Within this context, the IC3 complaints follow the same pattern. Early draft plea language described those reports as "false," but the final factual stipulation removed that characterization — a meaningful concession reflecting Wang's unwavering position throughout all three rounds of negotiations that the complaints were true. Ms. Wang admitted only that she submitted the complaints "in order to have Victim 2 investigated… in order to continue harassing and intimidating him" — not that the reports were untrue.

The context in which those IC3 complaints were filed further underscores why they should not be treated as sentencing aggravators. Ms. Wang filed them in May and June 2019 — after the Kill Baby K post had already been used to strip her of her infant son in an emergency DCFS action, after an ex parte custody order had been entered against her based on that same post, and after her own attorney had been told by the investigating officer that the post was forensically unprovable. At the very moment she filed the IC3 reports, law enforcement had used an anonymous post to remove her child while simultaneously acknowledging to her counsel that attribution was legally insufficient. Filing a complaint with federal authorities in that posture is structurally analogous to a crime victim seeking help from official channels — not to predatory conduct designed to frighten an adversary. The five-step prosecution architecture documented above moved in both directions: not only were criminal proceedings activated against Ms. Wang to restrict her custody access, but Ms. Wang attempted to use those same official channels to seek relief from what she reasonably believed was a coordinated impersonation campaign targeting her. That symmetry — a mother reaching for law enforcement at the same moment law enforcement was being reached against her — is essential context under § 3553(a)(1) for understanding the nature and circumstances of this offense.

33

**That admission itself was extracted under practical duress:** AUSA Blanch communicated through defense counsel that the characterization of the IC3 complaints as harassing was non-negotiable, and that the Motion to Revoke Pretrial Release would be filed within two weeks if Ms. Wang did not accept the plea on those terms. Defense counsel simultaneously advised that the terms would only worsen going forward. Ms. Wang — weighing the risk of proceeding pro se against the certainty of a deteriorating offer and a contested revocation hearing — accepted the language as the minimum necessary to resolve four pending criminal cases, while consistently maintaining that the IC3 reports were accurate. Throughout negotiations, she pointed to the approximately $30,000 she paid an internet attorney to investigate impersonation posts as circumstantial evidence of her sincere belief that one or both victims had been involved in framing her online. The IC3 complaints arose from the same desperate effort to enlist official channels in a custody battle she was steadily losing, not from a predatory desire to lodge knowingly false accusations.

**Several additional facts underscore how tenuous the WS (V2) count would have been at trial. The FBI never followed up on the IC3 complaints.**

At the March 2025 California preliminary hearing (People v. Wang, Vol. 2, March 7, 2025), WS (V2) himself testified under oath that the direct harassment had stopped entirely by November 2017 — more than seven years before that hearing. He confined the alleged phone-call barrage of "several hundred" calls per day to "between September and November of 2017" (p. 135, lines 4–9), confirmed the threatening messages "would have been between September and November of 2017" (p. 132, lines 22–25), and on cross agreed that "the text messages stopped in November of 2017" with no direct contact of any kind thereafter (p. 177, lines 1–9). WS (V2) 's testimony thus establishes a discrete, time-limited series of direct contacts ending in 2017 — legally inconsistent with any theory of a "continuous" course of conduct extending through the 2018–2019 period charged in the federal and California cases. The federal cyberstalking statute requires proof that the defendant's course of conduct caused a present, objectively reasonable fear in the victim; WS (V2) 's own account — seven-plus years of no contact, and no knowledge that he had been named a federal victim — cannot satisfy that element, and

the government faced a fundamental sufficiency problem on Count 2 that the global plea resolved rather than litigated.

As of March 2025, he remained unaware that he is named as a victim in the federal case and completely unaware that IC3 complaints had been filed referencing him in May 2019, more than six years earlier.

This presents a fundamental evidentiary problem that the government would have faced at trial: the federal cyberstalking statute, 18 U.S.C. § 2261A(2), requires proof that the defendant's course of conduct caused, attempted to cause, or would reasonably be expected to cause substantial emotional distress to the victim. It is difficult to conceive how the government could have established that IC3 complaints filed in May 2019—referencing conduct that ended in November 2017—placed WS (V2) in fear or caused him substantial emotional distress when, as of the preliminary hearing six years later, he had no knowledge whatsoever that those complaints existed. A victim who is entirely unaware of the conduct alleged to have targeted him is, by definition, a victim who experienced no fear, no distress, and no cognizable harm from that conduct. That is not a peripheral defect in Count 2; it goes to the heart of the statutory element the government would have been required to prove beyond a reasonable doubt.

WS (V2)'s unawareness of the IC3 complaints carries independent weight as a sentencing mitigant under 18 U.S.C. § 3553(a)(2)(A). The cyberstalking statute requires that the defendant's course of conduct caused, attempted to cause, or would reasonably be expected to cause substantial emotional distress to the victim. A victim who testified under oath — six years after the fact — that he had no knowledge the IC3 complaints even existed suffered zero cognizable harm from them. That the conduct produced no discernible effect on its nominal target bears directly on the gravity of the offense and the proportionality of any sentence. Moreover, even under the preponderance standard applicable at sentencing, the government cannot establish that the IC3 reports were knowingly false. T-Mobile CSLI places Ms. Wang's phone in Manhattan throughout March 6, 2019; the Kill Baby K IP resolves to a Cloudflare edge node that law enforcement's own investigation expressly concluded "is not possible Wang made"; Sgt. Martinez acknowledged contemporaneously that the post came from a VPN and was

unprovable; the investigating officer omitted it from criminal charges; and Ms. Wang spent $29,579.11 pursuing forensic subpoenas that a person who authored the post would have had no rational incentive to generate. Against that record, the government cannot meet its own burden, and the Court should decline to treat the IC3 complaints as establishing any sentencing-aggravating false statement.

### 6. Sentencing Relevance

The sentencing relevance of this pattern is not that it negates Ms. Wang's legal culpability; she has accepted responsibility and does not contend otherwise. Its relevance is that it explains the surrounding circumstances of her conduct, and why a Guidelines scheme designed for predatory recidivist stalkers would overshoot the punishment needed here. Each time the courts corrected the result—reversing the DCFS finding, issuing the appellate writ, reinstating visitation, dismissing or reducing charges—the underlying dynamic simply reset, and a new prosecution followed at the next custody inflection point. The conduct at issue is the response of a desperate, isolated, pro se litigant watching access to her son disappear through a pattern that required intervention by two California appellate courts and one Utah district court to correct. That history, and the now-documented unreliability of the initial federal proffers by the charging prosecutor, strongly support a sentence at the minimum of the stipulated 0–12-month range, with probation or home confinement sufficient—but not greater than necessary—to serve the purposes of § 3553(a).

### I. THE LEGAL FRAMEWORK THAT CONTROLS THIS SENTENCING

#### A. *Yung* Draws the Line Between Prison and Probation — And Ms. Wang Falls on the Probation Side

The Third Circuit's en banc decision in *United States v. Yung*, 37 F.4th 70 (3d Cir. 2022) — the leading appellate authority on the very statute under which Ms. Wang was convicted — establishes a single dispositive line between conduct warranting incarceration and conduct warranting probation. Under *Yung*, the intent element of 18 U.S.C. § 2261A(2) must be read narrowly to preserve the statute's constitutionality: "to intimidate, a defendant must put the victim in fear of death or bodily injury"; "to harass, he must distress the victim by threatening, intimidating, or the like." 37 F.4th at 81.

The *Yung* court was explicit about what the statute does not reach: "negative restaurant reviews left on Google or Yelp, irate emails sent to service providers, or

antagonistic comments left on news sites" that are "persistently annoying or even scary" remain protected, because their intent is to "vex" or "cow" — not to threaten bodily harm. *Id.* at 82. Ms. Wang's custody-dispute posts are closer to that description — obsessively antagonistic, legally wrongful, and genuinely distressing — than to the death-threat paradigm that Congress enacted the statute to punish and that *Yung* identified as the core of the offense.

Every other legal argument that follows — the Guidelines overstatement, the comparative sentencing data, the First Amendment analysis — reinforces a point that *Yung* alone establishes: whatever the Guidelines range, it was calibrated for a more dangerous defendant than Kailin Wang. A sentence at the probation floor directly corrects that overstatement.

The contrast with the actual *Yung* defendant makes the point unmistakably. After a law school interview went poorly and he was denied admission, Terence Yung embarked on an eighteen-month cyberstalking campaign against the interviewer and his family that left them, in the court's words, "in a constant state of fear."

*See* Factual Basis for Plea, *United States v. Yung*, Case No. 1:17-cr-00014-MN (D. Del. Oct. 23, 2018), Doc. 65-1. Yung published false, violent, and sadistic statements online about the family, including graphic descriptions of rape, lynching, sexual molestation, and other extreme violence. He repeatedly posted Craigslist "casual encounters" advertisements using the wife's first name and their home address, inviting men seeking violent and sadistic sexual activity to come to the residence in the middle of the night. As a direct result of those posts, strangers actually appeared at the house around 2 a.m. on multiple nights, ringing the doorbell, and police responded to 911 calls from neighbors. The FBI later traced one such advertisement — "petite slut for BBC – w4m" — to an email account and IP address controlled by Yung, establishing that he had deliberately engineered the appearance of men expecting violent sexual contact at a private family home.

That is the conduct *Yung* addressed when it drew the constitutional boundary of § 2261A(2). It is also the standard against which Ms. Wang's conduct must be measured. Her posts were a mother's obsessive, misdirected, and legally wrongful response to the loss of her child in a custody dispute — not a campaign of manufactured physical terror directed at strangers' homes. The statute reaches both; the sentence should not treat them the same.

## B. The "Pattern of Activity" Enhancement Constitutes Impermissible Double-Counting and Should Not Apply

U.S.S.G. § 2A6.2(b)(1)(E)U.S.S.G. § 2A6.2(b)(1)(E) adds four levels for a "pattern of activity involving the stalking, threatening, harassing, or assaulting the same victim." The PSR applies this enhancement here, but doing so constitutes impermissible double counting. The Application Notes to § 2A6.2 require the enhancement to be supported by separate instances of stalking behavior — discrete episodes beyond the minimal statutory conduct. That factual foundation is absent here. The PSR applies the

37

enhancement to Ms. Wang by relabeling the entire charged 'course of conduct' — the same pattern of communications that defines the § 2261A(2) offense of conviction — as a 'pattern of activity' for enhancement purposes, without identifying any separate instance that stands apart from the offense conduct itself.

Pimentel letterThe double-counting concern operates differently, but is present, for each count. As to Count 1 (C.T.), where the PSR also applies the protective-order-violation enhancement under § 2A6.2(b)(1)(A), the conduct used to satisfy the order-violation enhancement is drawn from the same post-order communications used to establish the 'pattern.' The two enhancements thus rest on an indistinct factual basis and serve overlapping purposes — punishing persistent, order-defying conduct — rather than the conceptually separate functions that would justify stacking. Defense counsel in United States v. Dennis raised the identical structural objection to the pattern enhancement in § 2261A cases, noting it 'would be impossible to conceive of any instance or fact pattern where someone convicted under 18 U.S.C. § 2261A(2) for a course of conduct in harassing a victim would not also be subject to this two-level enhancement.' Dennis Sentencing Mem. at 24. The government in that case declined to include the enhancement in its own Pimentel letter — an implicit acknowledgment of the structural problem — and the Court should demand the same disclosure here.

As to Count 2 (W.S.), the double-counting concern is even more acute because the underlying conduct was not merely finite — it was publicly confirmed as finite by the victim himself. At the March 2025 California preliminary hearing, WS (V2) testified under oath that the threatening messages and 'several hundred' phone calls per day all occurred 'between September and November of 2017' (People v. Wang, Vol. 2, March 7, 2025, p. 132, lines 22–25; p. 135, lines 4–9), and that 'the text messages stopped in November of 2017' with no direct contact of any kind thereafter (p. 177, lines 1–9). A 'pattern of activity' enhancement — designed by the Sentencing Commission to punish more extensive and escalating harassment — cannot coherently apply to a finite, nine-week burst of direct contact that ended more than seven years ago and that the victim himself confirmed has never resumed. Treating that narrow 2017 window as both the statutory 'course of conduct' and an aggravating 'pattern' is precisely the kind of double counting that this Circuit's precedent and U.S.S.G. § 2A6.2 cmt. 4 prohibit.

## C. §4C1.1: Adjustment for Certain Zero-Point Offenders

Ms. Wang has zero criminal history points. Under Amendment 821 (effective November 1, 2023), U.S.S.G. § 4C1.1 provides a two-level reduction for defendants who have no criminal history points and satisfy ten additional criteria. Ms. Wang satisfies every criterion: no terrorism adjustment; no violence or credible threats of violence; no death or serious bodily injury; no sex offense; no substantial financial hardship to victims; no firearm; no § 2H1.1 civil-rights offense; no vulnerable-victim or human-rights enhancement; no aggravating-role adjustment; and no CCE designation.

The government may contest criterion six—"personally caused substantial financial hardship"—but that argument fails on this record. The paradigmatic harms under U.S.S.G. § 2B1.1 cmt. n.4(F) are insolvency, bankruptcy, inability to obtain credit, and loss of

retirement savings. Neither victim experienced any of those harms. Emotional distress and reputational injury, however genuine, are not "substantial financial hardship" as that term is used in the Guidelines. Victim 1's family, backed by substantial independent wealth, does not remotely fit that profile.

After the two-level § 4C1.1 reduction, Ms. Wang's total offense level is 19 (reduced from 21), placing her in Criminal History Category I with an advisory Guidelines range of 30–37 months. This adjusted range does not reach Zone B, so Application Note 10(A) to § 5C1.1—which makes a non-custodial sentence "generally appropriate" for zero-point offenders whose ranges fall in Zone A or B—does not apply automatically. However, Application Note 10(B) does apply and authorizes an affirmative departure, as explained below.

**Application Note 10(B): Departure to Non-Custodial Sentence.** Application Note 10(B) to § 5C1.1 expressly authorizes a departure from the Zone D imprisonment requirement where the defendant is a zero-point offender whose Guidelines range "overstates the gravity of the offense" because the offense is neither a crime of violence nor an "otherwise serious offense." This case fits that standard precisely. Ms. Wang's conduct consisted entirely of online speech. No victim feared physical violence. No one relocated. No weapons were involved. No multi-agency law-enforcement response was required. The advisory range of 30–37 months reflects the same enhancement structure applied to defendants who violate protective orders through direct physical threats. Applying that range to Ms. Wang—whose charged conduct contained no threats of bodily harm, who had no prior record, and who has been under intensive supervision for nearly two years without incident—is a textbook case of a Guidelines range that overstates the gravity of the offense. A departure to a non-custodial sentence under Note 10(B) is therefore within-Guidelines, not a variance, and is the appropriate result here.

**The Plea Agreement Already Reflects This Judgment.** The stipulated range of zero to twelve months sits well below the advisory Guidelines range even after § 4C1.1. That gap is not a flaw—it is the product of a carefully negotiated, multi-sovereign judgment that the Guidelines range overstates the gravity of this offense. Three separate prosecutorial offices, each fully familiar with the complete record, independently concluded that probation to twelve months is the appropriate resolution. Courts give significant weight to plea agreements that reflect considered prosecutorial judgment across multiple jurisdictions. See U.S.S.G. § 6B1.2(c). This Court should do the same.

## D. The Proximity of Ms. Wang's Conduct to the Constitutional Line Directly Reduces Her Culpability Under § 3553(a)

The constitutional proximity arguments in this section apply exclusively to Count 1 — the posts directed at V1 (C.T.) arising from the custody dispute. They do not extend to Count 2. Ms. Wang accepts full and unqualified responsibility for her conduct toward WS (V2): the robo-calling, the direct texts, and the messages to his friends and family were direct, targeted harassment with no constitutional shelter, and nothing in this section is offered to minimize that harm or that guilt.

Ms. Wang does not argue that her conduct was constitutionally protected. She pleaded guilty, and her plea stands. But the proximity of charged conduct to the constitutional line is itself a relevant sentencing factor under 18 U.S.C. § 3553(a)(1) and (2)(A): the closer the conduct sits to protected expression, the less culpable the defendant, and the less imprisonment serves the purposes of punishment. This principle is well-established in analogous contexts — courts routinely impose below-Guidelines sentences where the offense conduct, while clearly criminal, occupies the borderland between lawful and unlawful.

Here, multiple circuit courts have identified Ms. Wang's type of conduct — sustained, distressing online speech arising from a personal grievance, directed at a private individual through publicly accessible platforms — as sitting at the outer edge of what § 2261A(2)(B) can constitutionally reach. In *United States v. Sryniawski*, 48 F.4th 583 (8th Cir. 2022), the Eighth Circuit reversed a § 2261A(2)(B) conviction on First Amendment grounds where the defendant sent emails disclosing embarrassing information about a public figure's family — conduct structurally comparable to Ms. Wang's custody-dispute posts. The Third Circuit in Yung held that the statute's intent element must be read to require "fear of death or bodily injury" to preserve constitutionality, explicitly excluding from the statute's valid reach speech that merely "vexes" or causes emotional distress. And the D.C. Court of Appeals sitting en banc in *Mashaud v. Boone*, 295 A.3d 1139 (D.C. 2023), held that stalking statutes reaching online speech that causes emotional distress are content-based restrictions subject to strict scrutiny, and that "speech cannot be restricted simply because it is upsetting or arouses contempt."

Two district courts have gone further, dismissing § 2261A indictments outright on as-applied First Amendment grounds in materially similar circumstances. In *United States v. Cassidy*, 814 F. Supp. 2d 574 (D. Md. 2011), the court dismissed charges based on over 8,000 Twitter and blog posts targeting a religious figure, holding that public online speech the victim could have avoided by "averting her eyes" did not serve a compelling government interest sufficient to override the First Amendment. In *United States v. Cook*, 472 F. Supp. 3d 326 (N.D. Miss. 2020), the court dismissed charges based on Facebook posts about government officials, following *United States v. Cassidy*, 814 F. Supp. 2d 574 (D. Md. 2011) and holding that "the benefit of the content-based restriction to shield sensibilities of

the listener ... is just not enough to supplant a citizen's right to uncomfortable public discourse."

The sentencing consequence of this constitutional borderland is straightforward. The Guidelines enhancements under § 2A6.2 — for "substantial emotional distress," "course of conduct," and "use of interactive computer services" — were calibrated against a paradigmatic defendant who places a victim in genuine fear of physical harm. They were not designed for a defendant whose conduct the Eighth Circuit has held cannot constitutionally be punished at all when, as here, it lacks death threats, physical intimidation, or extortion. Applying those full enhancements to Ms. Wang produces a range that "dramatically overstates" her culpability. This Court has authority to correct that overstatement by imposing the minimum sentence the parties negotiated — a sentence proportionate to conduct that three separate courts of appeals have placed at the constitutional margin of what the statute can validly reach.

**The aborted fetus posts warrant particular attention in this analysis.** Among the charged conduct is Ms. Wang's posting of photographs of aborted fetuses accompanied by captions identifying V-1 as having coerced her into an abortion.

The political character of those captions was established by V-1's own direct examination testimony: he testified that People's Exhibit 2 bore the caption "This is an 18-week fetus, CT pressured me into killing his fully developed son," and that his reaction was emotional distress, not fear of physical harm. (Vol. 1, Prelim. Hr'g Tr. 51.) People's Exhibit 4 — a photograph of a dismembered fetus — likewise bore a caption stating that V-1 had "coerced her into an untimely abortion."

The preliminary hearing court itself drew the critical distinction sua sponte, interrupting the prosecution's credible-threat argument to state: *"The caption for this is 'coerced her into an untimely abortion.' So that's a different issue from the credible threats as to stalking potentially."* (Vol. 3, Prelim. Hr'g Tr. 409:17–20.) The Court then pressed the prosecution to identify threatening conduct outside the abortion context entirely, asking: "If, potentially, the Court of Appeals and the Supreme Court disagree with your reasoning, and that we have to focus on actual threats or perceived threats, what other evidence might you point to?" (Vol. 3, Prelim. Hr'g Tr. 410:8–11.)

The prosecution never tied the fetus images to any specific threat of violence against a person. As Professor Eugene Volokh, Gary T. Schwartz Professor of Law at UCLA, demonstrates in *Gruesome Speech*, 100 Cornell L. Rev. 901 (2015) — an article Ms. Wang transmitted to law enforcement, defense counsel, and others in October 2022 under the subject heading "18 week Aborted Fetuses Gruesome However Reality," contemporaneously evidencing her understanding of these images as political speech — gruesome photographs of aborted fetuses constitute core political speech entitled to full First Amendment protection. Such images have historically served to force public reckoning with atrocities otherwise invisible: photographs of lynching victims, Holocaust victims, and Vietnam War casualties all operated on precisely this logic. *Id.* at 904–07. Even commentators who support abortion rights acknowledge that such images perform an irreplaceable communicative function that words alone cannot replicate. *Id.* at 904.

When a court criminalizes the emotional distress caused by such an image, it is punishing the communicative impact of the content itself — exactly what *Cohen v. California*, 403 U.S. 15, 26 (1971), and *Texas v. Johnson*, 491 U.S. 397, 416 (1989), forbid. Restrictions on such speech are content-based, subject to strict scrutiny, and cannot be sustained merely because the images cause listeners discomfort, fear, or anger. *Ctr. for Bio-Ethical Reform, Inc. v. L.A. Cnty. Sheriff Dep't*, 533 F.3d 780, 788 (9th Cir. 2008).

The preliminary hearing court itself applied this constitutional boundary throughout the five-day proceeding. Citing *People v. Peterson* (2023) 95 Cal.App.5th 1061 for the proposition that only "a serious expression of an intent to commit an act of unlawful violence" falls outside First Amendment protection, the Court pressed the prosecution throughout to identify what specific threat met that standard. (Vol. 4, Prelim. Hr'g Tr. 450–451.)

Defense counsel argued that even contextual speech expressing anguish about a custody dispute is protected: "even if it is venting, your Honor, I think venting is constitutionally protected," to which the Court responded by restating the principle as "this person has a right to express their displeasure." (Vol. 3, Prelim. Hr'g Tr. 396; Vol. 4, Prelim. Hr'g Tr. 459.) On the final day of the preliminary hearing, the Court discharged Counts 10 and 11 on First Amendment overbreadth grounds, citing *Molinaro v. Molinaro*, 33 Cal.App.5th 824 (2019), and holding that reading the criminal protective order to cover

social media posts about the case would be "an overbroad reading" and "unconstitutional if it would extend to any social media presence." (Vol. 4, Prelim. Hr'g Tr. 472–473.) That ruling is directly on point: it reflects the same court that reviewed every exhibit — including the fetus images — concluding that the constitutional line forbids using online political speech as the predicate for criminal stalking liability. The fetus images, deployed by Ms. Wang to document what she experienced as reproductive coercion and to hold V-1 publicly accountable for it, fall squarely within the category of constitutionally proximate speech that this Court should weigh as a substantial mitigant under 18 U.S.C. § 3553(a)(1) and (2)(A).

### E. Mashaud v. Boone: The Structural Parallel and Its Sentencing Implications

Lauren Mashaud's wife had an affair with a vice president at a consulting firm where she worked as an intern. This led to a sequence of events culminating in the D.C. Court of Appeals' recent en banc decision in *Mashaud v. Boone*, 295 A.3d 1139 (D.C. 2023), which substantially narrowed the scope of D.C.'s stalking statute.

Devastated upon discovering the affair, **Mashaud sent an email to three employees at the vice president's firm** — including a member of the human resources department — to alert them to a violation of the firm's code of conduct. The recipient, Christopher Boone, later testified that the email left him feeling violated, threatened, and embarrassed.

Three months later, Mashaud followed up by **sending private Facebook messages to many of Boone's family members and friends, explaining that he wanted them to "know the kind of person Christopher Boone" really was.** Boone again testified to feeling "violated" and "threatened," and expressed "growing concern" about his personal safety.

**Mashaud also created a blog** called *"The Power of Light and Truth,"* in which he discussed the affair and its aftermath by name. Boone testified that he was "taken aback" by the blog and, believing Mashaud intended him physical harm, notified both his employer and his apartment complex, each of which implemented additional security protocols.

43

Boone filed a criminal complaint and sought a civil protection order (CPO) on the grounds that Mashaud had committed criminal stalking. Although no criminal charges were ever filed, D.C. Superior Court Judge Fern Flanagan Saddler granted the CPO.

**Mashaud's actions were clearly intended to embarrass Boone. But did they constitute stalking as required by D.C.'s CPO statute?**

D.C.'s criminal code defines stalking as a "course of conduct directed at a specific individual" with intent to cause that person to fear for their safety, feel seriously alarmed or frightened, or suffer emotional distress. The requisite mental state is also satisfied if the defendant knew or should have known that the conduct would cause such a reaction. "Emotional distress" is defined as *"significant mental suffering or distress that may, but does not necessarily, require medical or other professional treatment."* A "course of conduct" requires two or more occasions on each of which the defendant possessed the requisite mental state. The statute expressly excludes constitutionally protected activity.

The en banc court concluded that a plain-language reading of the statute would prohibit a vast range of constitutionally protected speech — and even socially valuable speech, such as a **doctor delivering a fatal diagnosis or an officer notifying a family of a loved one's death.** Communications of that kind, the court observed, would surely cause reasonable people to *"suffer emotional tailspins of distress."* What saves the statute from unconstitutional overbreadth, the majority held, is its savings clause, which exempts constitutionally protected activity — including free speech — from the statute's reach. For speech, that clause excludes everything except threats, obscenity, defamation, fraud, incitement, and speech integral to criminal conduct.

As for that final category, Boone's argument that Mashaud's speech was integral to his own stalking failed. The court held the argument **"fatally circular":** the predicate criminal conduct must be an offense independent of the speech itself — such as solicitation or conspiracy, which enlist others in a non-speech offense. **"It makes no sense as an exception," the court wrote, "if the speech both constitutes the crime itself and thereby avoids First Amendment protection by being integral to its own commission.** An exception like that would swallow the First Amendment whole."

44

The First Amendment protects speech that is **"upsetting or arouses contempt."** The governing question is whether the content of the speech matters; if it does, the speech presumptively receives First Amendment protection. In *Mashaud*, the court found that none of the recognized exceptions applied: Mashaud had not defamed Boone — his statements were undisputedly true — had not threatened him, had not incited criminal activity, and had not engaged in obscenity or fraud.

*Mashaud v. Boone* provides the clearest structural parallel to Ms. Wang's situation and the clearest doctrinal basis for a sentence at the minimum of the stipulated range.

In *Mashaud*, a man discovered that a high-status professional had conducted an affair with his wife while she was that professional's workplace intern. **He responded by emailing the man's employer and messaging his social contacts, informing them of his conduct.** The D.C. Court of Appeals, sitting en banc, held that this constituted protected speech — because it was truthful, directed at persons with a legitimate interest in the information, and contained no threat of physical harm. **Ms. Wang's situation is structurally identical:** she posted accounts of her child's father's conduct in the custody proceedings, directed at his professional and social circle, in an attempt to hold him accountable for what she perceived as the abuse of extraordinary wealth and legal resources to permanently sever her relationship with her son.

**The *Mashaud* court's reasoning carries three direct implications for sentencing here.**

First, the constitutional character of the underlying offense. Where, as here, the "course of conduct" charged under a cyberstalking statute consists entirely of communication — no following, no surveillance, no physical confrontation — the statute operates as a content-based restriction on speech, because the government must examine what Ms. Wang said, not merely that she said something. Under *Reed v. Town of Gilbert,* 576 U.S. 155 (2015), content-based restrictions are presumptively unconstitutional. The *Mashaud* court recognized this and held that such statutes may validly reach only the "narrowly limited classes of speech" that fall outside First Amendment protection — true threats, obscenity, defamation with actual malice, and speech integral to independently

proscribable criminal conduct. Ms. Wang's custody-dispute posts do not fit neatly within any of those categories — a point the government implicitly conceded by agreeing to remove the word "false" from the plea as it pertains to Victim 1.

Second, the inadequacy of criminal stalking law as a remedy for primarily reputational harm. The *Mashaud* court recognized that the appropriate remedy for harm caused by truthful or contested speech is defamation law — where truth is an absolute defense — not stalking law. Victim 1's primary grievance is reputational: his family's resources and social connections were publicly associated with a custody dispute he preferred to keep private. Deploying cyberstalking law to punish that association, without a truth defense and at Guidelines ranges calibrated for physical predators, is precisely the form of overcriminalization that proportionate sentencing exists to correct.

Third, the deterrence conclusion *Mashaud* supports. The *Mashaud* framework does not suggest Ms. Wang should have been acquitted — she has pleaded guilty and accepts responsibility. It suggests that her conduct, arising from a genuine maternal grievance and consisting entirely of online communication rather than physical acts, is substantially less culpable than the paradigmatic stalking the Guidelines were designed to address. A sentence at the minimum of the stipulated range is not leniency; it is proportionality. It sentences Ms. Wang for the offense she actually committed — persistent, harmful, legally wrongful online speech at the outer constitutional boundary of what § 2261A(2)(B) can validly reach — rather than for the far more serious conduct the Guidelines were written to punish.

**Application to the December 25, 2018 Medium Post.** The first post charged in Count 1 — published on Medium and simultaneously posted to Instagram on December 25, 2018, under the title "CT Data Scientist @ Square impregnated me and then abandoned his son" — falls directly within the protected-speech analysis of both *Mashaud v. Boone* and *People v. Bethea*, 2004 N.Y. Slip Op. 50007 (N.Y. Misc. 2004). The mapping is exact.

*Mashaud* involved (1) a public blog about the affair; (2) messages to Boone's employer and professional contacts; and (3) no threats of physical violence. The D.C. Court of Appeals held all three categories protected. The December 25, 2018 post reproduces this

structure element for element. First, it was published on Medium — a public blogging platform — and cross-posted to Instagram, both open forums that C.T. was free to "avert [his] eyes" from. *United States v. Cassidy*, 814 F. Supp. 2d 574 (D. Md. 2011) *Cassidy*, 40 Media L. Rep. at 1018. It was not sent to C.T.'s inbox, his phone, or his physical address; the post began a course of conduct that, like Mashaud's blog, existed in the public space C.T. could have ignored. Second, like Mashaud emailing Boone's employer and contacting his social circle, Ms. Wang tagged C.T.'s professional accounts (@CT, @notorioustig, @eastendmile) and identified his employer (Square Inc.) — directing the message at persons with a legitimate interest in knowing the character of a man who had abandoned his child. Critically, those tags did not generate any notification or alert to C.T.; they did not push content to his feed, his inbox, or his phone. They functioned as public search-index labels, visible to anyone who searched those handles on a public platform, but delivering nothing to C.T. directly. The post therefore remained a purely public statement — a digital bulletin board, in *United States v. Cassidy*, 814 F. Supp. 2d 574 (D. Md. 2011)'s terms — that C.T. was free to read or ignore entirely. Third, the post contains no threat of physical harm to C.T. or anyone else. Every sentence expresses outrage, accusation, grief, and public accountability; none constitutes a "serious expression of an intent to commit an act of unlawful violence." *Virginia v. Black*, 538 U.S. 343, 359 (2003). C.T.'s own testimony confirmed this: he testified that the post's caption — "CT pressured me into killing his fully developed son" — caused emotional distress, not fear of bodily harm, which is precisely the category *Yung* holds cannot be punished consistently with the First Amendment.

*People v. Bethea*, 2004 N.Y. Slip Op. 50007 (N.Y. Misc. 2004) sharpens the analysis with facts that are almost indistinguishable from the December 25, 2018 post. In *People v. Bethea*, 2004 N.Y. Slip Op. 50007 (N.Y. Misc. 2004), Linda Bethea distributed publicly posted fliers identifying the father of her child — by name, employer, and photograph — as a deadbeat who had refused to pay child support, declaring in colorful language that she hated him for abandoning his parental obligations. She was charged with Aggravated Harassment and Harassment. The Bronx Criminal Court dismissed all charges, holding: "Americans are free to say and to write bad things about each other." The court found that Bethea's "self-evident purpose was to criticize, denounce and humiliate Mr. Williams because defendant believes he has been a poor father to their child" — a purpose

the court held "lawful and legitimate because Americans are, after all, free to criticize one another." Critically, the court held that "without direct communications to the complainant a harassment conviction cannot be sustained," and that Bethea's public fliers, however offensive, did not "invade the privacy of Mr. Williams' home" and therefore fell outside the statute's valid reach. At most, the court ruled, Mr. Williams' remedy was "a civil action for defamation or the like."

The December 25 post satisfies every *People v. Bethea*, 2004 N.Y. Slip Op. 50007 (N.Y. Misc. 2004) criterion for protected expression. It identifies C.T. by name, employer, and photograph — precisely as *People v. Bethea*, 2004 N.Y. Slip Op. 50007 (N.Y. Misc. 2004)'s fliers identified Williams. Its purpose was to criticize and publicly denounce C.T. for abandoning his child — precisely *People v. Bethea*, 2004 N.Y. Slip Op. 50007 (N.Y. Misc. 2004)'s purpose, found lawful. It was published in a public space, not delivered to C.T.'s door or inbox — satisfying the "no direct communication" requirement. Unlike *People v. Bethea*, 2004 N.Y. Slip Op. 50007 (N.Y. Misc. 2004)'s handwritten fliers, moreover, the Medium post was documented with contemporaneous evidence: screenshots of C.T.'s own text messages (including his statement that the pregnancy "would definitely be a disaster," his silence at the abortion clinic for nearly three hours, and his Venmo payment labeled "gambling fund"), a Utah County Health Department pregnancy confirmation, and the Los Angeles child support filing. The post does not make up facts about C.T.; it documents them from his own communications and public records. Even if some characterizations are contested, the post contains no falsehood that the government proved — and the government expressly agreed to remove the word "false" from the plea's factual basis. The *People v. Bethea*, 2004 N.Y. Slip Op. 50007 (N.Y. Misc. 2004) court held that even potentially defamatory fliers without a violence nexus could not sustain a criminal harassment charge; here, the posts are documented rather than conclusory and contain no violence nexus at all.

Finally, the "integral to criminal conduct" exception cannot rescue the prosecution's theory as applied to this post. *Mashaud* held that argument "fatally circular": the predicate offense to which speech must be integral must be an independently proscribable non-speech offense — not the cyberstalking charge itself. The December 25, 2018 post is not integral

48

to any independently criminal act by Ms. Wang. It is not integral to extortion (no demand for money), nor to in-person harassment (no physical approach), nor to identity theft, nor to fraud. The only "crime" the government identifies is the course of online posts — and the post cannot simultaneously constitute the cyberstalking offense and lose its First Amendment protection by virtue of being integral to that same offense. *United States v. Sryniawski*, 48 F.4th 583 (8th Cir. 2022) *Sryniawski*, 48 F.4th at 588–89. The California preliminary hearing court reached the same conclusion sua sponte, interrupting the prosecution's "credible threat" argument to distinguish "coerced her into an untimely abortion" from a threat, and ultimately dismissed the social-media **counts** on First Amendment overbreadth grounds. That ruling by the court that reviewed the actual exhibits — including the December 25, 2018 post and the fetus images — is the best available evidence of how a judicial officer who confronted this material in **context** assessed it against the constitutional line. The Court should give that assessment its full weight at sentencing.

A critical boundary applies **throughout Sections D** and E above: every First Amendment proximity argument is limited to Count 1 and the V1 (C.T.) posts. The Count 2 / WS conduct — hundreds of robo-calls per day to a private individual, direct texts containing derogatory and **defamatory content, and targeted messages to his friends and** family — falls entirely outside the **constitutional margin the cases describe. Courts and** commentators **draw a sharp line between public posts on open platforms, which a recipient** may "avert [their] eyes" from, **and communications** "targeted towards a particular victim and received outside a public forum." *United States v. Cassidy*, 814 F. Supp. 2d 574 (D. Md. 2011) (quoting *United States v. Bowker*, 372 F.3d 365, 379 (6th Cir. 2004)). The WS conduct sits squarely on the unprotected side of that line: phone calls that follow a target wherever they go carry no First Amendment shelter, in-person harassment statutes are explicitly carved out as proscribable criminal conduct under *United States v. Sryniawski*, 48 F.4th 583 (8th Cir. 2022) and its progeny, and the targeted messages to WS's friends and family were not public commentary but private intrusions. Ms. Wang does not invoke constitutional proximity to soften Count 2, and the Court should not read any argument in this section as doing so. She accepted full and unqualified responsibility for the WS harm, and that acceptance stands alone, unqualified by any First Amendment analysis.

## II. Application of the 18 U.S.C. § 3553(a) Factors Supports Probation or Minimal Custody

### A. Nature and Circumstances of the Offense

### 1. Ms. Wang's Conduct Was Non-Violent, Non-Threatening, and Directed Solely at Custody Litigation

Ms. Wang made no threats of violence. She possessed no weapons. She did not threaten to shoot, hang, or physically harm anyone. Her posts—however persistent, however distressing to the victims—were expressions of outrage, accusations of wrongdoing, and attempts to marshal public or official attention to what she perceived as injustices in her custody case. Three categories of conduct formed the basis of her plea:

> **Posts about V1 (C.T.)** from December 2018 through 2019, discussing reproductive coercion, custody disputes, and her belief that he and his family were responsible for blocking her access to her son. including photographs of aborted fetuses with captions stating "C.T. pressured me into killing his fully developed son"—conduct that even the California preliminary hearing court characterized as "political speech about reproductive coercion" rather than credible threats (See Introduction-3.docx; Vol. 3, Prelim. Hrg. Tr. 409:17–20.).

> **IC3 complaints** filed in May 2019, which Ms. Wang maintains were accurate reports based on her sincere belief—supported by approximately $30,000 spent on internet forensic investigation—that impersonation posts had been used to frame her (See Introduction-3.docx, IC3 section.).

The California preliminary hearing court dismissed ten of fourteen counts, including all charges arising from 2019 and the March 2, 2024 wellness-check calls. The court expressly invoked First Amendment overbreadth principles, holding that extending a criminal protective order to general social-media posts would be unconstitutional (See Introduction-3.docx; Vol. 4, Prelim. Hrg. Tr. 472–473.). When the prosecution argued that photographs of aborted fetuses constituted "credible threats," the court intervened *sua sponte*, stating: "the caption for this is 'coerced her into an untimely abortion.' So that's a different issue from the credible threats as to stalking potentially" (Vol. 3, Prelim. Hrg. Tr. 409:17–20.).

This is conduct at the margin of the statute—conduct that three prosecutors, after years of litigation and extensive review, agreed should resolve to probation or minimal custody, not "substantial" imprisonment.

## 2. Context: Seven Years of Custody Warfare and Systematic Weaponization of Criminal Process

Ms. Wang's conduct was not indiscriminate. Every post, every communication, every IC3 complaint related directly to two individuals intimately connected to her son: V1 (C.T.), the child's father and her adversary in six years of contentious custody litigation, and V2 (W.S.), a man she believed (rightly or wrongly) was involved in impersonation efforts used against her in that same litigation.

The record reveals a disturbing pattern across seven years: at each critical custody juncture, a criminal proceeding was activated or escalated, then cited back into family court to erode or eliminate Ms. Wang's contact with her son (See Introduction-3.docx, Three-Prosecution Pattern section.). Three prosecutions followed this architecture:

This Court need not resolve whether these prosecutions were strategically timed or whether C.T.'s legal team improperly leveraged criminal process for civil advantage. But this context is "essential" under 18 U.S.C. § 3553(a)(1) "for understanding the nature and circumstances of the offense and why a first-time felony offender, with no history of violence and a record of flawless post-indictment compliance. " (See Introduction-3.docx, Three-Prosecution Pattern section.).

Ms. Wang was a mother fighting to see her child, not a sovereign citizen threatening law enforcement, not a jilted applicant terrorizing a stranger's family.

## 2. Ms. Wang Has Demonstrated Extraordinary Compliance Under Supervision

Ms. Wang's conduct under supervision has been the exact opposite. The Presentence Report confirms:

1. She "promptly obtained the required mental health evaluation at Judicial Supervision Services in August 2024"
2. She "received diagnoses for anxiety and depressive disorders"
3. She "has participated in weekly individual therapy sessions—first at JSS through December 2024, then at A.V.Y. Counseling continuously through the present"
4. She "is currently prescribed Adderall for ADHD and Sertraline for anxiety and depression, and reports that her medications have significantly helped manage her outbursts"

5. Her father "independently corroborated this progress, reporting a positive change in his daughter and confirming that her medication and therapy have been beneficial"

6. "Pretrial records indicate the defendant has been in substantial compliance with her conditions of release"

7. She "has reported as directed and followed the requirements of her location monitoring" (PSR ¶¶ [cite]; see Introduction-3.docx, PSR compliance section.)

Ms. Wang has been granted seven separate travel modifications during her pretrial supervision—to California for criminal hearings, for family court proceedings, and even for vacation. She returned on time from every single trip, with zero violations (Jan. 12, 2026 Hrg. Tr. 17:11–18:2.). Judge Pead explicitly credited this record, stating at the January 12, 2026 hearing: "under the rules imposed by Judge Stewart, no violation under modifications, no violation. I think those things go to her credit—they demonstrate some trustworthiness" (Jan. 12, 2026 Hrg. Tr. 4:6:1–4.).

Ms. Wang has demonstrated the opposite through her conduct. She entered guilty pleas in three jurisdictions. She has complied with every condition of supervision for 21.8 months. She has engaged meaningfully in treatment. She has ceased all contact with the victims since 2017 with V2 (WS). This is what acceptance of responsibility looks like—not in words, but in sustained conduct.

### 3. Ms. Wang Faces Profound Collateral Consequences

Ms. Wang faces profound collateral consequences that far exceed any collateral impact on a typical defendant:

1. **Permanent loss of her only child.** The last time she held her son was May 17, 2024—the "DNA Mommy" visit. A Danish court has now extinguished all contact, including even her statutory right to receive information about his welfare (See Introduction-3.docx, Introduction and Danish judgment sections.).

2. **Career destruction.** She has been unable to secure employment at major retailers for seven years due to pending felonies. She now works part-time at $14.50/hour in food service, with hours limited by a physical disability affecting the use of her hands (See Introduction-3.docx, financial circumstances section.).

3. **Financial ruin.** She has a negative net worth of approximately $168,646, with roughly $143,646 accrued since 2019 defending against litigation financed by one of the wealthiest families in the world (See Introduction-3.docx, financial circumstances section.).

4. **Federal felony conviction.** The conviction will remain on her record for life—a permanent barrier to professional licensure, employment, housing, and civil rights.

These are not abstract consequences. They are the lived reality of Ms. Wang's choices, and they constitute severe punishment wholly independent of any custodial sentence this Court might impose.

---

## C. Meeting Sentencing Purposes

### 1. Reflect the Seriousness of the Offense

Ms. Wang's situation is defined by a deeply painful set of circumstances no reasonable person should have to endure alone. She gave birth to Victim 1's child without receiving so much as a single phone call inquiring whether the baby had arrived safely, whether the infant was healthy, or whether mother and child were stable. Instead, when she reached out and shared pictures of their newborn, Victim 1 and his entire family — Ivy-League educated and extremely wealthy — blocked her. The message was unmistakable: she and the child they had created together did not exist to them. The only communication ever received from Victim 1's attorney — the same attorney who orchestrated the interstate transfer of the child from Utah to California — was a request for Ms. Wang's tax returns, apparently for the purpose of minimizing Victim 1's child-support obligation. When Ms. Wang cooperated and asked, simply and directly, whether Victim 1 wished to be involved in his child's life, she was met with silence once again. She felt judged. She felt lied to. She felt utterly alone.

When Ms. Wang attempted to initiate reasonable communication and was denied, she allowed those painful assumptions — whether ultimately correct or not — to overwhelm her judgment. Her reaction was wrong, and she does not dispute that.

But no one has suffered the consequences of that reaction more severely than Ms. Wang herself. This case has consumed more than seven years of her life; she has been on home detention for the past two years and has had severely limited freedom for the seven-plus years preceding sentencing. It has cost her the relationship with her only child — a child she is unlikely to be able to have again, given her age — and has saddled her

with a lifelong felony conviction. Most painfully of all, she has lost her son. Ms. Wang would gladly accept a custodial sentence if it meant she could see her child again. That, however, is not part of the plea offer before this Court.Wang-Kailin-PSR-2.24CR163-1.pdf+1

The machinery that produced this outcome did not arise organically. It was constructed through a series of extraordinary — and deeply troubling — procedural maneuvers. On March 6, 2019, Victim 1's attorney, Darrick Chase, obtained an ex parte sole-custody order in San Francisco Superior Court for a child Victim 1 had, at that point, never met — while Ms. Wang was listed on the court record as "Not Present, and Not Served." On that very same day, Chase and Victim 1's team traveled to Utah and enlisted the Utah Division of Child and Family Services, relying in part on an alleged social-media post that Ms. Wang has denied making to this day and that was never proven to be hers. That ex parte order, and the interstate transfer of jurisdiction it enabled, set in motion everything that followed.Wang_Supplemental_Sentencing_Memo.docx+1

Darrick Chase died by suicide on January 21, 2023 — the weekend before he was scheduled to argue Victim 1's motion to permanently terminate all of Ms. Wang's contact with her son. According to the Marin County Sheriff-Coroner's Report of Death (Case # CR2300020), Chase had exhibited significant job-related distress and sleep deprivation, and his son reported that one particular case had been especially troubling to him in the days before his death; the coroner's report, Chase's own holographic will, and communications filed in Marin County probate proceedings collectively point to CT (V1) v. Wang as the central source of that distress. Chase took his own life before he could argue the motion to strip a mother of her child.\

That would be remarkable standing alone. But it does not stand alone. The Utah assistant DCFS attorney who facilitated the removal of Ms. Wang's infant son was later convicted of child rape. The federal prosecutor involved in related proceedings has since been formally sanctioned for serious misconduct in other cases. These are not simple coincidences of bad luck. They form a pattern that raises an unavoidable question: how

was a private citizen able to enlist such a constellation of compromised officials in the removal of a mother's child — a child she had carried, delivered, and was raising alone?

Ms. Wang did not manufacture this chaos. She was dropped into it the moment Victim 1 chose silence over accountability. Her offense is serious, and she accepts responsibility for it. But the surrounding context — the extreme deprivation of contact with her child, the cascading institutional failures, and the already-severe consequences she has endured — shows that a sentence at the low end of the stipulated range is sufficient to reflect the seriousness of the offense and the harm already inflicted.

Ms. Wang's conduct—posting and filing of the IC3 complaints was made because she 100% believed the conduct alleged to be accurate, the publishing of articles with images of aborted fetuses with captions that clearly stated that because defendant did not abort a 18-20-week-old baby. V1 abandoned her and her son, it was never included to promote fear, it was to show how V1 is a deadbeat father, this—does not remotely approach that level of seriousness. The government itself withdrew language characterizing the IC3 complaints as "false" in the final plea agreement, acknowledging that Ms. Wang "consistently maintained that she believed the IC3 reports were accurate". The FBI never followed up on those complaints. V2 testified he was unaware they even existed.

The preliminary hearing court dismissed ten of fourteen counts, including those predicated on Ms. Wang's social-media commentary, expressly invoking First Amendment principles When pressed by the prosecution to identify "credible threats" in the abortion-related posts, the court refused, distinguishing between "coerced her into an untimely abortion" (political accusation) and actual threats of violence (See Introduction-3.docx; Vol. 3, Prelim. Hrg. Tr. 409:17–20.).

Ms. Wang's conduct was serious enough to warrant federal charges and guilty pleas. But it was not serious enough to warrant years of imprisonment. Three prosecutors—federal, California, and Utah—independently reviewed the complete record and agreed: probation to twelve months is the appropriate range. That collective prosecutorial judgment should carry significant weight.

55

## 2. Promote Respect for the Law

Ms. Wang has demonstrated respect for the law through her conduct:

- She entered guilty pleas in three jurisdictions, accepting responsibility
- She complied with 21.8 months of intensive pretrial supervision without violation
- She ceased all contact with the victims immediately upon plea
- She engaged meaningfully in mental health treatment and medication management
- She appeared at every required hearing and traveled as authorized, returning on time every time
- She accepted stringent conditions including GPS monitoring, home detention, and internet restrictions

When Judge Low clarified in May 2021 that she could not reuse court-stamped subpoena forms, she stopped immediately and never repeated the conduct (See Introduction-3.docx, Utah subpoena case section.). When this Court imposed pretrial conditions, she followed them to the letter. That is respect for the law—not perfect compliance before charges were filed, but complete compliance once boundaries were clearly established.

Ms. Wang's conduct does not reflect brazen disregard—it reflects the desperate, misguided efforts of a mother who believed (rightly or wrongly) that the legal system was stacked against her and that her only recourse was public advocacy and complaints to authorities. She was wrong about the means. But her compliance since plea demonstrates that she can and will follow court orders when given clear boundaries.

## 3. Provide Just Punishment

Ms. Wang has already been punished severely:

- She spent May 23 to July 10, 2024 in federal detention
- She has been under intensive GPS supervision, home detention, and internet monitoring for 21.8 months
- She has lost her only child, likely permanently
- She has been convicted of serious federal felonies that will follow her for life
- She has accrued $168,646 in debt defending against three criminal cases
- She has been unable to work in her chosen profession for seven years
- She faces ongoing probation supervision for up to five years

56

Five years of probation—the floor of the stipulated range—is itself a serious sentence. It will require sustained compliance with conditions including no-contact orders, mental health treatment, technology restrictions, etc. For someone who has already been under court supervision continuously since 2019 across multiple jurisdictions, an additional five-year term means effectively *twelve years of continuous judicial oversight* (See Introduction-3.docx, probation duration section.).

That is substantial punishment, proportionate to the offense, and sufficient to reflect the seriousness of Ms. Wang's conduct without destroying what remains of her life.

**4. Provide Adequate Deterrence**

Ms. Wang's case has nothing to do with that phenomenon. She is not a sovereign citizen. She filed no frivolous "quo warranto" writs. She did not accuse prosecutors of human trafficking or claim exemption from U.S. laws. She simply fought—inappropriately, unlawfully—to maintain contact with her child.

General deterrence is already served by the fact of federal prosecution, conviction, and supervision. The message has been sent: using online posts and complaints to authorities as weapons in custody litigation will result in federal charges, guilty pleas, and serious consequences. Ms. Wang has become a cautionary tale. Imposing years of imprisonment serves no additional deterrent purpose—it simply punishes more, not better.

Specific deterrence is equally well-served by probation. Ms. Wang has demonstrated zero recidivism risk during 21.8+ months of pretrial supervision. The conduct underlying Count 2 (V2/W.S.) stopped in November 2017—nine years ago (See Introduction-3.docx, WS (V2) section.). The conduct underlying Count 1 ceased in 2019, with one isolated 2024 post that is constitutionally problematic (See Introduction-3.docx, prelim hearing dismissals section.). Ms. Wang has no meaningful capacity to reoffend: V1 resides in Denmark with sole custody, V2 is has not complained of any harassment since November 2017, and her son has been taken from her permanently, while there is residual litigation left, given the distance, and the circumstances it is likely Wang will never see her son ever again. What is there left to deter?

**5. Protect the Public from Further Crimes of the Defendant**

Ms. Wang has expressed no such warnings. To the contrary, she has demonstrated through 21.8  months of flawless compliance that she is *exceptionally* ready to succeed under supervision. The Probation Office independently assessed: "Pretrial records indicate the defendant has been in substantial compliance with her conditions of release" (PSR ¶ [cite]; see Introduction-3.docx, PSR section.). Three federal judges—Magistrate Judge Oberg, Judge Stewart, and Magistrate Judge Pead—have reviewed her conduct and found her trustworthy and compliant (See Introduction-3.docx, judicial findings section.).

Ms. Wang was arrested leaving a supervised visitation site without incident. She possesses no weapons. Ms. Wang has ceased all unauthorized contact and complied with every condition.

Public safety does not require Ms. Wang's incarceration. It requires continued supervision—exactly what five years of probation provides.

**6. Educational Training, Medical Care, or Other Corrective Treatment**

Ms. Wang is *already engaged* in exactly that treatment—and it is working. She has participated in weekly individual therapy since August 2024. She is prescribed and compliant with medications for ADHD, anxiety, and depression. Her father reports "a positive change in his daughter" and confirms "that her medication and therapy have been beneficial" (PSR ¶¶ [cite]; see Introduction-3.docx, PSR section.). The Probation Office confirms this progress.

Incarceration would *disrupt* that treatment. It would sever her relationship with her current therapist, interrupt her medication management, and require starting over with new providers in a custodial setting. Probation, by contrast, allows continuation of the very treatment that is producing documented progress.

Ms. Wang expects to sit for the LSAT within six months of sentencing and intends to pursue a career as a licensed attorney (See Introduction-3.docx, LSAT section.). Probation maximizes her chances of completing that education and rebuilding her life. Incarceration does the opposite—it destroys employment, interrupts treatment, and eliminates any realistic opportunity for Ms. Wang to preserve her rights in the pending

58

California and Danish appellate proceedings (See Introduction-3.docx, custodial consequences section.).

The goals of sentencing are best served through continued mental health treatment and counseling in the community, coupled with supervision, no-contact orders, and technology monitoring, and employment requirements. A custodial term would impose substantial collateral consequences without advancing deterrence or public safety.

## D. The Kinds of Sentences Available

Ms. Wang's case is governed by a Rule 11(c)(1)(C) plea agreement with a stipulated range of five years probation to twelve months imprisonment, followed by three years of supervised release. This Court is not bound by that agreement, but three prosecutors representing three sovereigns, each fully familiar with the record, have independently agreed that probation to twelve months is the appropriate outcome (See Introduction-3.docx, global plea section.).

That collective judgment deserves substantial weight. If this Court does not accept the agreement, the parties will face three full trials:

- The California stalking case, which required five days merely for the preliminary hearing and carries an estimated two-month trial
- The reinstated Utah state subpoena case
- A federal trial in this District that would require more than five days

All three prosecutorial offices reviewed the complete record—including posts, communications, victim impact, and forensic evidence—and concluded that the stipulated range is just. This Court should adopt that conclusion.

## D-1. The IC3 Complaints: Wang's Continued Position, the Coercive Plea Circumstances, and the Accurate Sentencing Record

### Why the Plea Was Nonetheless Appropriate

Despite Wang's unresolved objections to specific factual characterizations — particularly regarding the IC3 complaints — the plea represented a reasonable and pragmatic resolution of an extraordinarily complex multi-jurisdictional matter. The agreement simultaneously resolved four separate criminal cases that had been pending since as early as 2017 (the WS (V2) related Utah Spanish Fork proceedings) and 2019

(the California stalking case, the Utah state forgery/false statement case, and the federal indictment). Proceeding to trial carried enormous risk given the combined resources of the United States Attorney's Office, the San Francisco District Attorney's Office, and Victim 1's extensive team of private attorneys and experts who had been litigating against Wang for over six years. Wang's federal public defenders, while capable, entered the case late and did not have the years of institutional familiarity with the full factual record that CT (V1)'s team had accumulated. The imbalance was structural and undeniable.

Wang did not go pro se — a decision she made deliberately and with clear eyes, understanding that the overwhelming statistical reality is that pro se defendants in federal criminal cases fare catastrophically worse than represented defendants, regardless of the merits of their positions. This was not weakness or capitulation; it was a rational assessment of risk.

**Wang's Continuing Position: The IC3 Complaints Were True**

Wang has at all times — before, during, and after plea negotiations — maintained that every allegation contained in her IC3 complaints filed on May 16, 2019 and June 15, 2019 was true. She submitted those reports under digital signature with full awareness of the 18 U.S.C. § 1001 disclosure warning. She would not have done so — and would not have simultaneously paid approximately $30,000 out of pocket to retain an internet attorney (Kronenberger Burgoyne) to investigate the same posts — if she had fabricated the allegations. The expenditure of $30,000 in legal fees to investigate posts she herself allegedly created would be irrational on its face. That financial record, combined with the emails Wang sent to her attorneys and to the San Francisco Police Department during the relevant period, constitutes powerful circumstantial evidence that Wang genuinely believed CT (V1) or someone acting on his behalf had made those posts.

**The Circumstantial Evidence Supporting the IC3 Complaints**

The specific posts identified in the IC3 complaints — particularly the March 6, 2019 "Kill Baby K" post on Holysmoke.org — warrant careful scrutiny that has never been fully conducted. The timing of the posts aligns precisely with verified law enforcement activity. Sgt. Michelle Martinez of the San Francisco Police Department

conducted an interview with WS (V2) on February 15, 2019 — the same day that multiple posts about Wang began appearing online. Wang did not learn of this police contact or the contents of Sgt. Martinez's report until after the California state felony information filed on October 17, 2019, well after the IC3 complaints were filed. Wang therefore could not have fabricated a connection between law enforcement activity and the timing of the posts — she learned of that connection only after the fact, which actually corroborates her account.

The PSR notes that a search warrant served on Holysmoke.com indicated the March 6, 2019 "Kill Baby K" post was made from the Newark, New Jersey geographic region. Wang at that time listed her home address as New York, filed a police report with the NYPD on March 7, 2019 accusing C.T. of impersonating her, and reported the same to the IC3. This is consistent with Wang's claim that she was in the New York area and someone else — located nearby — made the post using her name. The PSR does not resolve this geographic ambiguity; it simply notes it without drawing a conclusion.

The geographic ambiguity the PSR notes is in fact resolved by T-Mobile cell-site location information (CSLI) produced pursuant to a search warrant. T-Mobile records (Tracking ID 2847939, certified by Custodian of Records Deisi Franco, August 6, 2020) confirm that Wang's phone registered at 65 West 70th Street, New York, NY 10023 continuously throughout all of March 6, 2019 — from midnight through 11:59 PM. The Kill Baby K IP address (108.162.219.228) geolocates via MaxMind GeoIP2 to Newark, New Jersey — a Cloudflare data center city approximately 15.2 miles from Wang's confirmed Manhattan location. Law enforcement's own analysis expressly concluded that the IP "has NOT been matched to the 21,000 IP addresses from the Medium Account nor the 100,000 IP addresses contained in the Search Warrant returns from the 16 Gmail Accounts" and that "it is not possible Wang made the March 6, 2019 Kill Baby K post." (PSR Obj. App., Exh. N.)

Three independent law enforcement sources reached the same conclusion. First, Cloudflare Trust & Safety (Report #2586627, David N., May 17–18, 2019) confirmed in writing that HolySmoke.org "was logging the wrong IP addresses" and that no user data could be produced from those addresses — destroying the entire probable-cause theory on

which the March 8, 2019 search warrant had been issued. (PSR Obj. App., Exh. K.) Second, SFPD Sgt. Martinez told Wang's attorney on May 22, 2019: "I have to prove that a post came from a specific person, and sometimes IP addresses are spoofed" — an acknowledgment by the investigating officer herself that attribution was legally insufficient. (SFPD Chron. p. 17 of 31; PSR Obj. App., Exh. R.) Third, when Sgt. Martinez filed the October 17, 2019 arrest warrant covering the identical investigation period, she charged Wang on 11 counts based on Medium and Instagram accounts with confirmed IP-to-subscriber attribution, and omitted the Kill Baby K post entirely. The DA charged Wang on everything it could prove and excluded the one post it could not. (PSR Obj. App., Exh. P.) Utah DCFS reached the same result independently: on November 6, 2019 — eight months after removing the infant from Wang's parents' home — DCFS reversed its "Supported" finding to "Unsupported," a reversal that followed directly from Cloudflare's forensic confirmation that the IP could not be attributed to any individual user. (PSR Obj. App., Exh. I.)

Wang's own conduct confirms the same conclusion. Between May and July 2019 — while describing herself as "bankrupted" from litigation — she paid $29,579.11 to internet-law specialists Kronenberger Rosenfeld LLP to pursue subpoenas against Cloudflare, Google, Charter, and Comcast, seeking forensic evidence proving she had not authored the Kill Baby K content. A person who made that post would have no rational incentive to spend money she did not have generating forensic paper trails against herself. (PSR Obj. App., Exh. K, L, M.) Every attempt to compel sworn Cloudflare testimony — in 2019, 2022, 2023, and 2025 — was blocked by C.T.'s counsel; each time compelled sworn testimony was imminent, C.T. simultaneously withdrew the post from the proceeding before him and reintroduced it in the next forum where forensic accountability could not be demanded. (PSR Obj. App., Exh. O, T, X, BB.) On June 12, 2025, Judge Roeca of the San Francisco Superior Court asked C.T. directly whether he planned to introduce the Kill Baby K post at the long-cause trial. C.T. answered under oath: "That's not my expectation." When Wang asked the Court to confirm this constituted a finding of irrelevance, Judge Roeca stated on the record: "That's correct." (June 12, 2025 RT 4:20–6:6; PSR Obj. App., Exh. Z.) The post has never been admitted into evidence, no court has made a factual finding that Wang authored it, and the only party with standing to

introduce it has now disclaimed intent to do so under oath. Any reliance on this post as an established adverse fact at sentencing would incorporate into the federal record an evidentiary determination that three independent law enforcement bodies declined to make and that C.T. himself declined to defend at trial.

Regarding WS (V2) specifically: WS (V2) was found culpable of harassing Wang in three separate civil stalking injunction proceedings held after evidentiary hearings. WS (V2) had his own documented history of spreading false information about Wang, including contacting her employer at Goldman Sachs where she was temping and making statements to mutual acquaintances. Wang had an objectively reasonable basis to believe WS (V2) was engaged in coordinated online activity against her, and the IC3 complaints reflected that reasonable belief.

**Why the Government Needed the IC3 Complaints for Federal Jurisdiction**

Wang's former defense counsel communicated to her that AUSA Blanch had expressed concern about the robustness of the federal government's jurisdictional basis for the cyberstalking charges as to V2 (W.S.), given that the core conduct occurred in 2017 — well over five years before the May 2024 indictment — creating statute of limitations exposure. The California state stalking case already covered much of the V1 (C.T.) and V2 (W.S.)-related conduct. The government therefore required something that was unique to the federal case and not duplicative of the California state proceedings, in order to protect the plea and any resulting conviction against an appellate challenge — even under a Rule 11(c)(1)(C) binding plea agreement. The IC3 complaints, filed in 2019, served that function: they were federal reports made using interstate computer systems, they post-dated the 2017 conduct, and they implicated both victims simultaneously. From the government's perspective they were jurisdictionally essential. From Wang's perspective, admitting they were made for improper purposes was the single most contested element of the entire negotiation.

**What Wang Actually Admitted and What She Did Not**

The final filed factual basis — as reflected in both the plea agreement and the PSR — states only that Wang made the IC3 reports "in order to have Victim 1 and Victim 2

investigated by law enforcement in order to continue harassing and intimidating" them. Critically, the government agreed before the plea was entered to remove the words "false" and "defamatory" from the factual basis. Wang did not admit the reports were false. She did not admit she fabricated the underlying allegations. The admitted language describes the purpose of the reports as characterized by the government — a characterization Wang disputes but which was the minimum language the government would accept to resolve all four pending cases.

Wang objects to any characterization in the PSR or at sentencing that treats the IC3 complaints as established fabrications. The admitted facts do not support that conclusion, the investigation was never completed to a standard that would support it, and Wang continues to assert that the reports were truthful reflections of her reasonable belief at the time they were filed.

**Objections for the Sentencing Record**

Ms. Wang formally objects to the following for the sentencing record: (1) any characterization of the IC3 complaints as knowingly false, which goes beyond what the factual basis actually admits; (2) any implication that the Motion to Revoke reflected actual violations, given that the motion was withdrawn without litigation and the underlying conduct did not meet the legal standard for contempt; and (3) any failure to capture the coercive practical circumstances — including the threatened filing of the Motion to Revoke and defense counsel's advice that the available terms would only worsen — under which the plea was entered. These objections do not seek to withdraw the plea or contest the conviction; they seek an accurate factual record for sentencing purposes.

This temporal evidence connects directly to the plea-integrity argument below. When the government negotiated the removal of "false," "defamatory," and "in truth" from the plea's factual basis, it did so against the full backdrop of the corroborating record: the posting timeline that mirrors the W.S. interview; Ms. Wang's written insistence throughout negotiations that the IC3 reports were truthful; her $30,000 expenditure to identify the real author; and the systematic forum-by-forum blocking of

every attribution subpoena by C.T.'s counsel. The government chose not to require Ms. Wang to admit fabrication because it could not establish fabrication by a preponderance against a record this strong. Under the principles articulated in *United States v. Giorgi*, 840 F.2d 1022 (1st Cir. 1988), and *Santobello v. New York*, 404 U.S. 257 (1971), the government is now bound by that concession and may not use the PSR to extract at sentencing the falsity finding it surrendered at the bargaining table. The discovery expenditure, the blocked subpoenas, and the negotiated removal of the falsity language from the plea together form a single, coherent evidentiary record that defeats the § 1001 relevant-conduct theory on every element: falsity, materiality, willfulness, and plea integrity.

**The Plea Agreement Confirms That the IC3 Reports Were Not Admitted as False**

**A. Wang Pleaded Guilty Only After the Government Agreed to Remove the "False" Characterization From the Factual Basis**

The plea negotiations produced an explicit, documented concession by the government that the IC3 complaints would not be characterized as false statements. That concession is memorialized in the evolution of the plea agreement from Draft 1 through the final executed version, designated by the government as its "FINAL OFFER OR REVOKE PROBATION AND TRIAL" on September 25, 2025. Draft 1 of the factual basis included "in truth" language and described the IC3 complaint as containing "false" and "defamatory" statements. Ms. Wang expressly and repeatedly objected to that language, communicating to the government: "I cannot admit to what I absolutely DID NOT post myself and certainly did not lie about in the IC3 reason." In direct response, the government removed the "false," "defamatory," and "in truth" language from the final agreed factual basis. AUSA Blanch confirmed in writing that plea negotiations were about "what facts [Wang] was willing to admit." The omission of any § 1001 or falsity language regarding the IC3 complaints was therefore deliberate, not accidental. See Ex. 28 (Sept. 15–25, 2025 USA v. Wang plea emails and drafts of three plea versions).

The stakes of the government's attempted end-run around that bargain are not abstract. Ms. Wang testified under oath — in depositions, evidentiary hearings, preliminary hearings, and family-court proceedings across California, Utah, and New

York — that she did not make the "Kill Baby K" post and that her IC3 reports were truthful. She gave that testimony before multiple judges over more than seven years, and that consistent sworn record is a principal reason she maintained any parental contact with her son during that period. If this Court were to adopt the PSR's characterization of the IC3 reports as knowingly false, it would retroactively render seven years of Ms. Wang's sworn testimony perjurious — testimony given in multiple jurisdictions across multiple cases. Ms. Wang's family's September 2025 correspondence to AUSA Blanch and defense counsel warned explicitly that compelling an admission of fabrication "not only exposes Wang to new criminal liability for perjury but also results in a cascade of additional criminal charges," and that Victim 1 "would absolutely pursue" such exposure. Ex. 28 at 17–18. This risk was known to the government during negotiations; the removal of the falsity language from the plea was the mechanism by which both sides understood that risk to be resolved. The government extracted its plea on those terms. *Santobello* does not permit it to re-litigate at sentencing what it relinquished at the bargaining table.

The coercive context of the plea further informs how this Court should weigh the government's current position. Ms. Wang was a financially indigent defendant — by her own contemporaneous account, bankrupt from years of litigation — facing the combined resources of the United States Attorney's Office, the San Francisco District Attorney's Office, and Victim 1's team of attorneys and experts who had been litigating against her for over six years. The government communicated through defense counsel that a motion to revoke pretrial release would be filed within two weeks if Ms. Wang did not accept the plea, and that the terms would only worsen. Faced with the choice between accepting a plea that omitted the falsity language or proceeding against five attorneys while risking a statutory maximum of ten years on the cyberstalking counts alone, Ms. Wang accepted the final offer — while simultaneously and consistently maintaining in writing that the IC3 reports were true. The asymmetry of bargaining power, the explicit threat of worsening terms, and Ms. Wang's documented contemporaneous insistence on removing the falsity language are each relevant to the weight this Court assigns the PSR's characterization of the IC3 reports. As *Giorgi* instructs, "the most meticulous standards of both promise and performance must be met by prosecutors engaging in plea bargaining," 840 F.2d at 1026 (quoting *Correale v. United States*, 479 F.2d 944, 947 (1st Cir. 1973)),

and "the costs of an unclear agreement must fall upon the government," which "must shoulder a greater degree of responsibility for lack of clarity in a plea agreement." *Id.* at 1027. That promise here was made to a defendant who had no realistic alternative and who accepted the plea on the precise condition that the falsity characterization be removed.

Having affirmatively bargained away any admission of falsity in order to secure Ms. Wang's plea, the government cannot now seek through the PSR what it surrendered at the bargaining table. The government may not re-import the abandoned falsity theory via uncharged relevant conduct at sentencing. Under *Santobello v. New York*, 404 U.S. 257, 262 (1971), when a guilty plea rests "in any significant degree" on a prosecutorial promise, that promise "must be fulfilled." Ms. Wang's plea rested in the most direct possible degree on the government's agreement to remove the falsity language — that removal was her stated condition, her documented objection, and the specific term the government agreed to in its final offer. A plea agreement is, as *Giorgi* recognizes, "not an appropriate context for the Government to resort to a rigidly literal approach in the construction of language," 840 F.2d at 1026, and any ambiguity as to the scope of what the government conceded must be resolved against it. If the government understood its removal of the word "false" to be a minor drafting concession that left the § 1001 theory intact for sentencing purposes, that understanding was never communicated to Ms. Wang and is irreconcilable with her documented position throughout negotiations. The Court should hold the government to the agreement it made, decline to treat the IC3 complaints as established fabrications, and evaluate the PSR's characterization in light of the full corroborating record that the government's own plea negotiating conduct implicitly acknowledged.

---

### Tao Materiality, the Sgt. Martinez Two-Affidavit Divergence, and the § 1001 / § 2261A Distinction

Even if the Court were to treat the IC3 reports as relevant conduct, the Tenth Circuit's binding decision in *United States v. Tao*, 107 F.4th 1179 (10th Cir. 2024), forecloses § 1001 treatment on this record. *Tao* demands an identifiable, actual federal agency decision that the statement was capable of influencing — and that capability must rise

above "mere metaphysical possibility." *Id.* at 1185, 1187. IC3's own published guidance confirms that it "does not conduct investigations"; it is a passive data-aggregation intake portal with no adjudicative function. There was no pending federal decision in 2019 for Ms. Wang's reports to influence. When an FBI agent later retrieved those complaints, he did so in the course of an investigation already underway — one targeting the identical cyberstalking allegations charged in the San Francisco case. The IC3 complaints generated no investigation; the investigation retrieved the complaints retroactively from a dormant database five years after they were filed. Under *Tao*'s anti-manufacture rule, "the government may not manufacture materiality by charging someone with a federal crime." *Id.* at 1190. The Court should decline to treat the IC3 complaints as § 1001 conduct at sentencing.

The jurisdictional defect is independently fatal. Under *Tao*, § 1001 "jurisdiction" exists only over matters that concern the "authorized functions of an agency or department" rather than "matters peripheral to the business of that body." 107 F.4th at 1183 (quoting *United States v. Rodgers*, 466 U.S. 475, 479 (1984)). The Tenth Circuit in *Tao* held that federal agencies do not acquire § 1001 jurisdiction merely because they fund an institution or because a grantee's internal form might someday be relevant to an agency decision — the statement must directly concern the agency's exercise of authority "in a particular situation." *Id.* That principle applies with full force here: the IC3 portal is a passive public intake system with no adjudicative, investigative, or enforcement function. The FBI's decision — five years after the fact — to retrieve dormant IC3 data in the course of an already-running investigation does not retroactively vest the portal with § 1001 jurisdiction at the time of filing. Nor does the connection between IC3 and the FBI supply what *Tao* requires: an agency actively exercising authority over the subject matter of the statement. Just as "jurisdiction does not simply follow federal money wherever it may lead," *United States v. Blankenship*, 382 F.3d 1110, 1138 (11th Cir. 2004) — quoted approvingly in *Tao* — § 1001 jurisdiction does not simply follow a citizen's report to any federal intake portal wherever it may eventually be retrieved.

The specific-decision requirement reinforces this conclusion. *Tao* teaches that determining materiality requires identifying "what decision was the agency trying to make" and then asking "whether the statement was material to the decision." 107 F.4th at 1186 (quoting *United States v. Gaudin*, 515 U.S. 506, 512 (1995)). In *Tao*, reversal was required because the government "never identified an NSF decision to which the [form] could have been material" — and the court found the omission fatal even though the agency concededly funded the grantee and cared about researcher conflicts of interest in the abstract. *Id.* at 1187. The government faces the same deficiency here. The IC3 complaints were filed in May and June 2019. The FBI never opened an investigation based on them. No agent reviewed them at the time of filing. No supervisor made a charging decision in response to them. The first time any federal official interacted with those complaints was when the FBI retroactively retrieved them years later in the course of an already-pending investigation. The government cannot identify — because it does not exist — a specific FBI investigative determination that Ms. Wang's 2019 reports actually influenced or were capable of influencing. Absent that showing, *Tao* forecloses any § 1001 treatment of the IC3 complaints at sentencing.

The fair-warning principle from *Tao* independently bars treating Ms. Wang's IC3 submissions as aggravating conduct. In *Tao*, the Tenth Circuit stressed that the vagueness doctrine "bars" a conviction where persons of "common intelligence" would not have concluded that their conduct was a federal offense, and that the "rule of lenity" bars "applying a novel construction of a criminal statute." 107 F.4th at 1192 (quoting *United States v. Lanier*, 520 U.S. 259, 265 (1997)). In *Tao*, a key indicator of insufficient notice was that the KU form itself warned only of "disciplinary action" for misrepresentations — not federal criminal liability — signaling that any consequences would be handled internally rather than prosecuted as a felony. *Id.* at 1193. An exactly analogous notice gap exists here. The IC3 form carries a boilerplate § 1001 warning addressed to deliberate fabrications — not to sincerely held, good-faith reports that a law enforcement intake system later declines to act on. A citizen reporting to the FBI that she believes someone impersonated her online — a report that law enforcement never investigated, that was never acted on, and that the filer supported with $29,579 in forensic subpoenas — has no notice that this constitutes a federal felony, any more than Dr. Tao had notice that his internal employment disclosure was a federal crime. The Tenth Circuit's warning in *Blankenship* — that an overbroad reading of § 1001 produces "shocking" results — applies here with particular force: if every IC3 submission that the FBI later retrieves is a potential § 1001 offense, then any victim who files an inaccurate crime report risks federal prosecution, a result that would chill the very citizen-reporting conduct the FBI designed the IC3 portal to encourage. 382 F.3d at 1137–38. That consequence is doubly troubling where, as here, the government has expressly agreed to remove the word "false" from the factual basis of the plea, conceding that it cannot sustain the falsity finding even under a lenient standard. The Court should decline to treat the IC3 complaints as § 1001 conduct for sentencing purposes.

The *Tao* Reply Brief adds a textual argument that independently forecloses § 1001 treatment of the IC3 complaints: 18 U.S.C. § 1001(a)(2) — the specific subsection the government invokes — criminalizes only affirmative materially *false statements*; it does not reach omissions. When Congress enacted the False Statements Accountability Act of 1996, it deliberately divided the prior single offense into three distinct provisions: § 1001(a)(1) for material omissions where there is a duty to disclose; § 1001(a)(2) for affirmative false statements; and § 1001(a)(3) for false writings. H.R. Rep. 104-680, at 8, 1996 U.S.C.C.A.N. 3935, 3942. Reading § 1001(a)(2) to encompass incomplete or partially inaccurate reports would render § 1001(a)(1) surplusage — a result that violates elementary rules of statutory construction. *See* Navajo Nation v. Dalley, 896 F.3d 1196, 1215 (10th Cir. 2018). This distinction maps directly onto the IC3 complaint record. The government expressly agreed to remove the word "false" from the plea's factual basis — effectively conceding it cannot establish that the reports were comprehensively fabricated affirmative lies. At most, the record supports the conclusion that Ms. Wang's IC3 submissions reflected sincere but disputed beliefs about attribution — a characterization that sounds in omission or overstated inference, not affirmative falsity. Section 1001(a)(2), as properly construed after *Tao*, does not reach such conduct.

Finally, the Supreme Court's unanimous decision in *Ciminelli v. United States*, 598 U.S. 306 (2023) — cited in the *Tao* Reply Brief — supplies the controlling principle of restraint. *Ciminelli* held that courts must not "vastly expand federal jurisdiction without

69

statutory authorization," and warned that overbroad readings of federal criminal statutes risk making "almost any deceptive act" criminal. 598 U.S. at 316. The Court further cautioned against readings that "criminalize traditionally civil matters and federalize traditionally state matters." *Id.* The government's effort to treat IC3 complaints as de facto § 1001 violations at sentencing runs headlong into this instruction. Filing a report with a federal crime-tip intake portal is not a proceeding within the "authorized functions" of an investigative body; it is the act of a private citizen reaching out to law enforcement in circumstances where — as the *Tao* Reply Brief emphasizes — the government provides "no limiting principle" that would cabin the expansion it seeks. Treating Ms. Wang's good-faith reports to federal law enforcement as aggravating § 1001 conduct would place citizen crime-reporting under federal criminal superintendence with no discernible boundary — precisely the overreach *Ciminelli* forbids.

The Sgt. Martinez two-affidavit divergence independently establishes that Ms. Wang's IC3 attribution was not a knowing false statement. On March 8, 2019 — two days after the Kill Baby K post appeared — Sgt. Martinez swore under penalty of perjury in her Holysmoke.org search warrant affidavit that the post constituted probable cause, quoting it verbatim and citing it as the sole basis for the warrant Judge Quinn issued. Seven months later, on October 17, 2019, Sgt. Martinez filed an arrest warrant charging Ms. Wang on eleven counts arising from the same investigation — and deliberately omitted the Kill Baby K post entirely. The same officer, under oath, on the same investigation: used the post to obtain a search warrant in March and excluded it from criminal charges in October. The intervening reason is not difficult to identify. Cloudflare had confirmed that the IP addresses associated with the post resolved to shared edge nodes, and T-Mobile CSLI had confirmed that Ms. Wang was in New York City throughout March 6, 2019. The government charged what it could prove and excised what it could not. That sworn charging judgment constitutes an official determination — by the government's own investigating officer — that the Kill Baby K post was not attributable to Ms. Wang even to the probable cause standard. The prosecution's current effort to characterize Ms. Wang's IC3 attribution of that post as a *knowing* false statement is irreconcilable with the sworn conduct of its own witness.

Finally, a guilty plea to § 2261A cyberstalking neither supplies nor substitutes for proof of any § 1001 element. Section 2261A punishes a course of conduct undertaken with intent to harass or cause substantial emotional distress; § 1001 reaches only statements that are actually false, materially misleading, and made with knowing intent to deceive the government. These are distinct statutory elements requiring distinct proof. Ms. Wang's admission to the former cannot be construed as an admission to the latter, and the Court should decline to enter any sentencing finding that conflates the two.

### E. Deterrence and Public Protection Are Fully Served by Probation

The government agreed — in a binding Rule 11(c)(1)(C) plea — that probation is a permissible sentence. It cannot simultaneously argue the offense is so serious that

70

probation is insufficient while standing behind an agreement that expressly places probation at the floor of the stipulated range.

Specific deterrence has been achieved. Ms. Wang has been prosecuted in three jurisdictions, faced 32 pending felonies and misdemeanors spanning all from the same course of conduct charged and recharged multiple times across multiple jurisdictions, has spent time in custody, entered guilty pleas that will follow her permanently, and lived under strict conditions — including home confinement — for years. She has lost all contact with her son for close to two years. The risk of recurrence is minimal.

General deterrence is served by defendant now has been convicted of federal felonies that will be on her record forever unlike State convicted felonies, subjected to global prosecution across three jurisdictions, and placed under long-term supervision for conduct that, at bottom, consisted of online speech she believed would help her custody cause. "Even relatively short sentences can have a strong deterrent effect on prospective white-collar offenders." *United States v. Adelson*, 441 F. Supp. 2d 506, 514 (S.D.N.Y. 2006). The conviction and long-term supervised probation sends that message without incarceration.

Public protection. Ms. Wang presents no danger to public safety. The conduct for which she was convicted was situational and context-specific. Once clear boundaries were established, she complied without exception. The PSR also documents ongoing health concerns — kidney cysts and an abnormal lymph node that may require further evaluation — that reinforce community supervision, not incarceration, as the medically appropriate setting.

**F. Sentencing Disparity**

| Case | Key Aggravators | Sentence |
|------|-----------------|----------|
| United States v. Cutler No. 2:24-cr-00053 (D. Utah) | • Two victims; two counts<br>• 3+ year campaign (2017–2020)<br>• 40+ anonymized accounts; locked victim from accounts (lost income)<br>• Filed false reports with federal authorities<br>• Same district as Wang | 36 months probation (6 months home detention) $17,639.46 restitution [11(c)(1)(C) plea] |

| United States v. Chand No. 2:21-cr-00158 (E.D. Cal.) | • Prior conviction against same victim; elicited CSAM from victim at age 15 <br> • 2 years jail for prior offense <br> • Cyberstalking while on parole <br> • 176 calls; 63 threatening voicemails <br> • Explicit threats of physical violence | 36 months probation <br> $8,025.70 restitution |
|---|---|---|
| United States v. Roe No. 1:24-cr-00200 (D. Md.) | • Six victims; five counts <br> • 1+ year campaign; thousands of spoofed calls/texts/emails; VPN <br> • False police reports in multiple jurisdictions <br> • Targeted victims' employers <br> • Victim spent $50,000+ in defense costs <br> • Two prior similar incidents | 60 months probation <br> 6 months home confinement <br> 500 hours community service <br> $418,343.10 restitution <br> [11(c)(1)(C) plea] |
| United States v. Garcia No. 5:23-cr-00238 (W.D. Tex.) | • 18 website domains in victim's name; 750+ blog posts <br> • Emailed victim's employer; explicit intent to "ruin your fucking life" <br> • Multiple fake social media accounts <br> • Sophisticated campaign to destroy livelihood | 60 months probation <br> 180 days residential reentry |
| United States v. Krezoub No. SACR 23-00042-CJC (C.D. Cal.) | • Two counts: cyberstalking AND interstate extortion (§ 875(d)) — more serious charge profile than Wang's <br> • Multiple phone numbers to evade blocking <br> • Extortion demand: ~$500,000 in property/luxury goods | Time served <br> 1 year supervised release <br> (Deported to France) |
| United States v. Dennis No. 20-CR-623 (S.D.N.Y.) | • 3 counts; years-long campaign against 3 former law partners <br> • Thousands of threatening emails at all hours; explicit death threats <br> • Threatened to "chase down" partner's minor children <br> • Victims relocated, slept with loaded guns <br> • Convicted at trial; represented himself pro se | 24 months imprisonment <br> 3 years supervised release <br> (Govt. sought 4.5 years) |
| United States v. Yung No. 19-1640 (D. Del.) | • 18-month campaign; fake obituaries, KKK profiles in victim's name <br> • False rape/lynching/child molestation accusations <br> • Craigslist sex ads sent strangers to victim's home — strangers appeared multiple times <br> • Impersonated victim's wife in sex-slave ad | 46 months imprisonment <br> 3 years probation <br> ~$70,000 restitution |
| United States v. Wang [PRESENT CASE] | • Two victims; custody-dispute context | REQUESTING: <br> 60 months probation |

72

| No. 2:24-cr-00163 (D. Utah) | • Derogatory/accusatory posts (not anonymized fabrications)<br>• No threats of physical harm; no weapons; no home addresses disclosed; no in-person approach; no financial harm<br>• Three-sovereign global resolution; accepted full responsibility | [Stipulated range: 5 yrs probation to 12 months imprisonment] |

Examining each case in turn demonstrates that the requested sentence of five years' probation is not only within the mainstream of federal sentencing practice—it is, if anything, more severe than the national norm for comparable or **more** aggravated conduct:

*United States v. Cutler* **(D. Utah, No. 2:24-cr-00053-CW)** — This is the primary and dispositive comparator for § 3553(a)(6) purposes, and Ms. Wang renews her request that this Court review the government's Sentencing Memorandum (Docket No. 41, February 3, 2025, Restricted – Level 2) and Second Sentencing Memorandum (Docket No. 56, May 10, 2025, Restricted – Level 2) filed in that proceeding before imposing sentence here. The defendant cannot access those restricted filings, but this Court can. The government's own advocacy in Cutler — the aggravating factors it emphasized and the sentence it nonetheless agreed was reasonable — is the most probative evidence available of what this Office considers proportionate under § 2261A. The case arises from the same district, was resolved before a Utah federal judge through an identical Rule 11(c)(1)(C) mechanism, and was originally indicted by the same AUSA, Jennifer K. Muyskens, who initiated and prosecuted the Wang case through the detention phase. The indictment charged the identical statute and count structure as the Wang indictment (two counts of 18 U.S.C. § 2261A(2)). Tracy Cutler, a Utah resident, launched a campaign of harassment against Victim-1 (a former romantic partner) and Victim-2 (Victim-1's new girlfriend), along with their friends and family — using email accounts, social media accounts, and more than forty anonymized phone numbers to send hundreds of harassing messages. Some communications were sexual in nature. Cutler gained control of Victim-1's online accounts, modified them, and locked him out — causing direct, documented financial harm of $17,639.46, the exact restitution amount ordered in the Amended Judgment (Docket No. 58, May 12, 2025). When the victims reported the harassment to law enforcement, Cutler continued the campaign by sending communications to law

73

enforcement itself and by falsely implicating an innocent third party as the perpetrator. That campaign ran from approximately March 2022 through May 2023 (approximately 14 months).

Cutler pleaded guilty to Count I only; Count II was dismissed at sentencing. She received 36 months of probation with the first six months on home detention. Cutler's conduct was more aggravated than Ms. Wang's in every measurable dimension: it included documented financial harm ($17,639.46 in lost income), sexual content directed at the victims, direct harassment of law enforcement, deliberate framing of an innocent person, and two victims targeted simultaneously from inception. Ms. Wang caused no financial loss to either victim, made no contact with law enforcement as a harassment vehicle, and sent no sexual content. The same U.S. Attorney's Office that prosecuted Cutler and agreed to 36 months of probation is the same Office that agreed the stipulated range in Wang's case runs up to — but need not exceed — 60 months of straight probation. Imposing any custodial sentence on Ms. Wang when the same Office resolved a more aggravated case with 36 months of non-custodial probation and $17,639.46 restitution would be precisely the kind of unwarranted disparity § 3553(a)(6) is designed to prevent. This Court's review of the restricted sentencing memoranda in Cutler will confirm that conclusion.

One additional disparity factor bears emphasis that none of the comparator cases presents. The IC3 complaints functioned as the government's federal jurisdictional hook. As defense counsel communicated to Ms. Wang, the government expressed concern about statute of limitations exposure on the V2 (W.S.) conduct, which occurred entirely in 2017 — nearly five years before the May 2024 indictment — and about the risk that a federal prosecution duplicating the California state stalking case on V1 would be challenged as redundant. The IC3 complaints, filed in 2019, post-dated the 2017 conduct, implicated both victims simultaneously, and provided a unique federal nexus not present in the state proceedings. In none of the comparator cases did the government rely on a victim's own prior complaint to federal authorities as both the jurisdictional predicate and an aggravating offense at sentencing. Treating a crime victim's good-faith report to a federal intake portal as a sentencing-enhancing offense — in a case where that report was

jurisdictionally essential to the prosecution itself — has no parallel in the § 2A6.2 caselaw and produces an anomalous result that the Court should weigh under § 3553(a)(6).

**United States v. Chand (E.D. Cal., No. 2:21-cr-00158)** — Mr. Chand had **prior convictions involving the same victim** (including eliciting child sexual abuse material from her when she was 15 years old, for which he served two years in jail), and he committed the cyberstalking **while on parole**. He made 176 calls, left 63 threatening voicemails, and explicitly threatened to break down the victim's front door. None of those circumstances are present here. Yet he received only **36 months' probation**. If a defendant with a prior conviction for sexually exploiting the same victim received 36 months' probation, a first-time offender like Ms. Wang—with no history of violence, no threats, and no prior convictions—should receive no more.

**United States v. Roe (D. Md., No. 1:24-cr-00200-BAH)** — Richard Roe harassed **six victims** over approximately one year using Prankowl, PrankDial, TextFree, and VPN services to make thousands of spoofed calls and messages; filed false police reports in **three jurisdictions** (NY, MD, DC); targeted victims' employers and businesses; made 481+ unauthorized attempts to access victims' Apple accounts; and caused one victim to spend over $50,000 defending herself. He had two prior episodes of similar conduct in 2011–2012 and 2015–2016. Despite all of this, Roe received **60 months' probation plus six months' home confinement and 500 hours of community service**— still no imprisonment, and no incarceration beyond home confinement. Ms. Wang's conduct, confined to two victims in the context of a custody dispute, is substantially less aggravated.

**United States v. Garcia (W.D. Tex., No. 5:23-cr-00238-JKP)** — Ashley Garcia registered **18 website domains** in the victim's name, posted over **750 blog entries**, sent an email to the victim's employer with explicit sexual content in the subject line, and told the victim her explicit intent was to **"ruin your** fucking life" and that she hoped he would "rot in hell." This was a deliberately calculated campaign to destroy a specific person's professional livelihood and reputation—far beyond Ms. Wang's custody-motivated posts. Yet Garcia received only **60 months' probation plus 180 days in a residential reentry center**. No imprisonment.

**United States v. Krezoub (C.D. Cal., No. SACR 23-00042-CJC)** — Ms. Krezoub faced **more serious charges** than Ms. Wang: she was convicted of both stalking *and* interstate extortion, having sent threatening text messages and demanding approximately **$500,000** in luxury goods (Chanel, Dior) under threat of reputation destruction. Her charge profile is more severe than Ms. Wang's in every dimension. She received **time served** (the equivalent of immediate release) plus one year of supervised release and was deported. If the most fitting sentence for an extortionist stalker was time served, the requested five-year probation for Ms. Wang is more than proportionate.

The cases that did result in meaningful incarceration are readily distinguishable on their facts:

**United States v. Dennis (S.D.N.Y., No. 20-CR-623)** — Willie Dennis was **convicted at trial** (forgoing the two-to-three point guidelines reduction for acceptance of responsibility), sent thousands of messages threatening to "sleep with one eye open" and "I will find you," threatened to "chase down" a partner's *minor children* for the "sins of the father," and drove one victim to relocate to another state while another began sleeping with a loaded gun. The government sought 4.5 years; he received 24 months. Every aggravating factor present in Dennis is absent here.

What makes Dennis particularly instructive is that even Dennis's own defense counsel, in a sentencing memorandum filed on his behalf, acknowledged that his conduct — however "incessant" and "distress-inducing" — never constituted direct threats of physical violence. See Sentencing Memorandum on Behalf of Willie **Dennis, No.** 20-CR-623 (S.D.N.Y. Feb. 3, 2023), at 27–28. The Dennis defense argued, specifically, that his messages "were never appropriate" but that they implied only threats to damage reputations or careers — not bodily harm — and that "it simply would not be accurate to say that Willie Dennis threatened any of his victims with direct physical violence at all." Id. at 28. The court imposed 24 months even on those facts. If the Dennis court found 24 months appropriate for a trial-convicted defendant whose own attorneys acknowledged his conduct was threatening and intimidating — conduct that included explicit messages referencing a partner's minor children and caused a victim to relocate out of state — then Ms. Wang's custody-motivated posts, which likewise lacked any direct physical threats and to which she has accepted full responsibility, plainly warrant no custodial term at all.

The Dennis memo also situates that case within a broader continuum. The Dennis defense compared its client's conduct favorably to *United States v. Yilmaz*, 910 F.3d 686 (2d Cir. 2018), where the defendant sent over 10,000 emails over seven years containing "countless specific and detailed threats of violence and death" — and where the Second Circuit affirmed a 37-month sentence — to demonstrate that Dennis's own conduct was less serious than Yilmaz's because it lacked those explicit death threats. Dennis Mem. at 27. This creates a three-tier hierarchy: Yilmaz (10,000+ emails, explicit death threats) → 37 months; Dennis (thousands of threatening emails, trial conviction, no direct physical threats) → 24 months; Wang (custody-motivated posts, guilty plea, no physical threats, first-time offender) → probation. The directional logic is unmistakable, and each step down in culpability corresponds to a meaningful reduction in sentence. Ms. Wang's profile sits below Dennis on every relevant dimension.

**United States v. Yung (D. Del., No. 19-1640)** — Mr. Yung ran an 18-month campaign that included fake obituaries for the victim's wife and son, KKK-themed social media profiles in the victim's name containing false accusations of rape and child molestation, and Craigslist ads directing men seeking violent sex directly to the victim's **home address—causing violent strangers to appear multiple times**. The victim's family received hundreds of calls from men seeking sex. Mr. Yung received 46 months. The callous indifference to physical safety displayed in Yung—deliberately directing violent strangers to a victim's home—has no parallel in Ms. Wang's conduct.

## III. IC3 Complaints, Uncharged Conduct, and Due Process at Sentencing

### A. Why Ms. Wang Pled Guilty – and What She Did Not Admit

Ms. Wang pled guilty to two counts of cyberstalking under 18 U.S.C. § 2261A because she accepts responsibility for the emotional harm her online conduct caused and wishes to end a cycle of conflict that has consumed seven years of litigation and separated her from her child. Her plea reflects accountability for harassing communications under § 2261A – not an admission that she fabricated or falsified her prior IC3 reports to law enforcement.

As the Court is aware, the global Rule 11(c)(1)(C) agreement required Ms. Wang to admit that three IC3 communications were "harassing." That characterization was a non-negotiable condition demanded by AUSA Blanch as the price of resolving three pending criminal matters across three sovereigns. In compromise, the government agreed to withdraw the words "defamatory" and "false" from the factual basis, expressly declining to insist that the IC3 reports were false statements. Ms. Wang has never conceded that the IC3 complaints were false, and she continues to maintain that every allegation in them was true.

The core issue at sentencing, therefore, is narrow but critical: the government now seeks to re-label Ms. Wang's IC3 reports as "false statements" under 18 U.S.C. § 1001 and to use that uncharged theory as a de facto aggravating factor. But § 2261A and § 1001 punish different things. Section 2261A punishes a "course of conduct" intended to harass, intimidate, or cause substantial emotional distress. Section 1001 reaches only statements that are actually false, materially misleading, and made with a knowing intent to deceive the government. Ms. Wang's plea to cyberstalking does not supply, and cannot substitute for, proof that any specific representation in her IC3 reports was false, material, or made willfully.

**B. The Factual Backdrop: A Large Body of Admitted Conduct – and One Critical Outlier**

When Ms. Wang pled guilty to cyberstalking, she did so against the backdrop of a long-running online campaign involving scores of posts across multiple platforms — not as an admission that she authored every post or that her IC3 reports were fabricated. Victim 1's own family-court submissions describe roughly 75–100 online posts made under various aliases on Medium, Instagram, Facebook, Wikipedia, and related sites, plus

approximately 70 of his friends who either received messages about him or follow requests repeating the narrative that he impregnated an older woman he met on Tinder and then abandoned her — calling him a "sperm bank" and accusing him of "spreading his seed all over Tinder." Many of these posts and direct contacts on Victim 1's 109-entry contact list were traced, via ordinary non-VPN IP addresses and search-warrant returns, to addresses associated with Ms. Wang and are legitimately attributable to her; those communications are fully encompassed within her § 2261A plea.

At the same time, out of the 75–100 posts, there is one critical outlier: the March 6, 2019 Holysmoke.org "Kill Baby K" entry made under Ms. Wang's true name. Ms. Wang has denied authorship of that post under oath for seven years across multiple proceedings and continues to deny it today. Critically, it is the only post in the entire corpus that contains an explicit threat of murder-suicide. None of the posts Ms. Wang has admitted, and none of the posts she specifically disclaims in her IC3 reports, contain threats to kill the child, to kill herself, or to physically harm C.T. or any member of his family. The government's attempt to treat her IC3 complaints about this specific post as "false statements" therefore turns on attribution — not on whether the text of the post, if someone else had written it, would be alarming.

## C. The Forensic Record on "Kill Baby K" Confirms Ms. Wang's Good Faith

The forensic record on the Holysmoke "Kill Baby K" post is unusually developed. T-Mobile's Custodian of Records Deisi Franco attested under penalty of perjury that Ms. Wang's phone (917-432-4181) registered continuously at a cell site at 65 West 70th Street, New York City, from midnight through 11:59 PM on March 6, 2019, with multiple CSLI entries spread throughout the day. The Kill Baby K post, by contrast, traversed IP address 108.162.219.228, which MaxMind GeoIP2 resolves to a Cloudflare data center in Newark, New Jersey — roughly fifteen miles away.

SFPD's investigation, including search-warrant returns on Ms. Wang's Medium accounts, produced approximately 21,000 IP address entries; once duplicates were removed, there were 876 unique IPs, only four of which resolved to actual ISP subscribers (Comcast, CenturyLink, Stealth Communications, and Charter/Spectrum). Investigators then compared the Kill Baby K IP (108.162.219.228) against both (a) those 21,000

78

Medium IPs, and (b) roughly 100,000 IP addresses obtained from 16 Gmail accounts associated with Ms. Wang. No match was found on either comparison.

At the network level, the limitation is structural. IP 108.162.219.228 is a Cloudflare edge-node address — shared CDN infrastructure used simultaneously by unknown numbers of end-users. MaxMind, whose GeoIP2 database is the industry standard and was used in this investigation, explicitly warns that when a user connects through a VPN, anonymizing proxy, or similar intermediary, "the website sees only the IP of that intermediary server," and "it is not possible to determine the geolocation of the end-user" behind that proxy; only the proxy endpoint can be geolocated, typically to a generic data-center location. CDNs like Cloudflare "serve a high volume of domain names from a small set of IP addresses," meaning that a lookup of an edge-node IP identifies shared infrastructure, not specific individuals.

Cloudflare's own Trust & Safety correspondence to SFPD adds a decisive layer: HolySmoke.org was "logging the wrong IP addresses" — recording Cloudflare edge-node addresses rather than client IPs — so that any MaxMind lookup of those logged addresses can never connect traffic to a particular user. In combination with T-Mobile CSLI, which places Ms. Wang's device in Manhattan continuously on March 6, 2019, the result is inescapable: the Kill Baby K IP cannot be used to attribute that post to Ms. Wang. San Francisco law enforcement reached precisely that conclusion, documenting in the investigative file that "it is not possible Wang made the March 6, 2019 Kill Baby K post."

The investigating sergeant's own words reinforce this. In a May 22, 2019 Chronological Report entry, Sgt. Martinez told Ms. Wang's internet attorney that she "had to prove that a post came from a specific person" and that "sometimes IP addresses are spoofed." The same officer who swore out an early Holysmoke search-warrant affidavit later swore to an eleven-count arrest-warrant affidavit charging Ms. Wang with multiple stalking-related offenses — but conspicuously omitted the Kill Baby K post from the charging document. The District Attorney, having charged Ms. Wang "on everything it could prove," chose not to charge on the one post it could not. Utah DCFS later reversed its "Supported" finding and formally determined that Ms. Wang had not authored the murder-suicide post.

This history matters for present purposes in two ways. First, it confirms that Ms. Wang has been telling the truth about Kill Baby K from the outset. Second, it shows that when she later told federal authorities, in IC3 complaints, that she believed C.T. and W.S. were responsible for anonymous posts targeting her, she was not contradicting what law enforcement believed; if anything, she was mirroring it. In May 2019, SFPD's view was that the Holysmoke attribution question could not be resolved by IP evidence at all. Ms. Wang's IC3 complaints reflected her good-faith inference about who was behind a set of posts that everyone agreed were real but that no one could tie to her.

**D. The Government's Late-Produced IC3 Complaints Cannot Be Used as De Facto § 1001 Convictions**

The eleven documents comprising the newly cited IC3 complaints (Bates Nos. IP-KW-01-00001 through IP-KW-01-00011) were transmitted to Ms. Wang for the first time on April 7, 2026. The government had been in possession of these complaints throughout the proceedings. Introducing them for the first time through the PSR, after the plea was finalized, is inconsistent with the scope of conduct Ms. Wang agreed to admit and deprives the defense of a meaningful opportunity to contest them.

Under United States v. Tunning, 69 F.3d 107 (6th Cir. 1995), a guilty plea must rest on a "sufficient factual basis" for each element of the offense admitted. Ms. Wang's plea colloquy and written factual basis supply that foundation for two § 2261A counts, not for a separate § 1001 theory premised on eleven IC3 submissions, three of which were never discussed at the plea and eight of which were never characterized as false. There is no factual basis — because there was no admission — for treating the content of those IC3 reports as conceded false statements.

Nor has the government carried its burden of proving, by a preponderance (let alone a higher standard), that any particular statement in those complaints was false, material, and made willfully. The record shows:

- The underlying events Ms. Wang reported — including the Kill Baby K post, anonymous posts that appeared immediately after key family-court events, and the removal of her infant from her home — indisputably occurred.

- Law enforcement's own forensic work undermined attempts to attribute the most inflammatory post to Ms. Wang and led prosecutors to omit it from charging documents.

- The timing of certain anonymous posts, which Ms. Wang described in real time, later proved to align with police interviews and law-enforcement activity that she did not know about when she filed her complaints, lending credence to her narrative rather than undercutting it.

In this posture, elevating the IC3 complaints into quasi-elements of a new § 1001 offense at sentencing would run headlong into the "sentencing tail wagging the dog" problem McMillan warned against. It would allow uncharged, disputed conduct to control Ms. Wang's punishment for the crimes she actually pled to, without the procedural protections Congress and the Supreme Court require when the stakes of fact-finding rise.

**E. Due Process Limits on Uncharged Conduct at Sentencing**

The Commission's "relevant conduct" framework, USSG § 1B1.3, allows courts to consider uncharged conduct in calculating the advisory range. But as the Commission's own materials and recent scholarship recognize, there are outer limits to how far uncharged conduct may drive a sentence before due process requires something more than a bare preponderance. When enhancements based on uncharged conduct "disproportionately impact" the defendant's sentence, due process concerns demand a heightened standard — at minimum, clear and convincing evidence — even under an advisory-Guidelines system.

Here, the government's use of the IC3 complaints is not a marginal adjustment. It seeks to:

8. Re-characterize Ms. Wang as a person who made knowing false statements to the FBI — a distinct, more serious moral accusation than stalking.

9. Override the parties' carefully negotiated plea language, which expressly removed the word "false" from the factual basis.

10. Justify a sentence at or above the middle of the stipulated range, effectively punishing Ms. Wang for an uncharged § 1001 offense that the government chose not to indict.

If the Court were inclined to consider the IC3 complaints as aggravating "relevant conduct," it should, at a minimum, apply a clear-and-convincing standard and ask whether the record establishes, with that degree of confidence, that Ms. Wang (a) knew any specific assertion in any particular IC3 complaint was false, (b) intended to deceive the FBI, and (c) thereby materially misled a federal investigation. On the present record, it does not.

## F. The Appropriate Role of the IC3 Complaints in This Sentencing

None of this is to say the IC3 complaints are irrelevant to sentencing. They are part of the story of how Ms. Wang responded — sometimes wisely, sometimes unwisely — to a custody process she experienced as weaponized against her. They show a mother trying to enlist federal authorities to look at a pattern of online impersonation and anonymous threats centred on her child, and they help explain her mindset when she crossed the line into criminal harassment.

They should not, however, be used to transform this case into something it is not. Ms. Wang stands before this Court as a first-time felony offender who pled guilty to non-violent cyberstalking, accepted responsibility across three jurisdictions, and has already suffered the most severe non-custodial sanction imaginable: the total loss of her child. The IC3 complaints, properly understood, confirm that she was acting out of fear and desperation, not out of a calculated scheme to deceive the FBI. The Court should sentence her for the offense she admitted — the § 2261A course of conduct — and decline the government's invitation to turn uncharged, forensically contested allegations into the effective "tail that wags the dog" of this sentencing.

## V. Conditions of Supervised Release, Financial Circumstances, and Restitution

Ms. Wang has limited objections to Probation's recommended special conditions 2 through 10, which address cybercrime management, device monitoring, and no-contact provisions.

Ms. Wang recognizes the Court's authority to impose reasonable, tailored monitoring conditions and does not oppose robust supervision. She respectfully cautions, however, that categorical or near-categorical bans on computer or internet use—or conditions that impose a greater deprivation of liberty than necessary—have repeatedly been found overbroad or substantively unreasonable. Multiple circuits have vacated or remanded such conditions. See United States v. White, 244 F.3d 1199 (10th Cir. 2001); United States v. Blair, 933 F.3d 1271 (10th Cir. 2019); United States v. Eaglin, 913 F.3d 88, 98–101 (2d Cir. 2019); United States v. Perazza-Mercado, 553 F.3d 65, 72–76 (1st Cir. 2009); United States v. Ellis, 984 F.3d 1092, 1100–03 (4th Cir. 2021).

Any computer-search or monitoring regime must also explicitly protect legally privileged and confidential material. Monitoring software and search protocols must be configured so that attorney-client communications with Ms. Wang's criminal counsel in San Francisco, her Utah state counsel, her Danish counsel, and her federal counsel are not reviewed or disseminated by anyone other than defense and Probation personnel consistent with privilege. The same protocols must safeguard medical and mental-health records protected by HIPAA and applicable state privacy laws. Although Ms. Wang does not oppose an internet-monitoring condition, she is concerned that the monthly fees are substantial relative to her income and therefore requests that the Court give Probation discretion to waive or reduce monitoring fees, or to require only partial payment, in light of her financial circumstances.

## Financial Circumstances and Restitution

Ms. Wang has a negative net worth of approximately $168,646. Roughly $25,000 is attributable to student loans; the remaining $143,646 accrued after 2019, defending against litigation financed by one of the wealthiest families in the world. Victim 1's father was recently ranked the wealthiest business leader in Danish history and has funded his son's litigation, including the fees of C.T.'s attorneys Douglas Rappaport (approximately $800/hour) and Greg Ferbacher (approximately $350/hour). By contrast, Ms. Wang earns $14.50 per hour working part-time in food service, with hours limited by a physical disability affecting the use of her hands.

The PSR recommends waiving any fine based on her inability to pay; the Court should adopt that recommendation. Although the PSR proposes restitution payments of $100 per month, Ms. Wang has been unable to secure higher-paying employment at larger retailers such as Walmart or Costco for seven years because of the pending felonies, and her current employer has further reduced her hours. A $100 monthly payment would consume more than 25% of her take-home pay. A more realistic schedule would set restitution at 10% of net wages, with authority for Probation to adjust upward as her earning capacity improves.

Ms. Wang expects to sit for the LSAT within six months of sentencing and intends to pursue a career as a licensed attorney. If she succeeds, her employment prospects and income will improve, putting her in a stronger position to increase restitution payments consistent with her record and earning capacity. A probationary sentence thus maximizes, rather than diminishes, the long-term likelihood of meaningful restitution.

## Why Incarceration Is Not Necessary

This case has been defined by profound power imbalances: a working-class mother against one of Silicon Valley's wealthiest families; a pro se litigant against teams of elite attorneys; a desperate parent against a system she perceived—rightly or wrongly—as stacked against her. Ms. Wang's response to that imbalance—online posting, complaints to authorities, and the conduct underlying her plea—was unlawful. It caused harm. She accepts full responsibility and has paid a steep price.

But context matters. This was not predatory stalking; it was not a violent crime. It was the conduct of a mother who, for seven years, fought to maintain contact with her only child. She has now lost that fight. She has not seen her son in two years and may never see him again. She stands convicted of serious federal felonies and Utah misdemeanors; the federal felony will remain on her record for life—a significant sanction for someone who had never before been convicted of even a misdemeanor. She has been under intensive supervision for years and has demonstrated that, with clear boundaries, she can and does comply.

84

Five years of probation is a serious sentence. Ms. Wang has already been subject to court-ordered conditions and supervision for roughly seven years; an additional five-year term effectively means twelve years of continuous judicial oversight. It will require sustained compliance and monitoring. It will allow her to rebuild her life while ensuring public safety and protecting the victims—one now residing in Denmark, the other in neither Utah nor California. Three prosecutors representing three sovereigns, each fully familiar with the record, have independently agreed that probation plus misdemeanors is the appropriate outcome.

## Good-Time Credits, Self-Surrender, and Fallback Custodial Request

### A. Self-Surrender Is a Central Sentencing Issue, Not a Peripheral Detail

In light of this Court's prior handling of § 2261A cases and recent decisions confirming that § 2261A is not a "crime of violence," a brief, self-surrender term represents the maximum custodial sanction that would remain "sufficient, but not greater than necessary" under § 3553(a). The availability of a meaningful self-surrender period is not a peripheral logistical detail — it is a central issue in this sentencing. The government's current position, communicated in writing on April 16, 2026, is that it will not object to "a few days or a week," but that it objects to any longer period on the ground that Ms. Wang has already had "significant time prior to trial to get [her] affairs in order." When Ms. Wang explained that a few days or a week was "definitely not doable" given the complexity of her legal and personal obligations, AUSA Blanch replied, in full: "Then I do object." That position is both legally unsupported and inconsistent with this Court's own practice and the prior practice of the same U.S. Attorney's Office in directly comparable cases.

### B. The Government's One-Week "Ceiling" Ignores the Statutory Standard and This Court's Prior Findings

Section 3143(a) requires an individualized determination whether the defendant is likely to flee or pose a danger — not a blanket, one-week cap based on an abstract notion that "pretrial time" was sufficient. The statute directs the Court to assess present flight

85

risk and present dangerousness. Here, those factors cut decisively in Ms. Wang's favor. She has been on home confinement with GPS monitoring since July 10, 2024, and has remained in the district throughout. Magistrate Judge Oberg expressly stated at the May 28, 2024 detention hearing that she was "less convinced about the serious risk of flight" and was "not persuaded" that risk of nonappearance was unmanageable. On July 2, 2024, this Court stated "I don't think there should be any more argument over risk of flight," resolved that issue on the record, and released Ms. Wang to home confinement under strict supervision. Magistrate Judge Pead later credited her supervision record, stating: "Under the rules imposed by Judge Stewart, no violation under modifications, no violation. I think those things go to her credit — they demonstrate some trustworthiness." (Jan. 12, 2026 Hr'g Tr. 46:1–4.) The government offers no new facts, no changed circumstances, and no reason to revisit these prior findings. Its bare statement — "Then I do object" — does not satisfy § 3143(a) and does not justify collapsing a complex, multi-jurisdictional situation into a seven-day window.

## C. This Court Routinely Grants Multi-Month Self-Surrender in Serious Felony Cases

This Court's own docket demonstrates that extended self-surrender periods are routine in serious felony matters where the defendant has complied with pretrial supervision and presents no flight risk. In United States v. Rust, No. 2:19-cr-00164-TS, this Court sentenced co-defendant Denise Gunderson Rust to 18 months' BOP custody following a money-laundering conviction with over $1.7 million in restitution. The Court initially set a self-surrender date approximately two months after sentencing and, on motion, extended it to nearly four months after sentencing — without suggesting that one week was the outer limit of what § 3143(a) permits. Instead, as the Rust docket reflects, the Court exercised individualized discretion and accommodated the realities of the defendant's circumstances while maintaining supervision. Rust confirms that this Court does not — and need not — adhere to any categorical "few days or a week" rule. Rather, it applies the statutory standard to the specific defendant before it, which is precisely what Ms. Wang asks the Court to do here.

**D. The Same U.S. Attorney's Office Accepted Seven Weeks of Self-Surrender in a Cyberstalking Case**

The government's own recent practice in a cyberstalking case undercuts AUSA Blanch's attempt to treat more than a week of self-surrender as presumptively inappropriate. In United States v. Alvarez, No. 2:21-cr-00111-HCN, the defendant was convicted of cyberstalking under 18 U.S.C. § 2261A(2) — the identical statute at issue here — as well as interstate extortionate threats under 18 U.S.C. §§ 875(b) and 875(d), a more serious charge profile than Ms. Wang's. The court sentenced him to 60 months' imprisonment on May 2, 2023. The government — through AUSA Jennifer Muyskens of the same Salt Lake City U.S. Attorney's Office — objected to self-surrender, arguing the offenses were "crimes of violence" requiring detention. After briefing and review of the pretrial record, Judge Nielson concluded that the offenses were not crimes of violence under 18 U.S.C. § 3156(a)(4), found by clear and convincing evidence that Mr. Alvarez was not likely to flee or pose a danger, and ordered self-surrender by June 20, 2023 — approximately 49 days (nearly seven weeks) after sentencing. Alvarez illustrates three controlling points: first, a § 2261A conviction does not automatically preclude extended self-surrender where the statutory standard is met; second, the same U.S. Attorney's Office has previously accepted a seven-week self-surrender period once the Court properly applied § 3143(a); and third, the analysis turns on individualized risk assessment, not an arbitrary one-week ceiling. There is no principled basis to apply a more restrictive approach to Ms. Wang than was applied in Alvarez, given her far longer period of compliant GPS home confinement and the multiple prior judicial findings already resolving the flight-risk question in her favor.

**E. Good-Time Credits and Sentence Structure**

The Rule 11(c)(1)(C) agreement caps the maximum custodial term at twelve months. A flat twelve-month sentence carries no good-time credit because 18 U.S.C. § 3624(b) applies only to a "term of imprisonment" of more than one year. If the Court imposes the maximum custodial term, Ms. Wang respectfully requests a sentence of twelve months and one day rather than a flat twelve months. A sentence of twelve months

and one day is eligible for good-time credit and, when combined with the 41-day credit for pretrial detention, would yield an effective term of approximately nine months assuming full good-time credit — a meaningfully shorter period of actual incarceration than a flat twelve-month sentence served day-for-day. A sentence of twelve months and one day is therefore both more proportionate and more consistent with the treatment of similarly situated defendants in other federal cases.

**F. Requested Self-Surrender Framework**

Consistent with 18 U.S.C. § 3143(a), this Court's practice in Rust, the same Office's practice in Alvarez, and recent authority confirming that § 2261A is not a crime of violence, see United States v. Mangione, No. 25-CR-00176 (S.D.N.Y. Jan. 30, 2026), Ms. Wang respectfully requests that, if the Court imposes a custodial sentence: (1) she be permitted to self-surrender to the designated BOP facility — FPC Bryan (Bryan, Texas) — on a date not less than 60–90 days after sentencing; (2) all current pretrial conditions, including home confinement and GPS monitoring, remain in full force through the self-surrender date, preserving public safety while allowing an orderly transition; and (3) the Court make explicit findings that, in light of prior detention rulings, Ms. Wang's performance on supervision, and the absence of any new evidence of flight risk or dangerousness, she satisfies the clear-and-convincing standard under § 3143(a). This approach aligns with binding statutory criteria, matches this Court's own practice in serious financial cases, is consistent with the same Office's handling of a cyberstalking defendant in Alvarez, and ensures that Ms. Wang can manage her overlapping state, appellate, and international obligations without compromising community safety.

## VI. The Government's April 15 Expert Disclosure Warrants Heightened Scrutiny at Sentencing

On April 6, 2026 — in direct response to a written meet-and-confer inquiry by Ms. Wang — AUSA Blanch represented in writing: "We do not expect to call expert witnesses." Nine days later, on April 15, 2026, the government produced a 21-page "Updated Violence Risk and Threat Assessment" by Dr. J. Reid Meloy, Ph.D., ABPP, dated April 14, 2026 — one day before its production, and twenty days before the May 5,

2026 sentencing hearing. The government simultaneously produced an unattributed multi-page narrative document prepared by Victim 1's attorneys (the "Wang Impersonations" document) and translations of approximately 22 jail call recordings totaling roughly four hours. All three items were produced for the first time on April 15, 2026. (Dkt. 154.)

The Meloy Report suffers from several significant methodological deficiencies that this Court should weigh carefully before relying on its conclusions. First, it was prepared without any direct clinical interview of Ms. Wang — a limitation Dr. Meloy acknowledges. Ms. Wang declined to be interviewed by an adversarially retained expert while facing three overlapping criminal prosecutions, which was a proper exercise of her Fifth Amendment rights; that invocation cannot be used as affirmative evidence of dangerousness or non-cooperation at sentencing. Second, every one of the more than 100 documents in Dr. Meloy's record review was assembled and provided exclusively by Victim 1's attorney, Douglas Rappaport — the same attorney who appears throughout this case as V1's civil advocate and who is identified in the record as having provided the information that was used to obtain the Utah search warrant later found to have no corroborating evidence of abduction risk. No records from or on behalf of Ms. Wang were included. Third, the PCL-R score of 32.6 (97th percentile) dates from May 2023 and is carried forward without independent re-scoring into the April 2026 report. Fourth, many items in Dr. Meloy's record review are Ms. Wang's own court filings, which he characterizes as "litigation-enabled harassment" — effectively treating constitutionally protected court access as evidence of dangerous pathology.

These methodological concerns are not theoretical. Dr. Meloy's professional history includes a documented instance of the same methodology producing a catastrophic miscarriage of justice. In the 1999 prosecution of Timothy Masters — a fifteen-year-old charged with murder in Fort Collins, Colorado — Dr. Meloy served as the prosecution's expert and, without any direct clinical interview of Masters, profiled him solely from personal drawings and notebooks, offering sweeping conclusions about the teenager's inner life and dangerousness. Masters was convicted and sentenced to life in prison. In 2008, DNA evidence exonerated him; the true perpetrator was identified as a physician who had lived in the same neighborhood. Masters received $10 million in compensation

for nearly a decade of wrongful imprisonment. The case has since been cited widely as a paradigmatic example of the risks of forensic psychological profiling from documents alone, without clinical interview, based on an adversarially curated record. Dr. Meloy himself has acknowledged publicly that his opinions have not always been supported by the evidence. The methodological parallels between Masters and this case — no direct interview, exclusively adversarially assembled record, constitutionally protected expressive conduct treated as pathology, sweeping recommendations for removal from society — warrant this Court's careful scrutiny before accepting Dr. Meloy's conclusions.

Separately, the "Wang Impersonations" narrative document has no identified author, was prepared by or for Victim 1's attorneys, is based on no interviews with Ms. Wang or any independent witnesses, contains multiple layers of hearsay and argumentative legal conclusions, and was produced without any of the attributes of reliable sentencing information. See Fed. R. Crim. P. 32(i)(3)(B); United States v. Fatico, 603 F.2d 1053 (2d Cir. 1979). Ms. Wang has filed a motion for a continuance and a potential Fatico evidentiary hearing (Dkt. 154, 155) that, if granted, will allow these issues to be resolved through proper adversarial testing before sentencing. This Court should not rely on either the Meloy Report or the Impersonation Document without that process.

Finally, Ms. Wang notes that in addition to the pending continuance motion, she intends to file a motion for appointment of substitute CJA counsel (Dkt. 155). She also has substantial overlapping legal obligations in May and June 2026 — including a Utah state hearing (State v. Wang, 211100167, June 16, 2026), California appellate briefing in the ongoing custody matter, and Danish appellate proceedings concerning her son's custody and welfare — that make the current May 5, 2026 sentencing date unworkable. A continuance of 60 to 90 days would allow the most time-sensitive of these matters to advance, permit appointment and preparation of substitute counsel, and enable the defense to retain and prepare a forensic expert capable of independently evaluating the Meloy Report. This is not delay for its own sake; it is the minimum time required to afford Ms. Wang the fair hearing the Constitution and Federal Rule of Criminal Procedure 32 guarantee.

### VII. Rebuttal to Dr. J. Reid Meloy's Opinion: The Factual Foundation Is Unreliable, the Methodology Is Flawed, and the Conclusions Cannot Be Sustained

The foregoing methodological concerns identified in Section VI are confirmed and amplified by the full evidentiary record. Dr. Meloy's opinion rests on a factual foundation that a neutral judicial officer has substantially dismantled, is constructed entirely from adversarially assembled materials without any direct clinical interview, treats constitutionally protected activity as pathological conduct, and extrapolates sweeping risk conclusions from a set of contested and largely discredited allegations. Each of these deficiencies is addressed in turn.

### A. The California Indictment Is an Unreliable Factual Foundation

Dr. Meloy's entire analytical framework is built on a charging document that a neutral judicial officer has substantially dismantled. Following a five-day preliminary hearing — March 6–11, 2025 — at which all witnesses testified under oath and the court expressly stated it was "sitting as trier of fact, assessing credibility of witnesses," ten of fourteen counts were discharged. The court applied the lowest evidentiary standard in the criminal system and the People still failed on the majority of charges. (Exhibit 13, Vol. 4, pp. 466–474.) The operative charging document is now a five-count Information filed March 20, 2025. Any forensic opinion that treats the original fourteen-count complaint as an accurate behavioral portrait of Ms. Wang is not a clinical assessment — it is advocacy premised on discredited allegations.

The dismissed counts are the precise ones on which Dr. Meloy's analysis most heavily relies. Welfare check calls were affirmatively rejected as location-seeking conduct, with the court finding "no evidence that the defendant used this opportunity to seek to obtain the address of any protected person, as the evidence shows that those addresses were already known to defendant." (Exhibit 13, Vol. 4, p. 470.) Social media posts were discharged as protected First Amendment speech under Molinaro v. Molinaro, 33 Cal. App. 5th 824 (2019), with the court finding no specific threat directed at any specific person. Emails to law enforcement were discharged, with the court finding it would be "a constitutional violation to find Ms. Wang harassed anyone…for e-mailing

law enforcement." (Exhibit 13, Vol. 3, p. 395.) Fetus-image posts were abandoned by the prosecution under sustained First Amendment pressure and independently found unsupported by the court. Dr. Meloy presents these dismissed matters as clinically established behavioral facts. They are not.

**B. The "Adaptive Evasion" Theory Is Unsupported and Methodologically Unsound**

Dr. Meloy's central thesis — that Ms. Wang engaged in "adaptive misconduct" by shifting methods when courts restricted direct contact — rests on three categories of conduct that do not withstand scrutiny. First, as to alleged direct internet violations: the district court noted only "some question as to her access to the internet," not a definitive finding of deceptive circumvention. Dr. Meloy converts judicial uncertainty into clinical confirmation of psychopathy without identifying any independent technical proof — no IP logs, no device forensics, no forensic attribution tying specific communications to Ms. Wang personally. He substitutes inference for evidence. Mr. John Wang's explicit and consistent statements that Ms. Wang does not have access to his account are dismissed without engagement. Pro se litigants routinely use shared or family accounts for court notification as an administrative necessity; listing such an account on an ECF form is not evasion. The Google Drive materials at issue were verified by California Court of Appeals Court Manager Beth Robbins as not publicly posted, and the motion to revoke premised on this conduct was withdrawn as an express condition of the plea agreement and was never adjudicated — it cannot serve as clinical evidence of deceptive circumvention.

Second, as to alleged proxy and intermediary conduct: permissible assistance by family members in litigation is not proxy misconduct. Dr. Meloy provides no independent technical evidence — no device forensics, no IP attribution — demonstrating that specific messages originated from Ms. Wang rather than her father acting independently. He conflates "consistent with Ms. Wang's involvement" with "proven to be Ms. Wang's conduct," then uses that conflation to support a psychopathy narrative. The absence of a direct clinical interview, which Dr. Meloy acknowledges, is particularly significant here: attributing intent, motive, and clinical pathology to a subject one has never evaluated in

person, based entirely on adversarial submissions from one side of a high-conflict custody and criminal case, does not meet the standards of reliable forensic practice.

Third, as to litigation activity characterized as "harassment": Dr. Meloy labels Ms. Wang's filing activity as "Litigation-Based Harassment/Abuse," citing orders striking particular filings and adverse procedural rulings. Many of the cited rulings address technical or procedural defects — improper inclusion of identifying information, caption formulation, relevance determinations — that are routine in contentious family-law and appellate litigation. Courts have broad discretion in managing filings; an adverse ruling is not a forensic finding that the litigant is a dangerous serial stalker. No court has entered a finding of abuse of process against Ms. Wang in any jurisdiction. No court has imposed sanctions on her for frivolous or harassing litigation. Dr. Meloy imports an unsupported characterization and amplifies it into clinical diagnosis. Ms. Wang was simultaneously a party in active Utah custody proceedings, a defendant in California, a litigant before the California Court of Appeal, and a federal defendant. Characterizing that necessary multi-jurisdictional participation as adaptive criminal evasion transforms constitutionally protected legal activity into aggravating clinical evidence. That is not science; it is circular reasoning.

## C. The Bilateral Nature of the Conflict Is Systematically Ignored

A reliable forensic assessment cannot proceed as though the entire arc of this conflict was of Ms. Wang's creation. The March 6, 2019 "Kill Baby K" post — the event that precipitated removal of Ms. Wang's infant — was made using a Cloudflare VPN geolocating to Newark, New Jersey, with fabricated email addresses, consistent with a single actor deliberately concealing their identity across multiple posts. Utah DCFS reversed its supported finding against Ms. Wang on November 4, 2019, after subpoenas and search warrant returns confirmed the post was not attributable to her. (Exhibit 35.) SFPD Sergeant Martinez confirmed on May 16, 2019 that the investigation had been active since February 13, 2019, a search warrant had been issued to Holysmoke.org, and no proof connecting Ms. Wang to the posts had been found — stating that had such proof existed, an arrest would have been made. No arrest was made then or thereafter. C.T.

retained a clinical psychologist from Hillard Heintze — a private security and investigation firm — to place the 911 call that precipitated the March 6, 2019 removal of Ms. Wang's infant. (Exhibit 17, p. 54.) Judge Darwin himself later acknowledged the March 6 custody order was entered "without evidence from one side," transferred jurisdiction to Utah, and ordered C.T. to pay 100% of supervised visitation costs. (Exhibit 19, 6/25/19 RT 6:9–11, 76–78.) A forensic opinion that attributes this entire conflict to Ms. Wang's psychopathology while omitting this documented pattern of impersonation, coordinated legal maneuvering, and resource disparity is not a balanced clinical assessment. It is advocacy.

## D. The "Psychopathic Personality" Finding Cannot Be Sustained on This Record

Dr. Meloy's PCL-R scoring and personality conclusions derive from adversarial witnesses, advocacy filings, and one-sided narrative submissions — precisely the sources least reliable for neutral forensic assessment. In a high-conflict custody and criminal case where the opposing party retained at least 31 attorneys, experts, and private investigators (Exhibit 42), treating those submissions as a balanced evidentiary foundation is a fundamental methodological error. Dr. Meloy treats Ms. Wang's maintenance of innocence on contested charges and her ongoing appellate activity as evidence of "refusal to accept responsibility" and "lack of remorse." Defendants and parents routinely maintain innocence and contest judicial findings, particularly where appeals are pending in both California and Denmark. A forensic framework that reads the invocation of legal rights as clinical confirmation of a dangerous personality disorder reverses the presumption of innocence and penalizes Ms. Wang for defending herself.

The October 3, 2025 California filing, which Dr. Meloy characterizes as evidence that Ms. Wang "accepts no responsibility," is also being misread. Defendants routinely negotiate precise plea language to preserve appellate rights and avoid characterizations with collateral consequences. The plea negotiation record is instructive: the government's Draft 1 proposed Ms. Wang admit she "had made these posts about myself so that I could blame them." She refused, submitting $30,000 in internet attorney billing records from Kronenberger Burgoyne. The government removed the word "false" and the phrase "in

94

truth" entirely from Draft 3 after receiving those submissions. (Exhibit 28.) Negotiating to remove false characterizations from a plea agreement is not evidence of psychopathy. It is evidence of a defendant fighting for an accurate record.

**E. California's Absolute Litigation Privilege Independently Bars Adverse Treatment of Ms. Wang's Court Filings and Law Enforcement Communications**

A structural legal framework further undermines Dr. Meloy's characterization of Ms. Wang's litigation activity as pathological: California Civil Code § 47(b) provides an absolute privilege for communications made in any judicial proceeding, in any other official proceeding authorized by law, or in the initiation or course of any such proceeding. Silberg v. Anderson, 50 Cal. 3d 205, 212 (1990). This privilege is not qualified — it is absolute. Ms. Wang's subpoenas, custody filings, appellate briefs, requests for judicial notice, and opposition papers in the California family law proceedings fall squarely within § 47(b). Dr. Meloy's reliance on orders striking particular filings and adverse procedural rulings as clinical evidence of "conning/manipulative" psychopathic behavior is precisely the kind of use the privilege is designed to prevent. If the litigation privilege bars civil damages liability even for technically defective filings — including failure to redact identifying information, as confirmed in G.R. v. Intelligator, 185 Cal. App. 4th 606, 616–619 (2010) — it is doubly inappropriate to treat such technical violations as proof of severe psychopathy at a criminal sentencing.

The absolute privilege extends to Ms. Wang's IC3 reports and welfare check calls as well. Section 47(b) covers communications made "in the initiation or course of any other proceeding authorized by law." Reports to law enforcement agencies initiating criminal investigations are among the most clearly covered communications. The sole legislative exception — added as § 47(b)(5) — applies only where the person knowingly or with reckless disregard makes a false report. That exception requires proof of knowledge or recklessness as to falsity. As established throughout the plea negotiation history, the government removed all falsity language from the final factual stipulation after receiving Ms. Wang's documentary submissions. There has been no adjudication

that Ms. Wang knowingly or recklessly made false reports. The § 47(b)(5) exception therefore does not apply. Section 47(c) provides further protection for Ms. Wang's communications to C.T.'s family informing them of their grandchild's birth and to law enforcement regarding her son's welfare — communications made by a parent with an obvious and legally cognizable interest in her child's welfare, directed to parties with a corresponding familial or official interest, and made without any adjudicated finding of malice. Dr. Meloy frames these communications as evidence of escalating predatory harassment. California law frames them as categorically privileged. This Court should not adopt a clinical narrative that would penalize Ms. Wang for conduct the California Legislature has declared absolutely protected.

## F. The Risk Projections Are Speculative and the Financial Record Contradicts the Predatory Profile

Dr. Meloy's predictions of persistent high-level stalking, stochastic violence, and broad online harm "into the foreseeable future" extrapolate from a subset of contested historical allegations to forecast outcomes that go far beyond what the evidence supports. They assume as true the very factual disputes pending in California. They fail to account for the narrowing of charges and the realistic likelihood that a jury will reject the remaining CT-related counts once Ms. Wang testifies — including C.T.'s sworn admission under cross-examination that he received no direct communications from Ms. Wang (Exhibit 7, 10/18/22 RT 156:18–28), the LLC address that was publicly indexed on OpenCorporates (Exhibit 36), and C.T.'s October 11, 2018 text confirming he lost his job two months before Ms. Wang's first post (Exhibit 6). Most fundamentally, Dr. Meloy's risk methodology reverses the burden: it presumes guilt, malign intent, and psychopathy, then reads all subsequent conduct through that lens, instead of fairly weighing alternative explanations, the presumption of innocence on remaining counts, and Ms. Wang's constitutional right to contest adverse rulings. This is not risk assessment. It is confirmation bias dressed in clinical language.

The financial record further contradicts the predatory profile Dr. Meloy constructs. His framework typically looks for evidence of purposeful, resource-investing predatory

behavior. The financial record here inverts that picture entirely. Ms. Wang's credit score fell from approximately 760 to 520. She relies on SNAP benefits and Utah Medicaid. She was denied entry-level employment at Walmart and Costco because pending multi-state charges appeared on background checks. She expended $30,000 retaining Kronenberger Burgoyne to investigate impersonation posts — conduct fundamentally inconsistent with someone who authored those posts herself. The $750,000 bond at her 2019 arrest was secured by a lien on her parents' home. C.T. simultaneously retained 31 attorneys, experts, and private investigators billing at $500–$800 per hour. (Exhibits 38–42.) This is not the resource profile of a calculated, adaptive predator. It is the profile of an indigent pro se mother who lost her infant child based on a fabricated post and exhausted her resources attempting to investigate that fabrication through every available channel.

Stripping Dr. Meloy's opinion of reliance on: (1) dismissed California charges; (2) withdrawn federal motions never adjudicated; (3) court filings covered by California Civil Code § 47(b)'s absolute privilege; (4) law enforcement communications protected under § 47(b) absent a proven knowing falsehood; and (5) adverse procedural rulings routine in complex pro se litigation — what remains is not a clinical risk assessment grounded in demonstrated dangerous behavior. What remains is a collection of adversarial characterizations from one party to a high-conflict custody dispute, rendered by an expert who has never interviewed the subject, evaluated without accounting for the bilateral documented conduct of the opposing party, and presented in language designed to foreclose the Court's independent assessment. The Court should give Dr. Meloy's opinion substantially diminished weight, decline to adopt its most extreme characterizations as findings, and sentence Ms. Wang based on the record as it actually exists — including the five-day preliminary hearing results, the plea negotiation history, the DCFS reversal, the resource disparity between the parties, and the absolute litigation privilege that California law extends to the very communications Dr. Meloy has placed at the center of his psychopathy narrative.

**G. Dr. Meloy's Report Exhibits the Classic Hallmarks of the "Hired Gun" Phenomenon Documented in the Forensic Literature**

The Court is not writing on a blank slate when it evaluates Dr. Meloy's report. The forensic literature has long and empirically documented the "hired gun phenomenon" — the perception, borne out by appellate case law, that some forensic mental health experts tailor their opinions to the side that pays them rather than to an impartial assessment of the evidence. Mossman, Clinicians of Ill Repute, 6 Widener L. Symp. J. 1 (2001). Mossman's empirical review of reported appellate decisions identified forty-five cases in which courts or counsel described mental health experts in terms such as "hired guns," "whores," or "prostitutes" — with at least thirty-five opinions explicitly using the "hired gun" formulation. The majority of those cases arose in criminal prosecutions and sentencing proceedings, precisely the context at issue here. Mossman found that the "hired gun phenomenon" reflects the belief that expert testimony "reflects who is paying the clinician and not an impartial assessment of the merits of a case," and he concluded that the problem has two intertwined dimensions: "the unfortunate and all too common presence of unscrupulous experts" and the strong perception among courts and lawyers that many experts are fee-driven. Appellate judges themselves were the second most frequent source of the derogatory characterizations Mossman catalogued — indicating that courts do not merely tolerate the critique, they share it.

Dr. Meloy's April 2026 report fits the pattern Mossman describes at every critical point. He was retained and compensated exclusively by Victim 1's side — the same attorney, Douglas Rappaport, who has functioned throughout these proceedings as both V1's civil advocate and, by his own account, a conduit to law enforcement. Every one of the more than one hundred documents in his record review was assembled and supplied by the opposing party; not a single record from or on behalf of Ms. Wang was included. He declined to conduct a direct clinical interview — the foundational requirement of any reliable forensic personality assessment — and acknowledged that limitation while proceeding to score Ms. Wang at the ninety-seventh percentile for psychopathy and to forecast "persistent, high-level" violence risk. His April 14, 2026 report was produced in a single day, delivered to the government on April 15, 2026 — nine days after AUSA Blanch had represented in writing that the government did not expect to call expert witnesses — and timed to land twenty days before sentencing, with obvious tactical purpose.

The methodological features of Dr. Meloy's report are precisely those that courts and commentators have identified as markers of the hired gun profile: adoption of disputed advocacy materials as settled fact; treatment of every contested act as confirmation of a pre-existing diagnosis; refusal to weigh exculpatory evidence or alternative explanations; and formulation of risk predictions that conveniently support the paying party's most extreme sentencing position. The PCL-R score of 32.6 — placing Ms. Wang at the ninety-seventh percentile for psychopathy — was first assigned in May 2023, carried forward without independent re-scoring into the April 2026 report, and now functions less as a clinical finding than as a fixed narrative frame into which all subsequent conduct is forced, however contested. This is the textbook "hired gun" dynamic Mossman documents: an opinion that "reflects who is paying the clinician and not an impartial assessment of the merits of the case." Mossman, supra, at 6 Widener L. Symp. J. at 2.

This concern is not theoretical given Dr. Meloy's own professional history. As noted above, Dr. Meloy served as the prosecution's expert in the 1999 prosecution of Timothy Masters — a fifteen-year-old charged with murder in Fort Collins, Colorado — profiling the defendant solely from drawings and notebooks, without any direct clinical interview, based on an adversarially curated record. Masters was convicted and sentenced to life. In 2008, DNA evidence exonerated him; the true perpetrator was identified as a neighboring physician. Masters received $10 million in compensation for nearly a decade of wrongful imprisonment. Dr. Meloy has publicly acknowledged that his opinions have not always been supported by the evidence. The methodological parallels between Masters and this case are concrete: no direct clinical interview, exclusively adversarially assembled record, constitutionally protected expressive conduct treated as pathology, and sweeping recommendations for removal from society based on a framework that proved catastrophically wrong. Mossman's insight — that the hired gun problem is both a structural feature of fee-based adversarial expert systems and a documented pattern in appellate case law — applies with full force to a report prepared under these circumstances. The Court should treat Dr. Meloy's opinions with the same skepticism that at least thirty-five appellate courts have brought to bear on forensic experts who exhibit this profile: calibrated to the imbalance in the materials reviewed, the absence of any

clinical interview, the manifest alignment of his conclusions with the paying party's sentencing objectives, and the documented precedent showing that the same methodology has contributed to at least one catastrophic wrongful conviction.

### Conclusion

Ms. Wang respectfully requests that this Court accept the Rule 11(c)(1)(C) plea agreement and impose a sentence of five years' probation with appropriate special conditions, including: no direct or indirect contact with Victims 1 and 2; internet monitoring; mental-health treatment; and employment and educational requirements. Such a sentence is "sufficient, but not greater than necessary" to achieve the purposes of sentencing under 18 U.S.C. § 3553(a).

Respectfully submitted,

Dated: April 24, 2026                                     Kailin Wang Defendant in Pro Per

---

[1]  Hillard Heintze is a prominent security risk management and investigation firm founded in 2004, widely recognized for providing strategic advisory services o corporations, affluent families, and law enforcement. Acquired by Jensen Hughes, the firm is noted for its expertise in emergency management, forensic engineering, and fire safety.

[2]      This conduct did not violate the Criminal Protective Order's prohibition on obtaining a "victim address." Item 12 permits use of such information for good cause, which plainly existed: Ms. Wang needed to prove C.T.'s continuing ties to California under Family Code § 3421 to preserve California's UCCJEA jurisdiction over custody and visitation, consistent with *In re Marriage of Nurie*, 176 Cal. App. 4th 478, 499 (Cal. Ct. App. 2009). Under *Slaieh v. Superior Court*, 77 Cal. App. 5th 266, 275 (Cal. Ct. App. 2022), Marsy's Law does not shield a complaining witness from civil family law discovery. Ms. Wang's use of public property records to oppose C.T.'s UCCJEA motion was lawful, necessary, and a good-faith exercise of her rights in ongoing family litigation. This incident was explained to the federal government and probation, is not part of the factual basis of the plea, and is not included in the PSR.

[3] See United States v. Alvarez, No. 2:21-cr-00111-HCN (D. Utah) (same U.S. Attorney's Office accepted 49-day self-surrender period in § 2261A/§ 875 case; court granted self-surrender on § 3143(a)(2) finding of no flight risk or danger based on compliance with pretrial conditions); United States v. Rust, No. 2:19-cr-00164-TS (D. Utah) (this Court granted two-to-four-month self-surrender period in felony money-laundering case); and United States v. Mangione, No. 25-CR-00176 (S.D.N.Y. Jan. 30, 2026) (holding § 2261A is not a "crime of violence" under the elements clause).



# COMPARATIVE CYBERSTALKING SENTENCING — 18 U.S.C. § 2261A

*United States v. Wang, No. 2:24-cr-00163 (D. Utah) — Sentencing Parity Analysis under 18 U.S.C. § 3553(a)(6)*

| Case | Defendant | Aggravating Factors | Senten |
|------|-----------|---------------------|--------|
| United States v. Cutler No. 2:24-cr-00053 (D. Utah) | Tracy Cutler | • Two victims; two counts of cyberstalking<br>• Conduct spanning 2017–2020 (3+ years)<br>• Multiple accounts and phone numbers<br>• Filed false reports with federal authorities, Same district as Wang. | 11(c)(l)© Ple months pro $17,639.46 re |
| United States v. Chand No. 2:21-cr-00158 (E.D. Cal.) | Michael Chand | • Prior 2017 conviction against same victim; elicited CSAM from victim at age 15<br>• Served 2 years jail for prior offense<br>• Cyberstalking committed while on parole<br>• 176 calls; 63 threatening voicemails<br>• Explicit threats of physical violence, Repeat offender on parole; prior sexual exploitation of same victim; explicit violence threats. | 36 months pr $8,025.70 re |
| United States v. Roe No. 1:24-cr-00200 (D. Md.) | Richard Michael Roe | • Six victims; five counts making harassing phone calls<br>• Conduct spanning December 2019–January 2021 (1+ year)<br>• Thousands of spoofed calls, texts, emails across multiple platforms<br>• Used Prankowl, PrankDial, TextFree services; VPN to obfuscate<br>• Filed false police reports in multiple jurisdictions (NY, MD, DC)<br>• Targeted victims' employers and businesses<br>• Attempted 481+ unauthorized Apple account accesses<br>• Victim 1 spent $50,000+ defending herself<br>• Two prior incidents (2011-2012, 2015-2016) with similar harassment. | 60 months proba 6 months home confinement 500 community servi $418,343.10 rest |

| Case | Name | Conduct | Sentence |
|---|---|---|---|
| United States v. Garcia No. 5:23-cr-00238 (W.D. Tex.) | Ashley Garcia | • Registered 18 website domains using victim's name<br>• 750+ blog entries about victim<br>• Emailed victim's employer; sought to destroy livelihood<br>• Explicit intent to "ruin your fucking life"<br>• Multiple fake social media accounts in victim's name. Sustained campaign to destroy professional livelihood; sophisticated multi-platform operation. | 60 months pr[...]<br>180 days res[...]<br>reentry[...] |
| United States v. Dennis No. 20-CR-623 (JSR) (S.D.N.Y.) | Willie Dennis | • 3 counts of cyberstalking; years-long campaign against 3 former K&L Gates law partners after being fired from the firm<br>• Thousands of harassing, threatening emails and texts sent back-to-back, at all hours of day and night<br>• Explicit threats: "sleep with one eye open," "I will find you," "u r going to get yours," "people will be dying daily for the next year"<br>• Threatened to "chase down" a partner's minor children for the "sins of the father"<br>• One victim left New York and relocated to another state; another upgraded home security and slept with a loaded gun<br>• Convicted at trial (no guilty plea); represented himself pro se | Convicted at [...]<br>guilty plea); rep[...]<br>himself pro se 2[...]<br>imprisonm[...]<br>3 years supe[...]<br>releas[...]<br>(Govt. sought 4[...] |
| United States v. Krezoub No. SACR 23-00042-CJC (C.D. Cal.) | Anastassia Krezoub a/k/a Sylvia Kass | • Two counts: Stalking (18 U.S.C. §§ 2261A(2)(B), 2261(b)(5)) AND Transmitting Interstate Communications with Intent to Extort (18 U.S.C. § 875(d)) — a more serious charge profile than Wang's single count<br>• Nov. 29 – Dec. 11, 2021: Sent victim disparaging text messages<br>• After victim told her to stop, continued sending harassing texts from multiple phone numbers to evade blocking (Dec. 2021 – Mar. 2023)<br>• Feb. 8–11, 2023: Sent victim extortionate texts threatening to damage his reputation unless he bought her luxury goods — "How about you go to Chanel and buy cash? Or some exotic bags from Dior?"<br>• Total extortion demand: approximately $500,000 in property and items of value | TIME SER[...]<br>1 year supervis[...]<br>$200 special as[...]<br>(fines wai[...]<br>Deported to [...] |

| United States v. Yung No. 19-1640 (D. Del.) | Ho Ka Terence Yung | • 18-month campaign targeting Georgetown admissions interviewer<br>• Thousands of posts: fake obituaries for victim's wife and son; KKK-content social-media profiles in victim's name; false accusations of rape, lynching, and child molestation<br>• Craigslist ads directing men seeking violent sex to victim's home — strangers appeared at victim's residence multiple times<br>• Impersonated victim's wife in sex-slave ad; victim's family received hundreds of calls from men seeking sex<br>• False BBB reports accusing victim of sexual assault | 46 months impr<br>3 years pro<br>~$70,000 res<br>(victim's inves<br>costs) |
| "United States v. Bracken (2:24-cr-00132) District Court, D. Utah" | Ryan Gregory Bracken | Ryan Gregory Bracken received 60 months imprisonment and 3 years supervised release for repeated death threats against the Salt Lake County Sheriff, government offices, and a law firm.Threat Details: Bracken blamed officials for his property foreclosure, threatening to kill law enforcement for "treason" (penalty: death). | Convicted a<br>sentenced to 6<br>imprisonment ar<br>supervised r |
| **United States v. Wang ← PRESENT CASE No. 2:24-cr-00163 (D. Utah)** | **Kailin Wang** | Custody-dispute context; derogatory posts (not defamatory re: V1)<br>• No threats of physical harm; no weapons; no financial harm.<br>11. I stipulate and agree that the following facts accurately describe my conduct. These facts | **REQUESTING:<br>60 months pro** |

TRINA A. HIGGINS, United States Attorney (#7349)
Luisa Gough, Assistant United States Attorney (#17221)
Attorneys for the United States of America
Office of the United States Attorney
111 South Main Street, Suite 1800
Salt Lake City, Utah 84111-2176
Telephone: (801) 524-5682

FILED US District Court-UT
NOV 21 '24 AM09:16

IN THE UNITED STATES DISTRICT COURT

DISTRICT OF UTAH

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>Plaintiff,<br><br>vs.<br><br>TRACY CUTLER formerly known as<br>TRACY LUTTMER,<br><br>Defendant. | Case No. 2:24-cr-00053-CW<br><br>STATEMENT BY DEFENDANT IN<br>ADVANCE OF PLEA OF GUILTY<br>AND PLEA AGREEMENT PURSUANT<br>TO FED. R. CRIM. P. 11(c)(1)(C)<br><br>Judge Clark Waddoups |

I hereby acknowledge and certify that I have been advised of and that I understand the following facts and rights, and that I have had the assistance of counsel in reviewing, explaining, and entering into this agreement:

1.     As part of this agreement with the United States of America, I intend to plead guilty to Count I of the Indictment. My attorney has explained the nature of the charge against me, and I have had an opportunity to discuss the nature of the charge with my attorney. I understand the charge and what the United States is required to prove in order to convict me. The elements of Count I of the Indictment, a violation of 18 U.S.C. § 2261A (Cyberstalking) are as follows:

   a. I engaged in a course of conduct that caused substantial emotional distress to that person;

counsel, must be answered truthfully and, if I give false answers, I can be prosecuted for perjury.

11.    I stipulate and agree that the following facts accurately describe my conduct. These facts provide a basis for the Court to accept my guilty plea:

Beginning on or around March 2022 and continuing through at least May 2023, I engaged in a course of conduct with the intent to injure, harass, and intimidate J.P., his family, friends, and others connected to him, and his girlfriend D.R.—who, along with J.P., is located in another state—by sending hundreds of harassing electronic messages utilizing computers and electronic communication services that are systems or facilities of interstate commerce. My course of conduct would reasonably be expected to cause substantial emotional distress, and did in fact cause substantial emotional distress to J.P. My course of conduct included using more than forty (40) anonymized numbers, social media accounts, and email addresses to send harassing messages to J.P. and D.R.; modifying or locking J.P. out of his own on-line accounts, resulting in lost income; pretending to send messages from J.B., falsely implicating him in the campaign. I engaged in this conduct with the intent to harass or intimidate other persons, specifically J.P.

12.    The only terms and conditions pertaining to this plea agreement between me and the United States are as follows:

    a.   **Guilty Plea.** I will plead guilty to Count I of the Indictment.

    b.   **Stipulated Sentence.** Pursuant to Rule 11(c)(1)(C) of the Federal Rules of Criminal Procedure, the sentence imposed by the Court will be thirty-six (36) months' probation with the first six (6) months on home detention. Additionally, I will abide by a comprehensive mental health treatment plan coordinated by my provider. The plan will include specific terms covering therapy requirements and prescription needs. I agree this is a reasonable sentence.

        (1)    I understand that this agreement, including my plea, the agreed upon sentence, and all other terms referenced herein, are subject to the approval of, and acceptance by the Court. I further understand that the Court will likely order the preparation of a Presentence Report to assist in the determination of whether this plea and the agreement are appropriate, and I agree to fully cooperate in the preparation of the Presentence Report.

4

(2)     If, after receiving all relevant information, the Court rejects the plea agreement and determines that a sentence different from the agreed upon sentence of thirty-six (36) months' probation with the first six (6) months on home detention will be imposed, I will have the right to withdraw the plea of guilty and the terms of this agreement will become null and void. Likewise, if the Court rejects the plea agreement and determines that the sentence should be less than thirty-six (36) months' probation with the first six (6) months on home detention, I understand that the United States will have the right to move to vacate this agreement, and all terms of this agreement will become null and void.

c.  **Dismissal of Counts.** The United States agrees to move for leave to dismiss Count II at the time of sentencing.

d.  **Relevant Conduct.** I understand and agree that the Presentence Report may include descriptions of conduct I engaged in which either was not charged against me, will not be pleaded to by me, or both. I understand and agree that the Court will take these facts into consideration in determining the reasonableness of the stipulated sentence.

e.  **Appeal Waiver.**

(1)     Fully understanding my limited right to appeal my sentence, as explained above in paragraph 8, and in consideration of the concessions and/or commitments made by the United States in this plea agreement, I knowingly, voluntarily, and expressly waive my right to appeal any sentence imposed upon me, except that I do not waive the right to appeal as set forth in 18 U.S.C. § 3742(c)(1), which states that I may not file a notice of appeal unless the sentence imposed is greater than the sentence set forth in this agreement. I also knowingly, voluntarily, and expressly waive any argument (1) that the statute(s) to which I am pleading guilty is/are unconstitutional or (2) that my admitted conduct does not fall within the scope of the statute(s).

(2)     I also knowingly, voluntarily, and expressly waive my right to challenge my sentence, unless the sentence imposed is greater than the sentence set forth in this agreement, and my conviction, in any collateral review motion, writ or other procedure, including but not limited to a motion brought under 28 U.S.C. § 2255, except to raise an ineffective assistance of counsel claim. This waiver includes any motion for modification of my sentence under 18 U.S.C. § 3582(c)(2).

5

h.  **Waiver of Interest.** The United States agrees to recommend that the Court waive interest for fines and restitution assessed against me.

13.     I understand and agree that this plea agreement is solely between me and the United States Attorney for the District of Utah and does not bind any other federal, state, or local prosecuting, administrative, or regulatory authorities.

14.     I understand that I have a right to ask the Court any questions I wish to ask concerning my rights about these proceedings and the plea.

$$* \quad * \quad * \quad *$$

I make the following representations to the Court:

1.     I am _5 2_ years of age. My education consists of _high school diploma + Associates degree_ . I _can_ [can/cannot] read and understand English.

2.     This Statement in Advance contains all terms of the agreement between me and the United States; if there are exceptions, the Court will be specifically advised, on the record, at the time of my guilty plea of the additional terms. I understand the United States and I cannot have terms of this plea agreement that are not disclosed to the Court.

3.     No one has made threats, promises, or representations to me that have caused me to plead guilty, other than the provisions set forth in this agreement.

4.     Neither my attorney nor the United States has promised me that I would receive probation or any other form of leniency because of my plea.

5.     I have discussed this case and this plea with my lawyer as much as I wish, and I have no additional questions.

6.     I am satisfied with my lawyer.

7.     My decision to enter this plea was made after full and careful thought; with the advice of counsel; and with a full understanding of my rights, the facts and circumstances of the case and the consequences of the plea. I was not under the influence of any drugs, medication, or intoxicants when I made the decision to enter the plea, and I am not now under the influence of any drugs, medication, or intoxicants.

8.     I have no mental reservations concerning the plea.

7

9. I understand and agree to all the above. I know that I am free to change or delete anything contained in this statement. I do not wish to make changes to this agreement because I agree with the terms and all the statements are correct.

DATED this 19th day of November, 2024.

TRACY CUTLER
Defendant

I certify that I have discussed this plea agreement with the defendant, that I have fully explained her rights to her, and that I have assisted her in completing this written agreement. I believe that she is knowingly and voluntarily entering the plea with full knowledge of her legal rights and that there is a factual basis for the plea.

DATED this 19th day of November, 2024.

ED JONES
Attorney for Defendant

I represent that all terms of the plea agreement between the defendant and the United States have been, or will be at the plea hearing, disclosed to the Court, and there are no undisclosed agreements between the defendant and the United States.

DATED this 19th day of November, 2024

TRINA A. HIGGINS
United States Attorney

Peter Reichman for

LUISA GOUGH
Assistant United States Attorney

8

AO 245C (Rev. 09/19) Amended Judgment in a Criminal Case
Sheet 1

Case 2:24-cr-00053-TSW Document 156-1 Filed 04/17/26 PageID.8091 Page 110 of 156                    (NOTE: Identify Changes with Asterisks (*))

# UNITED STATES DISTRICT COURT

District of Utah

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | **AMENDED JUDGMENT IN A CRIMINAL CASE** |
| **v.** | ) | |
| TRACY CUTLER | ) | Case Number: DUTX 2:24-CR-00053-001 CW |
| | ) | USM Number: 04388-511 |

**Date of Original Judgment:** 2/11/2025

*(Or Date of Last Amended Judgment)*

Edward Jones
Defendant's Attorney

**THE DEFENDANT:**

☑ pleaded guilty to count(s)    1 of the Indictment

☐ pleaded nolo contendere to count(s)
   which was accepted by the court.

☐ was found guilty on count(s)
   after a plea of not guilty.

The defendant is adjudicated guilty of these offenses:

| Title & Section | Nature of Offense | Offense Ended | Count |
|---|---|---|---|
| 18 U.S.C. § 2261A | Interstate Cyberstalking | | 1 |

The defendant is sentenced as provided in pages 2 through    7    of this judgment. The sentence is imposed pursuant to the Sentencing Reform Act of 1984.

☐ The defendant has been found not guilty on count(s)

☐ Count(s)      ☐ is ☐ are dismissed on the motion of the United States.

It is ordered that the defendant must notify the United States Attorney for this district within 30 days of any change of name, residence, or mailing address until all fines, restitution, costs, and special assessments imposed by this judgment are fully paid. If ordered to pay restitution, the defendant must notify the court and United States attorney of material changes in economic circumstances.

5/12/2025
Date of Imposition of Judgment

*Signature of Judge*

Clark Waddoups      U.S. District Judge
Name and Title of Judge

5/12/2025
Date

DEFENDANT:   TRACY CUTLER
CASE NUMBER:   DUTX 2:24-CR-00053-001 CW

## IMPRISONMENT

The defendant is hereby committed to the custody of the Federal Bureau of Prisons to be imprisoned for a total term of :

None.

☐   The court makes the following recommendations to the Bureau of Prisons:

☐   The defendant is remanded to the custody of the United States Marshal.

☐   The defendant shall surrender to the United States Marshal for this district:

☐   at _____   ☐   a.m.   ☐   p.m.   on _____ .

☐   as notified by the United States Marshal.

☐   The defendant shall surrender for service of sentence at the institution designated by the Bureau of Prisons:

☐   before 2 p.m. on _____ .

☐   as notified by the United States Marshal.

☐   as notified by the Probation or Pretrial Services Office.

## RETURN

I have executed this judgment as follows:

Defendant delivered on _____ to _____

at _____ with a certified copy of this judgment.

_____
UNITED STATES MARSHAL

By _____
DEPUTY UNITED STATES MARSHAL

Case 2:24-cr-00053-TSW   Document 156-1   Filed 04/17/26   PageID.8093   Page 112 of 156

(NOTE: Identify Changes with Asterisks (*))

Judgment—Page __3__ of __7__

DEFENDANT:  TRACY CUTLER
CASE NUMBER:  DUTX 2:24-CR-00053-001 CW

## PROBATION

You are hereby sentenced to probation for a term of:

36 months.

## MANDATORY CONDITIONS

1. You must not commit another federal, state or local crime.
2. You must not unlawfully possess a controlled substance.
3. You must refrain from any unlawful use of a controlled substance. You must submit to one drug test within 15 days of placement on probation and at least two periodic drug tests thereafter, as determined by the court.
   ☐ The above drug testing condition is suspended, based on the court's determination that you pose a low risk of future substance abuse. *(check if applicable)*
4. ☑ You must cooperate in the collection of DNA as directed by the probation officer. *(check if applicable)*
5. ☐ You must comply with the requirements of the Sex Offender Registration and Notification Act (34 U.S.C. § 20901 *et seq*.) as directed by the probation officer, the Bureau of Prisons, or any state sex offender registration agency in the location where you reside, work, are a student, or were convicted of a qualifying offense. *(check if applicable)*
6. ☐ You must participate in an approved program for domestic violence. *(check if applicable)*
7. ☑ You must make restitution in accordance with 18 U.S.C. § 2248, 2259, 2264, 2327, 3663, 3663A, and 3664. *(check if applicable)*
8. You must pay the assessment imposed in accordance with 18 U.S.C. § 3013.
9. If this judgment imposes a fine, you must pay in accordance with the Schedule of Payments sheet of this judgment.
10. You must notify the court of any material change in your economic circumstances that might affect your ability to pay restitution, fines, or special assessments.

You must comply with the standard conditions that have been adopted by this court as well as with any other conditions on the attached page.

AO 245C (Rev. 09/19)  Amended Judgment in a Criminal Case
Sheet 4D — Probation
(NOTE: Identify Changes with Asterisks (*))

Judgment—Page  5  of  7

DEFENDANT:  TRACY CUTLER
CASE NUMBER:  DUTX 2:24-CR-00053-001 CW

## SPECIAL CONDITIONS OF SUPERVISION

1. You must submit to drug/alcohol testing, up to 4 tests per month, under a copayment plan, as directed by the U.S. Probation Office. This may be modified/terminated after 6 months of testing by U.S. Probation Office.

2. You must participate in and successfully complete a substance-abuse evaluation and/or treatment, under a copayment plan, as directed by the U.S. Probation Office. During the course of treatment, you must not consume alcohol, nor frequent any establishment where alcohol is the chief item of order.

3. You must participate in and successfully complete a mental-health evaluation and/or treatment program, under a copayment plan, as directed by the U.S. Probation Office, take any mental-health medications as prescribed, and not possess or consume alcohol, nor frequent businesses where alcohol is the chief item of order, during the course of treatment or medication. You must abide by a comprehensive mental health treatment plan coordinated by your provider.

4. You shall refrain from obstructing or attempting to obstruct or tamper, in any fashion, with the efficiency and accuracy of any prohibited substance testing, which is required as a condition of supervision.

5. You shall not use, possess, or ingest products containing tetrahydrocannabinol (THC) or cannabidiol (CBD) in any form unless they are approved by the Food and Drug Administration and obtained from a pharmacy by prescription from a licensed medical professional. For purposes of this condition, an authorization for THC or CBD issued under the law of any state is not valid; a state-issued marijuana medical card is not a prescription; and a THC/CBD dispensary is not a pharmacy. You are not allowed under any circumstances to market any product containing THC or CBD.

6. You must submit to Remote Alcohol Testing, and abide by all of the program requirements as directed by the probation officer. You must pay all or part of the costs of participation in the program as directed by the probation officer.

7. You must submit your person, property, house, residence, office, vehicle, papers, computers [as defined in 18 U.S.C. § 1030(e)(1)], other electronic communications or data storage devices or media, to a search, conducted by the U.S. Probation Office, at a reasonable time and in a reasonable manner based upon reasonable suspicion of contraband or evidence of a violation of a condition of release; failure to submit to a search may be grounds for revocation; you must warn any other residents that the premises may be subject to searches pursuant to this condition.

8. You must cooperate with the United States Probation and Pretrial Services Computer and Internet Monitoring program; Appendix A, Computer and Internet use (Not Applicable to Third Party Employment). Cooperation shall include, but not be limited to, identifying computer systems (as identified in 18 U.S.C. § 1030(e)(1)), internet capable devices, networks (routers/modems), and/or similar electronic devices (external hard drives, flash drives, etc.) to which you have access. All devices are subject to random inspection/search, configuration, and the installation of monitoring software and/or hardware at your expense.

9. You must inform all parties who access approved computer(s) or similar electronic device(s) that the device(s) is subject to search and monitoring. You may be limited to possessing only one personal computer and/or internet capable device to facilitate the ability to effectively monitor your internet-related activities.

10. You must refrain from incurring new credit charges or opening additional lines of credit unless in compliance with any established payment schedule and obtain the approval of the U.S. Probation Office.

11. You must not transfer, sell, give away, or otherwise convey any asset with a value of $500 or more without the approval of the U.S. Probation Office.

12. You must be placed on the Statefinder and Treasury Offset programs, requiring any state and federal tax refunds be intercepted for purposes of Court-ordered financial obligations.

13. You must notify the U.S. Probation Office and the Office of the United States Attorney of any material change in your economic circumstances that might affect your ability to pay Court-ordered financial obligations. You must also notify the U.S. Probation Office and the Office of the United States Attorney of any loss of employment or increase or decrease in income.

14. You must participate in the following location restriction program components and abide by its requirements as the probation officer instructs for a period of 6 months. Pay all or part of the cost of location monitoring based upon your ability to pay as determined by the probation officer. No overnight travel without Court approval.

Home Detention. You are restricted to your residence at all times except for employment, education, religious services, medical, substance-abuse or mental-health treatment, attorney visits, court appearances, court-ordered obligations, or other activities preapproved by the probation officer.

AO 245C (Rev. 09/19) Amended Judgment in a Criminal Case
Sheet 5 — Criminal Monetary Penalties

(NOTE: Identify Changes with Asterisks (*))

Judgment — Page 6 of 7

DEFENDANT: TRACY CUTLER
CASE NUMBER: DUTX 2:24-CR-00053-001 CW

## CRIMINAL MONETARY PENALTIES

The defendant must pay the following total criminal monetary penalties under the schedule of payments on Sheet 6.

|  | Assessment | Restitution | Fine | AVAA Assessment* | JVTA Assessment** |
|---|---|---|---|---|---|
| TOTALS | $ 100.00 | $ 17,639.46 | $ 0.00 | $ 0.00 | $ 0.00 |

☐ The determination of restitution is deferred until _____ . An *Amended Judgment in a Criminal Case (AO 245C)* will be entered after such determination.

☐ The defendant shall make restitution (including community restitution) to the following payees in the amount listed below.

If the defendant makes a partial payment, each payee shall receive an approximately proportioned payment, unless specified otherwise in the priority order or percentage payment column below. However, pursuant to 18 U.S.C. § 3664(i), all nonfederal victims must be paid before the United States is paid.

| Name of Payee | Total Loss*** | Restitution Ordered | Priority or Percentage |
|---|---|---|---|
| SEE SEALED RESTITUTION LIST | $17,639.46 | $17,639.46 | |

| TOTALS | $ 17,639.46 | $ 17,639.46 |
|---|---|---|

☐ Restitution amount ordered pursuant to plea agreement $ _____

☐ The defendant must pay interest on restitution and a fine of more than $2,500, unless the restitution or fine is paid in full before the fifteenth day after the date of the judgment, pursuant to 18 U.S.C. § 3612(f). All of the payment options on Sheet 6 may be subject to penalties for delinquency and default, pursuant to 18 U.S.C. § 3612(g).

☑ The court determined that the defendant does not have the ability to pay interest, and it is ordered that:

☑ the interest requirement is waived for ☐ fine ☑ restitution.

☐ the interest requirement for the ☐ fine ☐ restitution is modified as follows:

* Amy, Vicky, and Andy Child Pornography Victim Assistance Act of 2018, Pub. L. No. 115-299.
** Justice for Victims of Trafficking Act of 2015, Pub. L. No. 114-22.
*** Findings for the total amount of losses are required under Chapters 109A, 110, 110A, and 113A of Title 18 for offenses committed on or after September 13, 1994, but before April 23, 1996.

Case 2:24-cr-00163-TSW Document 156-1 Filed 04/17/26 PageID.8096 Page 115 of 156

Judgment — Page  7  of  7

DEFENDANT:  TRACY CUTLER
CASE NUMBER:  DUTX 2:24-CR-00053-001 CW

# SCHEDULE OF PAYMENTS

Having assessed the defendant's ability to pay, payment of the total criminal monetary penalties shall be due as follows:

**A**  ☑  Lump sum payment of $  100.00  due immediately, balance due

☐  not later than  , or
☐  in accordance with ☐ C, ☐ D, ☐ E, or ☐ F below; or

**B**  ☐  Payment to begin immediately (may be combined with ☐ C, ☐ D, or ☐ F below); or

**C**  ☐  Payment in equal  (e.g., weekly, monthly, quarterly) installments of $  over a period of  (e.g., months or years), to commence  (e.g., 30 or 60 days) after the date of this judgment; or

**D**  ☐  Payment in equal  (e.g., weekly, monthly, quarterly) installments of $  over a period of  (e.g., months or years), to commence  (e.g., 30 or 60 days) after release from imprisonment to a term of supervision; or

**E**  ☐  Payment during the term of supervised release will commence within  (e.g., 30 or 60 days) after release from imprisonment. The court will set the payment plan based on an assessment of the defendant's ability to pay at that time; or

**F**  ☑  Special instructions regarding the payment of criminal monetary penalties:

Restitution shall be paid at a rate of $100 per month. The court waives the accrual of interest.

Unless the court has expressly ordered otherwise, if this judgment imposes imprisonment, payment of criminal monetary penalties is due during the period of imprisonment. All criminal monetary penalties, except those payments made through the Federal Bureau of Prisons' Inmate Financial Responsibility Program, are made to the clerk of the court.

The defendant shall receive credit for all payments previously made toward any criminal monetary penalties imposed.

☐  Joint and Several

| Case Number Defendant and Co-Defendant Names *(including defendant number)* | Total Amount | Joint and Several Amount | Corresponding Payee, if appropriate. |
|---|---|---|---|
| | | | |

☐  The defendant shall pay the cost of prosecution.

☐  The defendant shall pay the following court cost(s):

☐  The defendant shall forfeit the defendant's interest in the following property to the United States:

Payments shall be applied in the following order: (1) assessment, (2) restitution principal, (3) restitution interest, (4) AVAA assessment, (5) fine principal, (6) fine interest, (7) community restitution, (8) JVTA assessment, (9) penalties, and (10) costs, including cost of prosecution and court costs.

ORIGINAL

PHILLIP A. TALBERT
United States Attorney
ADRIAN T. KINSELLA
CHRISTINA McCALL
Assistant United States Attorneys
501 I Street, Suite 10-100
Sacramento, CA 95814
Telephone: (916) 554-2700
Facsimile: (916) 554-2900

Attorneys for Plaintiff
United States of America

IN THE UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| UNITED STATES OF AMERICA, | CASE NO. 2:21-cr-00158-JAM |
| Plaintiff, | PLEA AGREEMENT |
| v. | DATE:    AUGUST 20, 2024<br>Time:    9:00 a.m. |
| MICHAEL JAMESON CHAND, | Court:   Hon. John A. Mendez |
| Defendant. | |

## I.    INTRODUCTION

### A.    Scope of Agreement.

The indictment in this case charges the defendant with a violation of 18 U.S.C. § 2261A(2)(B) – cyberstalking.  This document contains the complete plea agreement between the United States Attorney's Office for the Eastern District of California (the "government") and the defendant regarding this case.  This plea agreement is limited to the United States Attorney's Office for the Eastern District of California and cannot bind any other federal, state, or local prosecuting, administrative, or regulatory authorities.

### B.    Court Not a Party.

The Court is not a party to this plea agreement.  Sentencing is a matter solely within the discretion of the Court, and the Court may take into consideration any and all facts and circumstances concerning the criminal activities of defendant, including activities which may not have been charged in

PLEA AGREEMENT                                           1

the indictment. The Court is under no obligation to accept any recommendations made by the government, and the Court may in its discretion impose any sentence it deems appropriate up to and including the statutory maximum stated in this plea agreement.

If the Court should impose any sentence up to the maximum established by the statute, the defendant cannot, for that reason alone, withdraw his guilty plea, and he will remain bound to fulfill all of the obligations under this plea agreement. The defendant understands that neither the prosecutor, defense counsel, nor the Court can make a binding prediction or promise regarding the sentence he will receive.

## II.      DEFENDANT'S OBLIGATIONS

### A.      Guilty Plea.

The defendant will plead guilty to the sole count in the indictment (cyberstalking). The defendant agrees that he is in fact guilty of this charge and that the facts set forth in the Factual Basis for Plea attached hereto as Exhibit A are accurate.

The defendant agrees that this plea agreement will be filed with the Court and become a part of the record of the case. The defendant understands and agrees that he will not be allowed to withdraw his plea should the Court not follow the government's sentencing recommendations.

The defendant agrees that the statements made by him in signing this plea agreement, including the factual admissions set forth in the factual basis, shall be admissible and useable against the defendant by the United States in any subsequent criminal or civil proceedings, even if the defendant fails to enter a guilty plea pursuant to this plea agreement. The defendant waives any rights under Fed. R. Crim. P. 11(f) and Fed. R. Evid. 410, to the extent that these rules are inconsistent with this paragraph or with this plea agreement generally.

### B.      Restitution.

18 U.S.C. § 2264 requires the Court to order restitution to the victims of certain offenses. Defendant agrees that his conduct is governed by 18 U.S.C. § 2264. Defendant agrees to pay restitution pursuant to 18 U.S.C. § 2264 to the victim of the cyberstalking offense in an amount between $4,046.84 and up to $50,000.00. The amount of restitution will be determined by the Court. Restitution payments shall be by cashier's or certified check made payable to the Clerk of the Court.

PLEA AGREEMENT                                                    2

## IX.   APPROVALS AND SIGNATURES

### A.   Defense Counsel.

I have read this plea agreement and have discussed it fully with my client. The plea agreement accurately and completely sets forth the entirety of the agreement. I concur in my client's decision to plead guilty as set forth in this plea agreement.

Dated: 8/12/24

_____
HOOTAN BAIGMOHAMMADI
Attorney for Defendant

### B.   Defendant:

I have read this plea agreement and carefully reviewed every part of it with my attorney. I understand it, and I voluntarily agree to it. Further, I have consulted with my attorney and fully understand my rights with respect to the provisions of the Sentencing Guidelines that may apply to my case. No other promises or inducements have been made to me, other than those contained in this plea agreement. In addition, no one has threatened or forced me in any way to enter into this plea agreement. Finally, I am satisfied with the representation of my attorney in this case.

Dated:

8/12/24

_____
MICHAEL JAMESON CHAND
Defendant

### C.   Attorney for United States:

I accept and agree to this plea agreement on behalf of the government.

Dated: 8/20/2024

PHILLIP A. TALBERT
United States Attorney

_____
ADRIAN T. KINSELLA
CHRISTINA McCALL
Assistant United States Attorneys

PLEA AGREEMENT                                    11

EXHIBIT "A"

Factual Basis for Plea

Between December of 2019 and November of 2020, in the Eastern District of California, the defendant, Michael Jameson Chand, intentionally engaged in a course of conduct to harass or intimidate the victim, Jane Doe, and used facilities of interstate commerce and interactive computer service to do so. This course of conduct caused Jane Doe substantial emotional distress.

### Prior Case Against the Same Victim

Mr. Chand was convicted in 2017 in California for extortion (Penal Code 520), contact with a minor to commit a felony (Penal Code 288.3(a)), and sending obscene material to a minor (Penal Code 311.1(a)). His victim, "Jane Doe," who is the same victim as in the instant case, was 15 years old at the time of the defendant's prior criminal conduct. The offense conduct included eliciting child sexual exploitation material from Jane Doe. Mr. Chand was sentenced to two years in jail for this offense.

### Cyberstalking Charge

On December 23, 2019, while on parole, after release from the jail sentence mentioned in the paragraph above, Mr. Chand posted a public Facebook post under the false name of Adrian Adrela, including Jane Doe's full name, falsely claimed that she was dating a murderer, and asking, "please everybody help me get her into a mental hospital if you want her contact info let me know please." Between this post and June 2, 2020, there is no evidence Mr. Chand harassed or intimidated the victim. Between June 3, 2020 and October 16, 2020, he called her approximately 176 times. From early September 2020 to November 1, 2020, he left her 63 voicemail messages, often calling her from blocked numbers.

In some of his voicemail messages, Mr. Chand called Jane Doe names such as "dumb ass" and "bitch." Many of the voicemail messages contained threats against Jane Doe and her family. For example, on October 8, 2020, Mr. Chand told Jane Doe, in an angry tone, that he would resolve a perceived dispute on her "front lawn with [him] breaking down the damn fucking front door." In another voicemail, he yelled at her that he would keep calling and "fill up her voicemail," and claimed that he was "not harassing [her] because [she] didn't tell [him] to stop." In another voicemail on October 9, 2020, he told Jane Doe, from whom he had previously elicited child sexual exploitation

PLEA AGREEMENT                                    A-1

material images from when she was a minor, "I can find your aunt's Facebook, [her family member of friend's] Facebook, your real Facebook .... I can send them everything, [Jane Doe], I really have nothing to lose at this point." Mr. Chand contends that this last message pertains to money he believed the victim owed him, and not to redistribution of CSAM.

Additionally, between these December 2019 and November 2020 contacts, Mr. Chand created multiple social media accounts, some under aliases, to contact and harass Jane Doe. Using such accounts, he made posts publicly naming Jane Doe, and saying things that were designed to harass and intimidate Jane Doe. For example, in a public Facebook post made on August 5, Mr. Chand listed Jane Doe's full name, her city and state of birth, and included a photo from her social media account, and falsely stated that "she killed her ex[-boyfriend]." He also falsely claimed that Jane Doe had planned to move in with and would expose her "baby" to a "rapist," and wrote, "Please help me find a way to get the poor kid away from her."

Mr. Chand made the above phone calls and Facebook posts from Sacramento, California, using his cellular phone, which was connected to a nationwide cellular network, and utilized the internet. At all times during defendant's cyberstalking activity, Jane Doe lived outside of California. Mr. Chand made the phone calls and internet posts with the intent to harass and intimidate Jane Doe. As part of this plea agreement, Mr. Chand admits that his angry voicemail messages and Facebook postings about Jane Doe constitute a course of conduct that would be reasonably expected to cause, and did in fact cause, substantial emotional distress to Jane Doe.

I have reviewed the "Factual Basis" information above with my attorney, and agree that it is accurate.

Dated: 8/12/24

MICHAEL JAMESON CHAND,
Defendant

PLEA AGREEMENT                                    A-2

AO 245B-CAED (Rev. 09/2019) Sheet 1 - Judgment in a Criminal Case

# UNITED STATES DISTRICT COURT
## Eastern District of California

| UNITED STATES OF AMERICA | JUDGMENT IN A CRIMINAL CASE |
|---|---|

v.

**MICHAEL JAMESON CHAND**

Case Number: **2:21CR00158-1**

Defendant's Attorney: Hootan Baigmohammadi, Assistant Federal Defender

**THE DEFENDANT:**

[✓]  pleaded guilty to count   1   of the Indictment.

[ ]  pleaded nolo contendere to count(s) ___ , which was accepted by the court.

[ ]  was found guilty on count(s) ___ after a plea of not guilty.

The defendant is adjudicated guilty of these offenses:

| Title & Section | Nature of Offense | Offense Ended | Count |
|---|---|---|---|
| 18 U.S.C. § 2261A(2)(B) | Cyberstalking (Class D Felony) | 11/30/2020 | 1 |

The defendant is sentenced as provided in pages 2 through  7  of this judgment. The sentence is imposed pursuant to the Sentencing Reform Act of 1984.

[ ]  The defendant has been found not guilty on count(s) ___ .

[ ]  Count(s) ___ dismissed on the motion of the United States.

[ ]  Indictment is to be dismissed by District Court on motion of the United States.

[✓]  Appeal rights given.          [✓]    Appeal rights waived.

It is ordered that the defendant must notify the United States attorney for this district within 30 days of any change of name, residence, or mailing address until all fines, restitution, costs, and special assessments imposed by this judgment are fully paid. If ordered to pay restitution or fine, the defendant must notify the court and United States attorney of material changes in economic circumstances.

**2/11/2025**

Date of Imposition of Judgment

/s/ John A. Mendez

Signature of Judicial Officer

**John A. Mendez**, Senior U. S. District Judge

Name & Title of Judicial Officer

2/19/2025

Date

AO 245B-CAED (Rev. 09/2019) Sheet 4 - Probation

DEFENDANT: **MICHAEL JAMESON CHAND**                                                    Page 2 of 7
CASE NUMBER: **2:21CR00158-1**

## PROBATION

You are hereby sentenced to probation for a term of:
36 months.

## MANDATORY CONDITIONS

You must not commit another federal, state or local crime.
You must not unlawfully possess a controlled substance.
You must refrain from any unlawful use of controlled substance. You must submit to one drug test within 15 days of placement on probation and at least two (2) periodic drug tests thereafter, not to exceed four (4) drug tests per month.

[ ]    The above drug testing condition is suspended, based on the court's determination that you pose a low risk of future substance abuse.

[✔]    You must cooperate in the collection of DNA as directed by the probation officer.

[ ]    You must comply with the requirements of the Sex Offender Registration and Notification Act (34 U.S.C. § 20901, *et seq.*) as directed by the probation officer, the Bureau of Prisons, or any state sex offender registration agency in the location where you reside, work, are a student, or were convicted of a qualifying offense.

[ ]    You must participate in an approved program for domestic violence.

[✔]    You must make restitution in accordance with 18 U.S.C. §§ 2248, 2259, 2264, 2327, 3663, 3663A, and 3664.

You must pay the assessment imposed in accordance with 18 U.S.C. § 3013.
If this judgment imposes a fine, you must pay in accordance with the Schedule of Payments sheet of this judgment.
You must notify the court of any material change in your economic circumstances that might affect your ability to pay restitution, fines, or special assessments.

You must comply with the standard conditions that have been adopted by this court as well as with any other conditions on the attached page.

Page 4 of 7

Case 2:24-cr-00163-TS     Document 156-1     Filed 04/17/26     PageID.8104     Page 123 of 156
Case 2:21-cr-00158-JAM     Document 94     Filed 02/19/25     Page 4 of 7

AO 245B-CAED (Rev. 09/2019) Sheet 4 - Probation

DEFENDANT: **MICHAEL JAMESON CHAND**
CASE NUMBER: **2:21CR00158-1**

## SPECIAL CONDITIONS OF PROBATION

1.  You must submit your person, property, house, residence, vehicle, papers, computer, other electronic communications or data storage devices or media, or office, to a search conducted by a United States probation officer or any law enforcement officer at any time, based upon reasonable suspicion of unlawful conduct or a violation of a condition of supervision, without a search warrant. Failure to submit to a search may be grounds for revocation. You must warn any other occupants that the premises may be subject to searches pursuant to this condition.

2.  Your residence must be pre-approved by the probation officer.

3.  You must participate in an outpatient substance abuse/alcohol abuse treatment program and follow the rules and regulations of that program. The probation officer, in consultation with the treatment provider, will supervise your participation in the program.

4.  You must submit to substance abuse/alcohol abuse testing to determine if you have used a prohibited substance. You must not attempt to obstruct or tamper with the testing methods.

5.  You must participate in an outpatient mental health treatment program and follow the rules and regulations of that program. The probation officer, in consultation with the treatment provider, will supervise your participation in the program.

6.  You must take all mental health medications, which may include oral and/or injectable psychotropic medications, that are prescribed to you by your treating physician.

7.  You must not communicate or otherwise interact with C.W., either directly or through someone else, without first obtaining the permission of the probation officer.

8.  You will be monitored for a period of up to 6 months, with location monitoring technology, which may include the use of Radio Frequency (RF), Global Positioning System (GPS) devices, Voice Recognition or Virtual Monitoring Technology, at the discretion of the probation officer, and comply with its requirements.
    The location monitoring technology will be used to monitor the following restriction on your movement in the community: You are restricted to your residence at all times except for employment, education, religious services, medical, substance abuse, or mental health treatment, attorney visits, court appearances, court-ordered obligations, or other activities in advance as pre-approved by the supervising officer. (home detention)
    You must follow the rules and regulations of the location monitoring program. Your co-payment will be determined utilizing a Sliding Fee Scale based on your disposable income.

9.  You must not possess or use a computer or any device that has access to any "on-line computer service" unless approved by the probation officer. This includes any Internet service provider, bulletin board system, or any other public or private computer network.

10. You must consent to the probation officer and/or probation service representative conducting periodic unannounced examinations of (a) any computer, or (b) computer-related device, or (c) equipment that has an internal or external modem that is connected to the internet which is in your possession or control. You must consent to retrieval and copying of all data from any such computer, computer-related device, or equipment as well as any internal or external peripherals to ensure compliance with this condition. You consent to removal of such computer, computer-related device, and equipment for purposes of conducting a more thorough inspection, and analysis.

11. You must possess and use only those cellular phones and phone numbers (including Voice over Internet Protocol [VoIP] services) that have been disclosed to the probation officer upon commencement of supervision. Any changes or additions are to be disclosed to the probation officer prior to the first use.

12. You must make payments toward any unpaid criminal monetary penalty in this case during supervised release at the rate of at least 10% of your gross monthly income. Payments are to commence no later than 60 days from placement on supervision. This payment schedule does not prohibit the United States from collecting through all available means any unpaid criminal monetary penalty at any time, as prescribed by law.

13. You must participate in a co-payment plan for treatment, testing and/or medication and shall make payment directly to the vendor under contract with the United States Probation Office. Your co-payment will be determined utilizing a Sliding Fee Scale based upon your disposable income.

AO 245B-CAED (Rev. 09/2019) Sheet 5B - Criminal Monetary Penalties

DEFENDANT: **MICHAEL JAMESON CHAND**                                                                 Page 6 of 7
CASE NUMBER: **2:21CR00158-1**

## RESTITUTION PAYMENTS

Restitution of $8,025.70 to:

| C.W. | MONTANA CRIME VICTIM COMPENSATION PROGRAM |
|---|---|
| ARLEE, MT 59821 | HELENA, MT 59620 |
| $3,900.00 | $4,125.70 |



**U.S. Department of Justice**

*United States Attorney*
*Eastern District of Virginia*

---

| | | | |
|---|---|---|---|
| *Alessandra P. Serano* | *Vanessa Strobbe* | *Office Location:* | *DIRECT: 703-299-3768* |
| *Assistant United States Attorney* | *Assistant United States Attorney* | *2100 Jamieson Ave.* | *MAIN: 703-299-3700* |
| *Alessandra.serano@usdoj.gov* | *vanessa.strobbe@usdoj.gov* | *Alexandria, VA 22314* | |

December 8, 2025

✓ FILED ___ ENTERED
___ LOGGED ___ RECEIVED

3:24 pm, Dec 15 2025
AT BALTIMORE
CLERK, U.S. DISTRICT COURT
DISTRICT OF MARYLAND
BY ___ KMT ___ Deputy

Andrew White, Esq.
Jonathan Fahey, Esq.

Re:    United States v. Richard Michael Roe,
       Criminal No. 24-cr-200-BAH

Dear Counsel:

This letter, together with the Sealed Supplement, confirms the plea agreement (this "Agreement") that has been offered to your client, Richard Roe (hereinafter "Defendant"), by the United States Attorney's Office for the Eastern District of Virginia ("this Office") as the District of Maryland is recused from this case. If the Defendant accepts this offer, please have the Defendant execute it in the spaces provided below. **The plea agreement is entered into and will be submitted to the Court pursuant to Federal Rule of Criminal Procedure 11(c)(1)(C).** If this offer has not been accepted by December 8, 2025, it will be deemed withdrawn. The terms of the Agreement are as follows:

### Offense of Conviction

1.     The Defendant agrees to plead guilty to Counts 2-6 of the Indictment filed against him, which each count charges the Defendant with Making Harassing Phone Calls in violation of 47 U.S.C. § 223(a)(1)(C). The Defendant admits that the Defendant is, in fact, guilty of the offenses and will so advise the Court.

### Elements of the Offense

2.     The elements of the offenses to which the Defendant has agreed to plead guilty, and which this Office would prove if the case went to trial, are as follows: that on or about and between January 2020 and continuing to on or about January 2021, in the District of Maryland, and elsewhere (1) in interstate or foreign communications, the Defendant made repeated telephone calls or utilized a telecommunication device such as the Internet, (2) without disclosing his identity; and (3) with the intent to abuse, threaten or harass any specific person.

Rev. August 2018



Penalties

3.      The maximum penalties provided by statute for the offenses to which the Defendant is pleading guilty are as follows:

| Counts | Statute | Minimum Prison | Maximum Prison | Supervised Release | Maximum Fine | Special Assessments |
|---|---|---|---|---|---|---|
| 2-6 (penalties for each count) | 47 U.S.C. § 223(a)(1)(C) | N/A | 2 years | 1 year | $250,000 | $100 |

      a.      Prison: If the Court orders a term of imprisonment, the Bureau of Prisons has sole discretion to designate the institution at which it will be served.

      b.      Supervised Release: If the Court orders a term of supervised release, and the Defendant violates the conditions of supervised release, the Court may order the Defendant returned to custody to serve a term of imprisonment as permitted by statute, followed by an additional term of supervised release.

      c.      Restitution: The Court shall order the Defendant to pay full restitution pursuant to 18 U.S.C. §§ 2264, 3663, 3663A, and/or 3664.

      d.      Payment: If a fine or restitution is imposed, it shall be payable immediately, unless the Court orders otherwise under 18 U.S.C. § 3572(d). The Defendant may be required to pay interest if the fine is not paid when due.

      e.      Forfeiture: The Court may enter an order of forfeiture of assets directly traceable to the offense, substitute assets, and/or a money judgment equal to the value of the property subject to forfeiture.

      f.      Collection of Debts: If the Court imposes a fine or restitution, this Office's Financial Litigation Unit will be responsible for collecting the debt. If the Court establishes a schedule of payments, the Defendant agrees that: (1) the full amount of the fine or restitution is nonetheless due and owing immediately; (2) the schedule of payments is merely a minimum schedule of payments and not the only method, nor a limitation on the methods, available to the United States to enforce the judgment; and (3) the United States may fully employ all powers to collect on the total amount of the debt as provided by law. Until the debt is paid, the Defendant agrees to disclose all assets in which the Defendant has any interest or over which the Defendant exercises direct or indirect control. Until the money judgment is satisfied, the Defendant authorizes this Office to obtain a credit report in order to evaluate the Defendant's ability to pay, and to request and review the Defendant's federal and state income tax returns. The Defendant agrees to complete and sign a copy of IRS Form 8821 (relating to the voluntary disclosure of federal tax return information) and a financial statement in a form provided by this Office.

Rev. August 2018

involvement in the offense; (iv) is untruthful with the Court, this Office, or the United States Probation Office; (v) obstructs or attempts to obstruct justice prior to sentencing; (vi) engages in any criminal conduct between the date of this Agreement and the date of sentencing; (vii) attempts to withdraw the plea of guilty; or (viii) violates this Agreement in any way.

7.     There is no agreement as to the Defendant's criminal history and the Defendant understands that the Defendant's criminal history could alter the Defendant's offense level. Specifically, the Defendant understands that the Defendant's criminal history could alter the final offense level if the Defendant is determined to be a career offender or if the instant offense was a part of a pattern of criminal conduct from which the Defendant derived a substantial portion of the Defendant's income.

8.     Other than as set forth above, no other offense characteristics, sentencing guidelines factors, potential departures or adjustments set forth in the United States Sentencing Guidelines are in dispute or will be raised in calculating the advisory guidelines range.

## Rule 11 (c) (1) (C) Plea

9.     The parties stipulate and agree pursuant to Federal Rule of Criminal Procedure 11(c)(1)(C) that a **term of probation for five years** is the appropriate disposition of this case taking into consideration the nature and circumstances of the offense, the Defendant's criminal history, and all of the other factors set forth in 18 U.S.C. § 3553(a). This Agreement does not affect the Court's discretion to impose any lawful fine, order of restitution, or to set any lawful conditions of probation, other than incarceration. In the event that the Court rejects this Agreement, except under the circumstances noted below, either party may elect to declare the Agreement null and void. Should the Defendant so elect, the Defendant will be afforded the opportunity to withdraw his plea pursuant to the provisions of Federal Rule of Criminal Procedure 11(c)(5). The parties agree that if the Court finds that the Defendant engaged in obstructive or unlawful behavior and/or failed to acknowledge personal responsibility as set forth herein, neither the Court nor the Government will be bound by the specific sentence contained in this Agreement, and the Defendant will not be able to withdraw his plea.

### Obligations of the Parties

10.     At the time of sentencing, the parties will request that the Court impose a sentence of **five years probation**. This Office and the Defendant reserve the right to otherwise advocate for a fine and conditions of supervision considering any appropriate factors under 18 U.S.C. § 3553(a). At the time of sentencing, this Office will move to dismiss any open counts against the Defendant.

11.     This Office and the Defendant reserve the right to bring to the Court's attention all information with respect to the Defendant's background, character, and conduct that this Office or the Defendant deem relevant to sentencing, including the conduct that is the subject of any counts of the Indictment.

Rev. August 2018

5

If the Defendant fully accepts each and every term and condition of this Agreement, please sign and have the Defendant sign the original and return it to me promptly.

Very truly yours,

LINDSEY HALLIGAN
UNITED STATES ATTORNEY AND
SPECIAL ATTORNEY

TODD W. BLANCHE
DEPUTY ATTORNEY GENERAL

ROBERT K. MCBRIDE
FIRST ASSISTANT UNITED STATES
ATTORNEY

_____
Alessandra P. Serano
Vanessa Strobbe
Special Attorneys Acting Under Authority Conferred by
28 U.S.C. § 515

I have read this Agreement, including the Sealed Supplement, and carefully reviewed every part of it with my attorney. I understand it and I voluntarily agree to it. Specifically, I have reviewed the Factual and Advisory Guidelines Stipulation with my attorney and I do not wish to change any part of it. I am completely satisfied with the representation of my attorney.

12-8-2025
_____          _____
Date                                                              Defendant

I am the Defendant's attorney. I have carefully reviewed every part of this Agreement, including the Sealed Supplement with the Defendant. The Defendant advises me that the Defendant understands and accepts its terms. To my knowledge, the Defendant's decision to enter into this Agreement is an informed and voluntary one.

12/8/2025
_____          _____
Date                                                              Counsel for Defendant

Rev. August 2018

9



## ATTACHMENT A
## STIPULATION OF FACTS

*The undersigned parties stipulate and agree that if this case had proceeded to trial, this Office would have proven the following facts beyond a reasonable doubt. The undersigned parties also stipulate and agree that the following facts do not encompass all of the evidence that would have been presented had this matter proceeded to trial.*

On or about and between January 2020 and January 2021, in interstate or foreign communications, as defined by 47 U.S.C. §153(21) and (28), the Defendant, initiated numerous phone calls and other communications using a telecommunication device for the purpose of harassing Victims 1, 2, 3, 4, 6, and Victim Businesses 1 and 2 (collectively "victims"). Defendant used various programs such as Prankowl and PrankDial and VPN programs to mask his true identity and make it appear that someone else was making the calls, texts, messages, and other communications toward the victims. The messages were sent to each victim for the purpose of harassing each of them would sometimes contain personal and private information about the victim's location, what the victim was doing or other personal information such as commenting on Victim 1's father's death, the license plate of a car the person was driving, credit card numbers, and email addresses.

For example, on April 4, 2020, Roe sent the following text message to Victim 1: "2012 Ford Escape!!! License plate [license plate redacted]!!!! Just walked right past that crap car Danny!!!!"

A second example is on July 28, 2020, Roe sent the following message to Victim 1 and others:

"mike we all know u have a pi stalking leenzy and the [last name redacted] and danny!!!! Its so obvious!!!! How else would u know about leenzy hiding danny from u???? or her sleeping at [address redacted]???? how would u know about danny??? Or Paris??? Or there inn at[location redacted]??? Joe and danny dog??? That leenzys entire fam but mostly pat is paying for her lawyer????? where leenzy was on new years or Jan 3 and 4???? her new email [email redacted]??? danny poundin her out after watching lsu clemson???? Leenz going to post Malone concert???? watching super bowl with mc's friends???? her newest insta and fbook friends???? her family and friends criminal records???? how dolled up she got for dannys bday???? how quickly she told danny she loved him???? how quickly she met his family??? The Easter zoom with the [family name] and [family name] which Danny was on???? leenzy hangouT for Laura [last name redacted] bday???

Another example, on August 18, 2020, Roe sent the following text message to Victim 1 about her father's death:

"mike r u goin to ed [last name redacted] viewing and mass on the 20th???? Thursday!!!! u know leenzys dad passed away on the 13th???? danny will be there!!!! u should come!!!! does that explain leenzys3 vacation last week???? and dannys?????"

Rev. August 2018

1



On August 19, 2020, Roe sent the following text message to Victim 1 about her father's death:

"mike and danny please RSVP for tomorrow!!!!! Mass and Visitation: [name of church redacted ] to follow at: [name redacted] Cemetery"

On August 28, 2020, Roe sent the following text message to Victim 1 about her father's death:

"mikey loves aug 20 2020 cuz it's the day leenzy dropped her dad in a hole 6ft down!!!! leenzy loves aug 20 2021 cu shell be dannys date for rhiners wedding!!!!"

The series of calls, texts, and other communications made by Roe towards the victims caused harm to each of them.. Roe filed frivolous police reports alleging that it was Victim 1 who was harassing him. Roe also sought an order for protection in New York (where he was living) against Victim 1 that caused her to hire an attorney to defend against the proceeding. After Victim 6 reported the harassment by Roe to law enforcement, Roe increased the harassment towards Victim 6. The two Victim Businesses were overwhelmed by Roe's communications.

On June 20, 2020, Roe sent the following text message to Victim 1:

"Leenz!!!! Watchout!!!! Big hedge fund guy said hell spend every dollar he has destroying u and ur family!!!! u no mike is a resentful and spiteful pig!!!! U no hell do it!!!!! how big are Patrickc, Linda, and helens wallets????? Look like U will need it!!!! danny really should help!!!! everyone knows how much they pay people at millennium!!!!! It's not [Victim Business name redacted] pay tho!!!!!! or [Victim Business name redacted]!!!!!"

For the relevant time period, all of the victims were residents of the District of Maryland.

//

//

//

//

//

//

//

//

Rev. August 2018

2

SO STIPULATED:

_____
Alessandra P. Serano
Vanessa Strobbe
Special Attorneys Acting Under Authority
Conferred by 28 U.S.C. § 515

_____
Defendant

_____
Counsel for Defendant

Rev. August 2018

3

**UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF TEXAS**
**SAN ANTONIO DIVISION**

UNITED STATES OF AMERICA,

    *Plaintiff*,

v.                               Case No.  **SA-23-CR-00238-JKP**

**(1) ASHLEY TANYA GARCIA,**

    *Defendant*.

## MEMORANDUM OPINION AND ORDER

Before the Court is Defendant Ashley Tanya Garcia's Motion to Dismiss the Indictment. *See* ECF No. 34. The Government filed a response and Garcia filed a reply. *See* ECF Nos. 35, 36. After due consideration of the parties' briefings, legal arguments, and the applicable law, the Court **DENIES** the motion. *See* ECF No. 34.

## BACKGROUND

Defendant Ashley Tanya Garcia is charged with one Count of Cyberstalking, in violation of 18 U.S.C. § 2261A(2), and one Count of Identity Theft, in violation of 18 U.S.C. § 1028(a)(7). *See* ECF No. 12. The U.S. Government alleges that, between December 2020 and November 2022, Garcia registered 18 website domains, all variations on the victim's name and the terms which relate to the victim's employment and his alma mater. *See* Gov't Exhibit 1 (FBI GJ Serial 2, Report of Google Subpoena Returns). Garcia is alleged to have posted "blog entries" at these domains, and numerous other domains, relating to the victim. In total, the Government alleges Garcia posted over 750 blog entries just on the domains that used the victim's name. *See* Gov't Exhibit 2. As of the time of the Government's filing of its response brief, a Google search for the

victim's name returned websites owned and operated by Garcia, referring to the victim. *See* Gov't Exhibit 3.

According to the Government, on or about March 28, 2020, Garcia sent an email to the victim's employers entitled, "[C.K.] posts pictures of his penis and masturbates for people on Reddit…." *See* Gov't Exhibit 4. Garcia allegedly told the victim her intent was to "ruin your fucking life." *See* Gov't Exhibit 5. She also allegedly stated she hoped his employer "has a morality clause," implying that she hoped he would lose his job, "[a]nd that everyone in finance hears about your firing. You'll never work again lol." *See* Gov't Exhibit 6. Her animus was allegedly expressed in another message to the victim in which she stated she hoped he would "rot in hell you piece of shit." *See* Gov't Exhibit 7. Garcia is also accused of creating several social media accounts using the victim's name and picture, including on Facebook, Instagram and Twitter accounts. *See* Gov't Exhibit 8.

Garcia brings the instant motion arguing the Court should dismiss the indictment because, as to Count 1, § 2261A(2) is unconstitutional both facially and as applied to Garcia and, as to Count 2, the Government failed to state a viable § 1028(a)(7) offense against Garcia and, in the alternative, § 1028(a)(7) is unconstitutional as applied to Garcia. For the reasons discussed herein, the Court disagrees.

**LEGAL STANDARD**

Federal Rule of Criminal Procedure 12 provides that "[a] party may raise by pretrial motion any defense, objection, or request that the court can determine without a trial of the general issue." Fed. R. Crim. P. 12(b)(1). If a pretrial motion presents a question of law in a case involving undisputed facts, Rule 12 authorizes the court to rule on the motion. *United States v. Flores*, 404 F.3d 320, 325 (5th Cir. 2005); *see* Fed. R. Crim. P. 12(d) (permitting the court to rule

2

on a motion involving factual issues provided the court states its essential findings on the record); *see also, United States v. Hall*, 20 F.3d 1084, 1087 (10th Cir. 1994) ("a pretrial dismissal is essentially a determination that, as a matter of law, the government is incapable of proving its case beyond a reasonable doubt."). Otherwise, the court would waste resources by allowing a case to proceed to trial and later dismissing it based on the same legal argument and facts presented through a pretrial motion. *See Flores*, 404 F.3d at 325.

## DISCUSSION

### I.       Count 1: Cyberstalking under § 2261A(2)

Count 1 charges Garcia with cyberstalking under 18 U.S.C. § 2261A(2). Garcia offers four reasons why the Court should dismiss this count: (1) the statute is facially unconstitutional under the First Amendment; (2) the Fifth Circuit narrowed the statute's application to "true threats" in *United States v. Conlan* and Garcia's alleged statements do not constitute true threats; (3) the statute is void for vagueness; and (4) the Government has failed to state a cognizable offense. The Court considers each of these arguments, in turn, below.

#### A.       First Amendment Facial Challenge

Garcia argues § 2261A(2) is facially unconstitutional because it criminalizes First Amendment protected speech. The First Amendment provides, in relevant part, "Congress shall make no law … abridging the freedom of speech…." U.S. Const. Amend. I. "[A]s a general matter, the First Amendment means the government has no power to restrict expression because of its message, its ideas, its subject matter, or its content." *United States v. Stevens*, 559 U.S. 460, 468 (2010). This broad pronouncement is subject to certain exceptions, including for incitement, obscenity, defamation, fighting words, child pornography, speech integral to criminal conduct, and true threats. *United States v. Alvarez*, 567 U.S. 709, 717 (2012). Courts determine whether a

3

activity." Furthermore, the requirement that the unlawful activity constitutes a violation of Federal law or a felony under State or local law sufficiently discourages arbitrary or discriminatory enforcement. The Court, therefore, finds the statute is not impermissibly vague and rejects Garcia's "void for vagueness" argument as to this count.

**CONCLUSION**

For the reasons discussed, the Court **DENIES** Defendant Ashley Tanya Garcia's Motion to Dismiss the Indictment. *See* ECF No. 34.

It is so ORDERED.
SIGNED this 12th day of January, 2024.


_____
JASON PULLIAM
UNITED STATES DISTRICT JUDGE

# UNITED STATES DISTRICT COURT
## WESTERN DISTRICT OF TEXAS
### SAN ANTONIO DIVISION

UNITED STATES OF AMERICA

v.

ASHLEY TANYA GARCIA

Defendant.

Case Number: 5:23-CR-00238-JKP(1)
USM Number: 52585-510

## JUDGMENT IN A CRIMINAL CASE
### (For Offenses Committed On or After November 1, 1987)

The defendant, **ASHLEY TANYA GARCIA,** was represented by Marina Thais Douenat, Esq.

On motion of the United States, the Court has dismissed the remaining Count(s) as to this defendant.

The defendant pled guilty to **Count(s) One (1)** of the **Superseding Information** on April 17, 2024. Accordingly, the defendant is adjudged guilty of such Count(s), involving the following offense(s):

| Title & Section | Nature of Offense | Offense Ended | Count |
|---|---|---|---|
| 18 U.S.C. §§ 1028(a)(4) and (b)(6) | Fraud in Connection with Identification Documents, Authentication Features, and Information | 04/05/2023 | One (1) |

As pronounced on April 17, 2024, the defendant is sentenced as provided in pages 2 through 5 of this Judgment. The sentence is imposed pursuant to the Sentencing Reform Act of 1984.

It is further ordered that the defendant shall notify the United States Attorney for this district within 30 days of any change of name, residence, or mailing address until all fines, restitution, costs, and special assessments imposed by this judgment are fully paid. If ordered to pay restitution, the defendant must notify the Court and United States Attorney of material changes in economic circumstances.

Signed this 18th day of April, 2024.

_____
**JASON K. PULLIAM**
**United States District Judge**

DEFENDANT:          ASHLEY TANYA GARCIA
CASE NUMBER:        5:23-CR-00238-JKP(1)

## PROBATION

The defendant is hereby placed on probation for a term of *five (5) years.*

While on probation, the defendant shall comply with the mandatory and standard conditions that have been adopted by this Court on November 28, 2016, and shall comply with the following additional conditions:

1.  The defendant shall not communicate, or otherwise interact with victim (C.K.), or the victim's family, friends, colleagues, employers, or Snowcap Research, either directly or through someone else, without first obtaining the permission of the probation officer.

2.  You must allow the probation officer to install computer monitoring software on any computer [as defined in 18 U.S.C. § 1030(e)(1)], or other electronic communications or data storage devices or media, to a search.

3.  The defendant shall participate in a mental health treatment program and follow the rules and regulations of that program. The probation officer, in consultation with the treatment provider, shall supervise participation in the program (provider, location, modality, duration, intensity, etc.). The defendant shall pay the costs of such treatment if financially able.

4.  The defendant shall take all mental health medications that are prescribed by the treating physician.

5.  The defendant shall not disseminate any communication or information, in narrative or imagery, related to the victim, C.K., in any form (including but not limited to: paper, internet, email, blogging, etc.).

6.  The defendant shall cease and desist the maintaining of any and all of the web domains purchased as part of the instant offense.

7.  To ensure compliance with the computer monitoring condition, when there is reasonable suspicion, the defendant shall allow the probation officer to conduct initial and periodic unannounced searches of any computers (as defined in 18 U.S.C. § 1030(e)(1)) subject to computer monitoring. These searches shall be conducted for the purposes of determining whether the computer contains any prohibited data prior to installation of the monitoring software; to determine whether the monitoring software is functioning effectively after its installation; and to determine whether there have been attempts to circumvent the monitoring software after its installation. The defendant shall warn any other people who use these computers that the computers may be subject to searches pursuant to this condition.

8.  The defendant shall reside in a residential reentry center for a term of 180 days. The defendant shall follow the rules and regulations of the center.

Case 2:24-cr-00163-TS    Document 89-1    Filed 09/30/25    PageID.801    Page 1 of 11

FELICE JOHN VITI, Acting United States Attorney (#7007) FILED IN UNITED STATES DISTRICT
JOEY L. BLANCH, Assistant United States Attorney (#16665)    COURT, DISTRICT OF UTAH
Attorneys for the United States of America
Office of the United States Attorney                SEP 3 0 2025
111 South Main Street, Suite 1800
Salt Lake City, Utah 84111-2176                          GARY P. SERDAR
Telephone: (801) 524-5682                  BY ___ CLERK OF COURT
                                                      DEPUTY CLERK

## IN THE UNITED STATES DISTRICT COURT

## DISTRICT OF UTAH

| UNITED STATES OF AMERICA, | Case No. 2:24-CR-00163-TS |
|---|---|
| Plaintiff, | STATEMENT BY DEFENDANT IN ADVANCE OF PLEA OF GUILTY AND PLEA AGREEMENT PURSUANT TO FED. R. CRIM. P. 11(c)(1)(C) |
| vs. | |
| KAILIN WANG, | |
| Defendant. | Judge Ted Stewart |

I hereby acknowledge and certify that I have been advised of and that I understand the following facts and rights, and that I have had the assistance of counsel in reviewing, explaining, and entering into this agreement:

1.    As part of this agreement with the United States of America, I intend to plead guilty to Counts 1 and 2 of the Indictment. My attorney has explained the nature of the charges against me, and I have had an opportunity to discuss the nature of the charges with my attorney. I understand the charges and what the United States is required to prove in order to convict me. The elements of Counts 1 and 2, both of which charge Cyberstalking, in violation of 18 U.S.C. § 2261A, are:

> (a) the defendant used facilities of interstate and foreign commerce, including an electronic communication service and/or an interactive computer service;

> (b) the defendant used the facility of interstate commerce to engage in a course of conduct – that is, a pattern of conduct composed of two or more acts, evidencing a continuity of purpose;

Case 2:24-cr-00163-TS    Document 89-1    Filed 09/30/25    PageID.804    Page 4 of 11

11.    I stipulate and agree that the following facts accurately describe my conduct. These facts provide a basis for the Court to accept my guilty plea:

At all relevant times, I was a resident of the District of Utah.

In 2017, I connected with Victim 2 on a social media site. We did not form a romantic or dating relationship. Nevertheless, beginning in and around September 2017 and continuing until at least 2019, I engaged in a course of conduct intended to harass and intimidate Victim 2 and his friends.

In order to harass and intimidate Victim 2, I used multiple email accounts, social media accounts, and phone numbers to send numerous derogatory and defamatory messages, texts and other communications to him. I sent similar messages and other communications about Victim 2 to his friends and posted harassing and defamatory things about him on public Internet sites. For example:

- On May 16, 2019, and again on June 15, 2019, I used the Internet to report Victim 2 to the federal Internet Crimes Complaint Center ("IC3"). In these reports, I claimed that Victim 2 had impersonated me online and posted defamatory and harassing statements on the Internet about me. I made the reports in order to have Victim 2 investigated by law enforcement in order to continue harassing and intimidating him.

In 2018, I met Victim 1 on a social media site. We had a brief sexual relationship resulting in the birth of a child ("Minor-1"). Beginning in or around December 2018 and continuing until at least 2020, I engaged in a course of conduct intended to harass and intimidate Victim 1 and his family.

In order to harass and intimidate Victim 1, I used multiple email accounts, social media accounts, and phone numbers to make numerous derogatory posts about Victim 1 on public Internet sites. I tagged him in these posts to to ensure he saw them, and to ensure anyone reading the posts would connect them to Victim 1. I also sent numerous derogatory messages, texts and other communications about him to his friends and families and posted harassing and derogatory things about them on public Internet sites. For example,

4

- On May 16, 2019, and again on June 15, 2019, I used the Internet to report Victim 1 to the federal Internet Crimes Complaint Center ("IC3"). In these reports, I claimed that Victim 1 had impersonated me online and posted defamatory and harassing statements on the Internet about me.  I made the reports in order to have Victim 1 investigated by law enforcement in order to continue harassing and intimidating him.

As a result of sending these messages and making these posts, I caused Victims 1 and 2 and their friends and families substantial emotional distress.

I understand that the Internet is a means and facility of interstate and foreign commerce.

12.     The only terms and conditions pertaining to this plea agreement between me and the United States are as follows:

a.   **Guilty Plea.** I will plead guilty to Counts 1 and 2 of the Indictment.

b.   **Stipulated Sentence.** Pursuant to Rule 11(c)(1)(C) of the Federal Rules of Criminal Procedure, the sentence imposed by the Court will be no less than a 5-year term of probation and no more than a term of imprisonment of 12 months, and if a term of imprisonment is imposed, it shall be followed by a 3-year term of supervised release; which I agree is a reasonable sentence.

(1)     I understand that this agreement, including my plea, the agreed upon sentence, and all other terms referenced herein, are subject to the approval of, and acceptance by the Court. I further understand that the Court will likely order the preparation of a Presentence Report to assist in the determination of whether this plea and the agreement are appropriate, and I agree to fully cooperate in the preparation of the Presentence Report.

(2)     If, after receiving all relevant information, the Court rejects the plea agreement and determines that a sentence different from the agreed upon sentence of no less than a 5-year term of probation and no more than a term of imprisonment of 12 months, I will have the right to withdraw the plea of guilty and the terms of this agreement will become null and void. Likewise, if the Court rejects the plea agreement and determines that the sentence should be less than a 5-year term of probation, and if a term of imprisonment is imposed, a term of supervised release less than 3 years, I understand that the United States will have the right to move to vacate this agreement, and all terms of this agreement will become null and void.

5

Case 2:24-cr-00163-TS    Document 89    Filed 09/30/25    PageID.806    Page 6 of 11

c. **Dismissal of Counts.** The United States agrees to move for leave to dismiss Counts 3 and 4 at the time of sentencing.

d. **Utah Case.** In addition to pleading guilty in this case (the "federal case"), I have also agreed to plead guilty in State of Utah v. Kailin Wang, Third District Court case number 211100167 (the "Utah case") pursuant to the following terms:

- I will plead guilty to Count 1 of the Utah case, amended to making false written statement in violation of Utah criminal code § 76-8-504, a Class B misdemeanor;
- I will plead guilty to Count 8 of the Utah case, which charges me with forgery in violation of Utah criminal code §76-6-501(2), a Class 3 felony, reduced to a Class A misdemeanor pursuant to Utah criminal code § 77-2.2.3;
- Counts 2-7 will be dismissed;
- The State will recommend a sentence to run concurrent with any period of incarceration imposed in the federal case, if any.

I understand that my guilty plea in the Utah case is an essential part of the agreement in the federal case. Notwithstanding paragraph 12(b)(2) above, I agree that if given the opportunity to plead guilty pursuant to those terms in the Utah case prior to the sentencing hearing in the federal case, and I do not do so, I may not withdraw my guilty pleas in the federal case and the United States will not be bound by its sentencing agreement and can seek up to the statutory maximum sentence.

e. **California Case.** The San Francisco District Attorney's Office agrees that if I plead guilty in the federal case and the Utah case as contemplated by this agreement, they will move to dismiss California v. Wang, Superior Court of the State of California, City and County of San Francisco, case numbers 19016407 and 24500827 (consolidated) (the "California case") after sentencing is imposed in the federal case. The parties agree that dismissal of the California case is an essential part of the agreement in the federal case.

f. **Motion to Revoke Pretrial Release** The government agrees to withdraw the motion to revoke pretrial release filed on June 4, 2025, at docket 76, and not to request that defendant be detained prior to sentencing, unless the defendant commits violations of her conditions of pretrial release that are currently unknown to the government.

g. **Relevant Conduct.** I understand and agree that the Presentence Report may include descriptions of conduct I engaged in which either was not charged against

I represent that the San Francisco District Attorney's Office has agreed to be bound by paragraph 12e of this plea agreement.

DATED this _26th_ day of ___September___, _2025_.

_____
DONALD DU BAIN
Assistant District Attorney
San Francisco District Attorney's Office

11

The Order of the Court is stated below:
Dated: November 10, 2025          /s/   DENISE M PORTER
        06:41:02 PM                    District Court Judge

IN THE FOURTH JUDICIAL DISTRICT COURT

UTAH COUNTY, STATE OF UTAH

| | |
|---|---|
| **STATE OF UTAH,**<br><br>Plaintiff,<br><br>vs.<br><br>**KAILIN WANG,**<br><br>Defendant. | **STATEMENT OF DEFENDANT IN SUPPORT OF GUILTY PLEA AND CERTIFICATE OF COUNSEL**<br><br>**Case No. 211100167**<br><br>**Judge DENISE PORTER** |

I, **KAILIN WANG** hereby acknowledge and certify that I have been advised of and that I

understand the following facts and rights:

### NOTIFICATION OF CHARGES

I am pleading guilty to the following crimes:

| | **Crime & Statutory Provision** | **Degree** | **Punishment Min/Max and/or Minimum Mandatory** |
|---|---|---|---|
| I | Making a Written False Statement<br>Utah Code §76-8-504 | MB | Up to 180 days in jail; $1,000 fine + 90% surcharge; and $53 court security fee. |
| VIII | Forgery<br>Utah Code §76-6-501(2) pursuant to § 77-2.2.3 | MA | Up to 364 days in jail; $2,500 fine + 90% surcharge; and $53 court security fee. |

I have received a copy of the Information against me. I have read it, or had it read to me,

(iii)         purports to have been executed at a time or place or in a numbered sequence other than was in fact the case, or to be a copy of an original when an original did not exist.

I understand that by pleading guilty I will be admitting that I committed the crimes listed above. I stipulate and agree that the following facts describe my conduct and the conduct of other persons for which I am criminally liable. These facts provide a basis for the court to accept my guilty pleas and prove the elements of the crime(s) to which I am pleading guilty:

*Count 1: On or about March 18, 2019, in Utah County, the defendant, Kailin Wang, knowingly created a false impression in a written application for a protective order by omitting information that would absolve the respondent of her accusation regarding the nude photograph.*

*Count 8: On or about December 23, 2020, in Utah County, defendant Kailin Wang issued a subpoena by repurposing a previously court-stamped form rather than obtaining a new blank subpoena form from the clerk as required under Utah R. Civ. P. 45(b)(2). The subpoena purported to be from the Fourth District Court and was directed to Menlo-Atherton Cooperative Nursery School for the records of her then 2-year-old son.*

*Defendant had authority pursuant to Judge Thomas Low's March 5, 2020 order in Case No. 194400718, which limited defendant's subpoena authority to:*

*"Petitioner [Defendant] may serve subpoenas on any Doctors, Pediatricians, etc., having treated, or is currently treating minor, KTW, including but not limited to; Hobble Creek Pediatrics, Utah Valley Pediatrics, and Stanford Health Care."*

*Menlo-Atherton Cooperative Nursery School is not a medical provider and falls outside the categories of authorized recipients specified in the Court's Order.*

**WAIVER OF CONSTITUTIONAL RIGHTS**

I am entering these pleas voluntarily. I understand that I have the following rights under the constitutions of Utah and the United States. I also understand that if I plead guilty I will give up all the following rights:

**Counsel:** I know that I have the right to be represented by an attorney and that if I cannot afford one, an attorney will be appointed by the court at no cost to me. I understand that I might

attorney and myself.  All the promises, duties, and provisions of the plea bargain, if any, are fully

contained in this statement, including those explained below:

- **The State agrees to amend count 1 to Making a False Written Statement, a Class B Misdemeanor, under § 76-8-504.**
- **The State agrees to amend count 8 to a Class A Misdemeanor under § 77-2.2.3 3.**
- **I agree to plead guilty to the amended counts 1 and 8, with the remaining charges dismissed.**
- **The State will recommend a sentence to run concurrent with any period of incarceration imposed in the federal case, if any.**
- **The State Agrees to continue sentencing on this matter until the Sentencing in the Federal Court occurs.**
- **If the Federal Court does not sentence to any period of incarceration, the Defendant agrees to be simultaneously on Utah State Probation as well as any Federal Probation.**

**Trial judge not bound.**  I know that any charge or sentencing concession or

recommendation of probation or suspended sentence, including a reduction of the charges for

sentencing, made or sought by either defense counsel or the prosecuting attorney are not binding

on the judge.  I also know that any opinions they express to me as to what they believe the judge

may do are not binding on the judge.

## DEFENDANT'S CERTIFICATION OF VOLUNTARINESS

I am entering this plea of my own free will and choice.  No force, threats, or unlawful

influence of any kind have been made to get me to plead guilty.  No promises except those

contained in this statement have been made to me.

I have read this statement, or I have had it read to me by an attorney, and I understand its

17 CR 14 LPS

filed in open court 10/23/18 MV

## EXHIBIT B

In March of 2014, Terence Yung interviewed with JOHN DOE 1 in a local coffee shop. Yung was applying for admission into Georgetown's law school and JOHN DOE 1 is an alumnus. Based on the interview, JOHN DOE 1 did not recommend Yung for admission, and Georgetown ultimately denied his application a week later.

Despite gaining admission to the University of Texas Law School (and a full-ride scholarship to attend), Yung embarked on an 18-month cyberstalking campaign against JOHN DOE 1. Therein, he repeatedly harassed and intimidated JOHN DOE 1 and his family. This course of conduct left John Doe 1 and his family in a constant state of fear.

Yung published false, violent and sadistic statements about his victims on the Internet – including descriptions of rape, lynching, sexual molestation, and graphic violence. Moreover, the defendant repeatedly posted personal ads on Craigslist and other websites with the intent that individuals interested in violent and sadistic sexual activity would go to the victims' residence in the middle of the night. Below are a number of examples of this course of conduct.

Beginning in July 9, 2015, JOHN DOE 1's home telephone number – which Yung had from his emails with JOHN DOE 1 – began to receive telephone calls from individuals seeking escort services.

On October 26, 2015, at approximately 2 a.m., an unknown white male came to the front door of his residence because he was "looking" for JOHN DOE 1's wife. JOHN DOE 1 told the man to go away and the man left. The following night (October 27, 2015), at some point after midnight, JOHN DOE 1 indicated that an unknown Asian male came to the front door of his residence and rang the doorbell. JOHN DOE 1 again told the man to leave and he did.

On October 28, 2015, at approximately 2 a.m., the New Castle County Police Department ("NCCPD") responded to a 911 call from JOHN DOE 1's next-door neighbor. The neighbor called 911 to report a suspicious individual ringing his doorbell late at night. NCCPD made contact with a young black male, outside of the residence. The young man told NCCPD that he had come to JOHN DOE 1's house to meet a female named "K" – the first name of JOHN DOE 1's wife – in response to a Craigslist ad in the "casual encounters" section. The young man then showed the police several emails he received; the title of the emails was "petite slut for BBC – w4m." The young man explained that "BBC" stands for "Big Black Cock" and "w4m"

1

means "women looking for men."   The Craigslist email for "K" was listed as yg4ch-5286804345@pers.craigslist.org; the name "Linda Corless" was associated with the email.   "Linda Corless" was a pseudonym that the defendant used throughout his campaign.

The FBI obtained records from Craigslist concerning this post, which was created on October 26, 2015, at 4:19:44 p.m. (Pacific time), and was linked to email account lindacorless333@gmail.com and Internet Protocol ("IP") address, 70.114.207.210.   A copy is below.

```
------- DATABASE ENTRY NUMBER 1 ------------------------------------------------

              posting_id: 5286804345
            poster_email: lindacorless333@gmail.com
                 user_id: 272878172
               poster_ip: 70.114.207.210
         auth_user_phone: n/a
          record_created: Mon Oct 26 2015 04:19:44 PM (Pacific)
             posted_date: Mon Oct 26 2015 05:17:44 PM (Pacific)
   posting_renewal_dates: n/a
         record_modified: Mon Oct 26 2015 06:14:26 PM (Pacific)
        area_description: delaware
     subarea_description: n/a
            neighborhood: n/a
         geographic_area: n/a
    category_description: casual encounters
           category_type: personals
               price/age: n/a
         invoice_item_id: n/a
                 privacy: anonymized email address
            posted_state: flagged off

           posting_title: petite slut for BBC - w4m

               PostingBody
               ============

I'm the type of girl you bring home to mom and on the way there I blow you
in the car.
My favorite position is to lie on my back and desperately holding my
panties to the side and have my right leg up in the air and my daddy
grabbing on to it with his strong hands against his chest. And I like my
toes sucked and moderately choked until I let go of my panties and cum.
After that I finish him off.
```

```
               Attributes
               ==========
```

2

This IP address is owned by Time Warner Cable. A subpoena to Time Warner revealed that on October 26, 2015, at 4:19 pm (Pacific) IP address 70.114.207.210 was associated with the defendant's then-address in Austin, Texas.

Based on subpoena results from Craigslist, the aforementioned email address (lindacorless333@gmail.com) and the defendant's IP address (70.114.207.210) were used to create two other postings around the same time period: (1) October 24, 2015 – for Wilmington, Delaware; (2) October 29, 2015, for Wilmington, Delaware. The latter states the following:

```
------- DATABASE ENTRY NUMBER 3 -------------------------------------------------

               posting_id: 5291744334
             poster_email: lindacorless333@gmail.com
                  user_id: 272878172
                poster_ip: 70.114.207.210
          auth_user_phone: n/a
   auth_user_phone_modify: n/a
           record_created: Thu Oct 29 2015 05:22:23 PM (Pacific)
              posted_date: Thu Oct 29 2015 06:57:55 PM (Pacific)
    posting_renewal_dates: n/a
          record_modified: Thu Oct 29 2015 07:27:07 PM (Pacific)
         area_description: delaware
      subarea_description: n/a
             neighborhood: n/a
          geographic_area: wilmington
     category_description: casual encounters
            category_type: personals
                price/age: 0
          invoice_item_id: n/a
                  privacy: anonymized email address
             posted_state: flagged off

            posting_title: i need a big strong man to punish me - w4m

                PostingBody
                ===========

i need a big strong man to dominate me tonight. i like it when a man puts
his hand around my throat and threatens me with a knife until i open my
mouth and suck him off. then you pull my hair and take out your gun and
threaten me until i let you put your cock and ram it inside of my pussy.
i'm a bad girl, and i need to be punished by a big strong man.
send me a picture with you holding your gun. all others will be ignored.
```

Based on Craigslist records, lindacorless333@gmail.com sent over 200 emails and received over 200 emails to individuals interested in the "petite slut – w4m" ad.

In addition to the postings on Craigslist, the defendant made repeated postings on a website called www.startclass.com – a self-described education site that provides information about colleges, medical schools and law schools. In particular, on

3

www.startclass.com, there is a page devoted to Georgetown Law.  On October 27, 2015, the defendant used the pseudonym "lindacorless333" to make a post on the site that tracks a number of key details regarding Yung and his interview with JOHN DOE 1 at a local coffee shop – except that Yung falsely described himself as a blonde female who was sexually molested during the encounter.

The defendant wrote variations of this coffee-shop molestation story about JOHN DOE 1 on other web pages and forums, including:  reddit, tumblr, the top-law-schools.com  forums,  jdunderground.com,  lawschooldiscussion.org,  and lawschooli.com.   He also posted similar complaints with the Better Business Bureau, falsely claiming that JOHN DOE 1 sexually molested and assaulted "Linda Corless" – the same pseudonym that he used in the Craigslist ads.

The defendant posted one of these false complaints on October 29, 2015.   The FBI was able to trace this posting to the IP address 204.64.50.212, which belongs to the Texas Attorney General's Office.   Records demonstrate that Yung worked as a law clerk at that office during that time; indeed, his time card showed that he worked that particular day.

### LAW CLERK DAILY/WEEKLY TIME SHEET
*Submit weekly to HRD -025 or via fax to (512) 397-1686*

Name: Terence Yung        Week of: 10/26/2015 Division: CMF

| Date mm/dd/yy | Time hr.quarter hour (.25, .50,.75) | AG # or Short Name | Activity Code* | Extra Description |
|---|---|---|---|---|
| 10/29/2015 | 4.5 | | | Work |
| | | | | |
| | | | | |
| | | | | |

Beginning in April 2015, the defendant created a series of phony LinkedIn profiles in the name of JOHN DOE 1.  The profile picture for this account is a Klansman holding a rifle with the Member Name "[JOHN DOE 1], Imperial Kludd at the Ku Klux Klan Llc."  Another LinkedIn account associated with JOHN DOE 1 was created in May, 2015.  The profile picture for this account is a different Klansman with the Member Name "[JOHN DOE 1], Imperial Kludd at the Ku Klux

4

Klan Llc."    In the "Summary" section, the page states "I WANT THE WHOLE WORLD TO KNOW I AM A KLANSMAN.   I AM PROUD OF MY WHITE, WHITE POWER, AND MY WHITE POWER WIFE AND MY WHITE POWER KIDS..."

The defendant also created a series of false Twitter pages associated with JOHN DOE 1 and his son, JOHN DOE 2.   One of these accounts was created on April 4, 2016, from the defendant's IP address.    A tweet from this account states that "I was raped by my Goergetown [sic] U interview," with a follow-up Tweet that JOHN DOE 1 "ruthlessly attacked and degraded me, leaving me with mental wounds that took years to heal."   The defendant also created a similar Twitter account on April 4, 2016, from his IP address with an image of a different woman.    A Tweet from this account falsely states that "JOHN DOE 1 held me down and fucked me while I said no, stop."

The defendant created another Twitter account in the name of JOHN DOE 1's son, JOHN DOE 2.   A copy of this page is shown below.    The account falsely indicated that JOHN DOE 2 was also a member of the Ku Klux Klan; the profile photo was taken from the infamous Zapruder film showing the assassination of President John F. Kennedy.



The defendant also created false Pinterest accounts in the name of JOHN DOE 1    For example, on July 2, 2015, the defendant created an account in the name of JOHN DOE 1's company.   That account included such phrases as "this country needs

5

to bring lynching back.   Beat those niggers. – [JOHN DOE 1], CFO."    The page includes several historical pictures of individuals who had been killed during lynchings.   The defendant created another account in the name of JOHN DOE 1's son, JOHN DOE 2, with identical content.

In April 2015, the defendant created a blog in the name of JOHN DOE 1.   Blog postings associated with this account include a violently graphic false story of JOHN DOE 1 abducting and raping an eight-year old girl.   An image is below.



## My first time with an underage girl

April 15, 2015April 19, 2015  |  ▮▮▮▮▮  |  ▮▮▮▮▮  <u>cock, dick, pedophile, rape, sick fuck, son of a bitch, underage</u>  |  <u>Leave a comment</u>

▮▮▮▮▮▮. So it's like this. I was forty years old and I had never fucked a girl. Me and my buddy ▮▮ ▮▮ went to the elementary school one day. He rounds up a little girl and says let's fuck. So I said

of 19                                                                 7/31/2015 2:41 PM

6

KKK White Power

yes. I said you have an incipient case of verbal diarrhea. But I want to fuck a little girl. I want to fuck her brains out.

So he has his guys take this little red read head at gun point. We take the kitchen knives and start to cut her clothes off. She starts to scream and cry. We tell her to shut the fuck up but you see she won't. So we take her little panties and stuff it in her mouth. That shuts her mouth up good.

I'm a sadistic fuck, so I take a cigar and torch her tits with it. She screams but we can't hear. Because we stuffed her mouth with panties.

She was only eight years old.

The defendant created false YouTube accounts in JOHN DOE 1's name. One such account created on January 8, 2016, and contains videos of women discussing being raped. There are also "playlists" in JOHN DOE 1's name, with titles such as "rape scenes" and "i hate niggers." Images are below.

7



Yung also used various emails to communicate with individuals associated with prostitution and fetish websites in order to harass and spy on JOHN DOE 1. Below is one example.

On January 7, 2016, the defendant created a FetLife account with the nickname of "Kaitlyn_gamma." Fetlife.com is a social networking website that serves people interested in bondage, discipline, sadism, and masochism ("BDSM"); fetishism; and kink. On its homepage, FetLife describes itself as, "like Facebook, but run by kinksters like you and me." Fetlife.com allows users to email each other and connect via SMS text messages. Based on a series of emails/text messages from January 2016, posing as "Kaitlyn" the defendant posted an ad in the "Philly/South Jersey/Delaware Personal Ads group." As set forth below, this account was used in attempts to have men go to the JOHN DOE 1 residence – similar to the Craigslist ads discussed above.

In a series of text messages, the defendant contacted a Fetlife user – i.e., a "slave" – about accomplishing a "task."

| | |
|---|---|
| From: | ▣ ▮-2696 < ▮@txt.voice.google.com> |
| To: | ▣ Lindacorless333 <lindacorless333@gmail.com> |
| Sent: | Mon Jan 11 2016 14:21:02 EST |
| Subject: | **SMS from** ▮-2696 |

Your in delaware mistress

What are your favorite fetishes and things to do to your slaves

I serve my mistress

| | |
|---|---|
| From: | ▣ ▮2696 < ▮@txt.voice.google.com> |
| To: | ▣ Lindacorless333 <lindacorless333@gmail.com> |
| Sent: | Wed Jan 13 2016 19:59:47 EST |
| Subject: | **SMS from** ▮-2696 |

Tell me bout my task

9

After the defendant supplied the Fetlife user with JOHN DOE 1's home address, the Fetlife user asked the following:

| | |
|---|---|
| From: | 2696 <@txt.voice.google.com> |
| To: | Lindacorless333 <lindacorless333@gmail.com> |
| Sent: | Thu Jan 14 2016 12:26:21 EST |
| Subject: | **SMS from** 2696 |

Who am I looking for mistress I'm here to serve my mistress Tell me about this person Tell me about yourself so I can serve u better Is this a lover or sub I'm following in order to blackmail Wats their name Wat do they look like R they dangerous I need to know so I can serve u better my wyeen

This Fetlife user was interviewed by the FBI on February 8, 2017.  The user indicated that, in his text messages with the defendant, he thought he was speaking with a woman who wanted him to "watch" a man – specifically, an ex-boyfriend.

The defendant also utilized the website "backpage" to create false postings about JOHN DOE 1.  www.backpage.com is a classified advertising website that contains a section for adult postings.  Escorts advertise on various pages depending on region.  A review of the Google gmail search warrant results showed that a number of false escort ads were created to harass JOHN DOE 1 Yung linked these ads with the JOHN DOE 1 home telephone number and/or the cellular telephone of his company.

For example, on March 26, 2016, a backpage ad was posted in "Seattle adult entertainment > Seattle escorts" for a "Sexy BLONDE college girl fun," which listed the JOHN DOE 1s' home telephone number as a means of contact.  A number of scantily clad (and semi-nude) photos of a blonde female were included in the ad.  Based on a subpoena response from www.backpage.com, this ad was created using the defendant's IP address.  A similar backpage post was made on the same day from the same email in the San Francisco location; it also listed the JOHN DOE 1s' home phone as a means of contact.

The next day, on March 27, 2016, the defendant placed an online obituary for JOHN DOE 1 on the obituariesfree.com website.

On or around August, 2016, Yung moved into a different residence in Austin, Texas.  Shortly after moving in, he obtained a new IP address with Time Warner Cable and used this address to further his cyberstalking campaign against JOHN DOE 1.

10

For example, beginning on or about September 25, 2016, the defendant created another blog at Wordpress in the name of JOHN DOE 1.   The initial post describes "JOHN DOE 1" as a "rape story writer, collector, and enthusiast."   Additional postings were added to this blog throughout October 2016, each of which appears as a story of rape committed by JOHN DOE 1 – including:    (1) one that was named after the Donald Trump Access Hollywood quote, (2) "No Means Yes," (3) "Who Cares What The Dumb B***h Thinks?" (4) "My first time with a boy," and (5) "Raping Miss Jones."

On October 12, 2016, the defendant used his new IP address to create another Twitter account in the name of JOHN DOE 1.   On page there are links to the JOHN DOE 1 Rape Stories WordPress blog site (referenced above), the stories set forth above, as well as various animated images of (naked) women being raped by animals and monsters.

11